1

2

3

4

5

6

7 **IN THE UNITED STATES DISTRICT COURT**

8 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

9

10 DAVID LAUGHING HORSE                    CASE NO. 09-cv-01977-BAM
   ROBINSON, ET AL.
11                    Plaintiffs,          **ORDER ON MOTIONS TO DISMISS**
                                           (Doc. 136, 137, 139)
12        vs.

13 KEN SALAZAR, ET AL.,

14                    Defendants.
   _____/

15

16        Three motions to dismiss pursuant to Fed.R.Civ.Proc. 12(b)(1) and 12(b)(6) are pending before

17 this Court: (1) motion by defendant Ken Salazar, in his capacity as the Secretary, U.S. Department of

18 the Interior (doc.136), (2) motion by County of Kern (doc. 137), and (3) motion by Tejon Mountain

19 Village, LLC and Tejon Ranch Corporation (doc. 139).  Plaintiffs David Laughing Horse Robinson and

20 Kawaiisu Tribe of Tejon filed oppositions, objections, and evidentiary support to their oppositions (see

21 Doc. 155, 161, 163).  Moving parties filed reply briefs and supporting evidence. (See Doc. 168, 170-173,

22 175.)  The parties consented to the conduct of all proceedings before the assigned Magistrate Judge.  The

23 Court conducted a hearing on the motions on December 12, 2011.  Plaintiffs appeared by telephone by

24 counsel Evan Granowitz. Defendant Ken Salazar appeared by telephone by counsel Barbara Marvin and

25 Barbara Coen.  Defendants Tejon Mountain Village, LLC and Tejon Ranch Corporation appeared by

26 telephone by counsel Jena MacLean and Benjamin Sharp.  Having considered the moving, opposition,

27 and reply papers, including supporting evidence and objections, as well as the argument of counsel and

28 the Court's file, the Court issues the following order.

1

<u>**FACTUAL OVERVIEW**</u>

2          The following factual overview is taken from the Second Amended Complaint ("SAC").  The

3  well pled factual allegations are taken as true.

4  **A.      The Plaintiffs**

5          Plaintiff, the Kawaiisu Tribe of the Tejon ("Tribe"), is an Indian tribe which "resided in the State

6  of California since time immemorial."  Plaintiff alleges that the Tribe "descends from signatories to

7  the 1849 Treaty with the Utah and the 'Utah tribe of Indians' that was recognized by the government of

8  the United States in that treaty" and are descendants from the Indians for whom the 1853

9  Tejon/Sebastian Reservation was created. (Doc. 133, SAC ¶3.)  The Tribe acknowledges that it is not

10  on the list of federally recognized tribes by the Bureau of Indian Affairs.  (Doc. 133 SAC ¶5.) The Tribe

11  alleges it is a State recognized Indian tribe and its members are located in the County of Kern.

12          Plaintiff David Laughing Horse Robinson is the Chairman of the Kawaiisu Tribe of Tejon.[1]

13  **B.      The Defendants**

14          Defendant Tejon Mountain Village, LLC and Defendant Tejon Ranch Corporation are private

15  entities which hold title or interest in 270,000 acres of land which the Tribe claims is a portion of the

16  reservation and aboriginal lands of the Tribe.  (Doc. 133 SAC ¶¶8-9.)  These entities intent to develop

17  "Tejon Mountain Village" with 3,450 residences, additional commercial development, including a hotel

18  and resort facilities, a golf course and other recreational and educational facilities.  (Doc. 133, SAC ¶36.)

19          Defendant County of Kern ("Kern") was the lead agency for the land development project and

20  ultimately approved the project after hearing and Environmental Impact Report.  (Doc. 133, SAC ¶7.)

21          Defendant Ken Salazar is sued in his official capacity as Secretary of the United States

22  Department of Interior.

23  **C.      Plaintiffs' Claims to Land**

24          Plaintiffs claim a right to occupy some or all of the 270,000 acres proposed for the defendants'

25  development.  Plaintiffs' sources of land claims include (1) aboriginal rights, which the right to occupy

26  the land, and (2) treaty rights, which is the permissive right to occupy.  Plaintiffs allege that the Tribe

27  _____

28          [1] For ease of reference in this order, the Court will refer to the Kawaiisu as the "Tribe."  The Court acknowledges
that a major dispute between the parties is whether, indeed, the Kawaiisu is a "Tribe."

2

is entitled to its aboriginal tribal land.  Plaintiffs claim that the Tribe descends from the Shoshone Paiute tribes which territory extended from Utah to the Pacific Ocean.  (SAC ¶16.)  "They have inhabited this areas from time immemorial."  The Tribe is not currently on the list of federally recognized tribes maintained by the Bureau of Indian Affairs (SAC ¶ 5), but claims to be federally recognized by virtue of, inter alia, the 1849 Treaty with the Utah entered into with the United States and that was ratified by Congress (9 Stat. 984) and by virtue of Treaty D. (Doc. 133, SAC ¶¶ 3, 18-23.)  Plaintiffs allege to be descendants of the "signatories to the Treaty with the Utah."  (SAC 20.)  The Tribe alleges that Treaty D was entered into with the United States in 1851, but which Congress did not ratify.  (SAC ¶ 25.)  In Treaty D, the Tribe agreed to cede large portions of its land in exchange for a reservation, among other things.  (SAC ¶25.)  Plaintiffs allege that the Senate secretly neglected to ratify the treaty so that Indian land would be open for exploitation.  (SAC ¶25.)

The Tribe also alleges that it has right to the land by virtue of its reservation.  On March 3, 1853, Congress passed an Act authorizing the President to create"five military reservations for the protection of Indians" in the State of California.  (SAC ¶26, citing 10 Stat 226.)  In 1853, an Indian reservation was established by Congress for the Kawaiisu's benefit. A reservation was established at Tejon Pass for the Tejon Indians (SAC ¶27), and which was resurveyed as late as 1858, on which the Kawaiisu lived at one time on 75,000 acres.  The establishment of the Tejon/Sebastian Reservation was re-surveyed to 19,928 acres in 1858.  (SAC ¶27.)

Plaintiff alleges that in 1856 California Indian Superintendent Edward F. Beale created land patents for the 270,000 acres that now comprise Tejon Ranch, all of which was with the Tribe's aboriginal  land.  (SAC ¶28.)  The Indians located on the Tejon/Sebastian Reservations were then forcibly moved to the Tule Reservation.  Plaintiffs allege that defendants TRC and TMV derive their title from Superintendent Beale's patents. Plaintiffs allege that "[t]o the extent that any title descending from Beale's self appointed patents has deprived the Tribe of lands, which the Tribe historically occupied or lands reserved pursuant to the 1853 executive order," the title is unlawful.  (SAC ¶28.)  Plaintiffs allege that only an act of Congress can terminate a Reservation and no act of Congress terminated the 1853 Reservation.  ("The 1853 Reservation") (SAC ¶29.)

Plaintiffs allege the 1853 Reservation was allotted to the Tribe.  In 1880, Congress authorized

3

1  the issuance of allotments from the 1853 Reservation and in 1893, 70 allotments were issued to

2  predecessors of the Tribe.  These allotments were inappropriately sold off.  Nonetheless, plaintiff alleges

3  that members of the Tribe have been present on the land from 1915 through 1945.  (SAC ¶30.)  The

4  California Indian Agency took a roll in 1949 which found 3,384 acres of Indian trust land in Kern

5  County and 62 Indians on the Census Roll.  (SAC ¶32.)

6      Plaintiff allege alternatively their aboriginal title encompasses 270,000 acres or 49,000 acres

7  which comprise the 1858 Survey of the Tejon/Sebastian reservation.  (SAC ¶34-35.)  Plaintiffs allege

8  the following claims for relief:

9          (1)    Unlawful possession under common law, Violation of Non-Intercourse Act, trespass and

10                 accounting, against TRC and TMV;

11         (2)    Violation of the Native American Graves Protection and Repatriation Act, against TRC

12                 and TMV;

13         (3)    Violation of Civil Rights, 42 U.S.C. §1983 against Kern;

14         (4)    Violation of the California Environmental Quality Act (CEQA) and Govt. Code 65352.3

15                 against Kern, TRC and TMV; and

16         (5)    Declaratory relief against defendant Salazar.

17                              **ANALYSIS AND DISCUSSION**

18  **A.     Standard for Motion to Dismiss**

19         **1.     Motion to Dismiss for Failure to State a Claim**

20      A motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6) is a challenge to the sufficiency of the

21  pleadings set forth in the complaint.  A Fed. R. Civ. P. 12(b)(6) dismissal is proper where there is either

22  a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal

23  theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990).  In considering a motion

24  to dismiss for failure to state a claim, the court generally accepts as true the factual allegations of the

25  complaint in question, construes the pleading in the light most favorable to the party opposing the

26  motion, and resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens,* 546 F.3d 580, 588

27  (9th Cir. 2008); *Jenkins v. McKeithen*, 395 U.S. 411, 421, *reh'g denied*, 396 U.S. 869 (1969).

28      To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief

4

that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007). A claim has facial plausibility,"when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, – U.S. –, 129 S.Ct. 1937 (2009). "[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).

A court is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations." *Farm Credit Services v. American State Bank*, 339 F.3d 765, 767 (8th Cir. 2003) (citation omitted). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. 554,127 S. Ct. 1955, 1964-65 (internal citations omitted). Although accepted as true, the "[f]actual allegations must be [sufficient] to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555 (citations omitted). Moreover, a court "will dismiss any claim that, even when construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student Loan Marketing Ass'n v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998). In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562, 127 S.Ct. at 1969. While accepting factual allegations in the complaint as true, the court is not required to accept legal conclusions as true, and the factual allegations must state a plausible claim for relief. *Maya v. Centex Corp.*, 658 F.3d 1060 (9th Cir. 2011).

### 2.    Motion to Dismiss for Lack of Subject Matter Jurisdiction

The defendants seek Fed.R.Civ.Proc. 12(b)(1) dismissal of plaintiffs' claims.  F.R.Civ.P. 12(b)(1) authorizes a motion to dismiss for lack of subject matter jurisdiction.  Fundamentally, federal courts are of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377, 114 S.Ct. 341 (1994).  "A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." *Stock West, Inc. v. Confederated Tribes*, 873 F. 2d 1221, 1225 (9th Cir. 1989).

1  Limits on federal jurisdiction must neither be disregarded nor evaded. *Owen Equipment & Erection Co.*
2  *v. Kroger*, 437 U.S. 365, 374, 98 S.Ct. 2396 (1978). A plaintiff bears the burden to establish that subject
3  matter jurisdiction is proper. *Kokkonen*, 511 U.S. at 377, 98 S.Ct. 2396; *see Tosco Corp. v.*
4  *Communities for Better Environment*, 236 F.3d 495, 499 (9th Cir. 2001) ("plaintiff has burden of proving
5  jurisdiction" to survive a F.R.Civ.P. 12(b)(1) motion to dismiss).

6      When addressing an attack on the existence of subject matter jurisdiction, a court "is not
7  restricted to the face of the pleadings." *McCarthy v. U.S.*, 850 F.2d 558, 560 (9th Cir. 1988). In such a
8  case, a court may rely on evidence extrinsic to the pleadings and resolve factual disputes relating to
9  jurisdiction. *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir.), *cert. denied*, 493 U.S. 993, 110 S.Ct.
10  541 (1989); *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987); *Augustine v. United States*, 704
11  F.2d 1074, 1077 (9th Cir. 1983); *Smith v. Rossotte*, 250 F.Supp.2d 1266, 1268 (D. Or. 2003) (a court
12  "may consider evidence outside the pleadings to resolve factual disputes apart from the pleadings").

13      "The plaintiff always bears the burden of establishing subject matter jurisdiction. In effect, the
14  court presumes lack of jurisdiction until the plaintiff proves otherwise." *Valdez v. U.S.*, 837 F.Supp.
15  1065, 1067 (E.D. Cal. 1993). "[T]he burden of proof is on the plaintiff to support allegations of
16  jurisdiction with competent proof when the allegations are challenged by the defendant." *O'Toole v.*
17  *Arlington Trust Co.*, 681 F.2d 94, 98 (1st Cir. 1982).

18      **3.    Judicial Notice**

19      Courts may take judicial notice of facts whose "existence is 'capable of accurate and ready
20  determination by resort to sources whose accuracy cannot reasonably be questioned.' " *W. Radio Servs.*
21  *Co. v. Qwest Corp.*, 530 F.3d 1186, 1192 n. 4 (9th Cir. 2008). It must be taken when a party requests
22  it and supplies all necessary information. Fed.R.Evid. 201(d). "Judicial notice" is the court's recognition
23  of the existence of a fact without the necessity of formal proof. *See United States v. Harrison*, 651 F.2d
24  353, 355 (5th Cir. 1981); *Castillo-Villagra v. I.N.S.*, 972 F.2d 1017, 1026 (9th Cir. 1992). Facts proper
25  for judicial notice are those facts not subject to reasonable dispute and either "generally known" in the
26  community, or "capable of accurate and ready determination" by reference to sources whose accuracy
27  cannot be reasonably questioned. Fed.R.Evid. 201; *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504
28  (9th Cir. 1986) (court may take judicial notice of official records and reports. The court need not accept

as true allegations that contradict facts which may be judicially noticed by the court.)  A court may take judicial notice of its own records.  *See e.g.*, *Day v. Moscow*, 955 F.2d 807, 811 (2nd Cir. 1992).  Courts may take judicial notice of public records.  *Cachil Dehe Band of Wintun Indians of Colusa Indian Community v. State of Calif.*, 547 F.3d 962, 969 & fn. 4 (9th Cir. 2008).  Judicial notice is particularly appropriate for the court's own records in prior litigation related to the case before it. *Amphibious Partners, LLC v. Redman*, 534 F.3d 1357, 1361–1362 (10th Cir. 2008) (district court was entitled to take judicial notice of its memorandum of order and judgment from previous case involving same parties).

The parties have asked the Court to take judicial notice of numerous documents.  (*See e.g.*, Doc. 138, Kern's Request for Judicial Notice; Doc. 141, Tejon's Request for Judicial Notice; Doc. 153, Plaintiff's request for Judicial Notice; Doc. 172, Tejon's Request for Judicial Notice, Doc. 192, Plaintiff's Request for Judicial Notice.)  The Court has taken judicial notice of those documents appropriate for judicial notice and has taken judicial notice of the requested documents that have been referenced specifically in this Order.

**B.      The 1851 Act and the Treaty of Guadalupe Hidalgo**

Defendants TMV and TRC argue that plaintiffs' claims to the land should be dismissed because plaintiffs challenge to title is barred by the 1851 Act (Act of March 3, 1851, ch. 41, 9 Stat. 631 (1851)) and the Treaty of Guadalupe Hidalgo.  TRC argues title to TRC's land is readily traceable from land grants made by the Mexican government to private parties prior to 1848 and confirmed by the United States after the land was ceded by Mexico to United States, as evidenced by a United States land patent. (Doc. 140, Moving papers p.5.)  Defendants argue that the Tribe has lost any aboriginal title for failing to comply with the requirements of the 1851 Act.

**1.      Aboriginal Title**

The common view of aboriginal title is that it is the right of occupancy held by tribes. *See*, *e.g.*, *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 667, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974); *U.S. v. Dann*,  873 F.2d 1189, 1195 (9th Cir. 1989).  Indians' aboriginal title derives from their presence on the land before the arrival of white settlers.  *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 279, 75 S.Ct. 313, 317, 99 L.Ed. 314 (1955).  It is well settled that in all the States the tribes who inhabited the lands of the States held claim to such lands after the coming of the white man, under what is

sometimes termed original Indian title or permission from the whites to occupy. *Id.* Fee title to the lands occupied by Indians when the colonists arrived became vested in the United States, but a right of occupancy in the Indian tribes is recognized. This mere possession is not specifically recognized as ownership by Congress. This is not a property right but amounts to a right of occupancy which the sovereign grants and protects against intrusion by third parties, but which right of occupancy may be terminated and such lands fully disposed of by the sovereign itself without any legally enforceable obligation to compensate the Indians. *Tee-Hit-Ton Indians v. U.S.*, 348 U.S. 272, 279,  75 S.Ct. 313, 317 (1955).  Aboriginal title may be extinguished by the federal government at any time, although extinguishment will not be taken lightly. *United States v. Gemmill*, 535 F.2d 1145, 1147 (9th Cir.), *cert. denied*, 429 U.S. 982, 97 S.Ct. 496, 50 L.Ed.2d 591 (1976).  "Congress' power to extinguish aboriginal title is supreme, 'whether it be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise....' " *United States v. Santa Fe Pacific R.R. Co.*, 314 U.S. 339, 347, 62 S.Ct. 248, 252, 86 L.Ed. 260 (1941).

**2.      Overview of the Treaty of Guadalupe Hidalgo and the 1851 Act**

The Treaty of Guadalupe Hidalgo, signed on February 2, 1848 and entered into force on May 30, 1848, signaled the formal end of the Mexican-American War.  9 Stat. 922 (1848); *U.S. ex rel. Chunie v. Ringrose,* 788 F.2d 638, 641 (9th Cir. 1986).  The United States and Mexico signed the treaty of Guadalupe Hidalgo, in which Mexico ceded land that includes parts of the present-day state of California to the United States.  9 Stat. 922 (1848).  To settle land claims in the newly acquired territory, Congress passed the Act of March 3, 1851, ch. 41, 9 Stat. 631 (1851) ("1851 Act").  The 1851 Act created a board of commissioners to determine the validity of claims, and required every person "claiming lands in California by virtue of any right or title derived from the Spanish or Mexican government" to present the claim within two years.  1851 Act, ch. 41, § 8; *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d at 641.  Any land not claimed within two years, and any land for which a claim was finally rejected, was deemed "part of the public domain of the United States."   1851 Act, ch. 41, § 13.  The determination by the commission as to patents issued "shall be conclusive between the United States and the said claimants only, and shall not affect the interests of third persons."  1851 Act, ch. 41, § 13.  Courts in the United States have uniformly found that title to the land first passed to the United States through the Treaty.

See, e.g., *United States v. California*, 436 U.S. 32, 34 n. 3, 98 S.Ct. 1662, 1663 n. 3, 56 L.Ed.2d 94 (1978) (stating that, under the Treaty, "all nongranted lands previously held by the Government of Mexico passed into the federal public domain").

### 3.    Cases in which Indians Lost the Right of Occupancy under the 1851 Act

In *Barker v. Harvey*, 181 U.S. 481, 21 S.Ct 690 (1901), the Supreme Court held Mission Indians lost their land claims for failure to comply with the 1851 Act.  The Court  upheld the validity of land patents against challenges by Mission Indians claiming pre-existing aboriginal title.  The Mission Indians had not presented their claims to the 1851 Commission.  In *Barker,* individuals claiming title to the land also claimed by the Mission Indians, sued to quite title to land.  The individuals claimed the land was ceded to the United States by the Treaty of Guadalupe Hidalgo, and under a patent confirming grants made by the Mexican government to the plaintiffs' ancestor in title. The defendants, Mission Indians, contended that plaintiffs' title was subject to their right of permanent occupancy which they claimed had been recognized by the government of Mexico long before the existence of the grants relied on by the plaintiffs. The Indians claimed that the "government of Mexico had always recognized the lawfulness and permanence of their occupancy." *Id.* at 482.  The Court held that the 1851 Act barred the Indian's claim to occupy the land because their claims were not presented to the commission for consideration within the time allowed by the act.  "If these Indians had any claims founded on the action of the Mexican government they abandoned them by not presenting them to the commission for consideration." *Barker v. Harvey*, 181 U.S. at 491.

Similarly, in *United States v. Title Ins. & Trust Co.*, 265 U.S. 472, 44 S.Ct. 621 (1924), the court held that the Tejon Mission Indians lost their rights to land for failure to present their claim to the commission pursuant to the 1851 Act.  In 1843, two Mexicans were granted a land grant by the Mexican government of California for El Tejon conditioned upon the protection of the Indians who resided there. Under the laws of Spain and Mexico, the individuals were entitled to the undisturbed possession and use of the land they occupied.  *Title Ins*., 288 F. at 822.[2]  After the treaty of Guadalupe Hidalgo, the two

---

[2]   The procedural history of United States v. Title Ins. & Trust Co. includes that the District Court dismissed the case, the Ninth Circuit affirmed and the Supreme Court reviewed.  The decisions of the Ninth Circuit and Supreme Court are provided to give a full review of the facts of the case.

Mexicans petitioned the board of commissioners under the 1851 Act to settle their claim and the commissioners confirmed the land patent in the individuals.  Thereafter, in *Title Ins.*, the United States brought action on behalf of the Tejon Mission Indians who occupied land in the El Tejon Rancho in Kern County. The Indians claimed that "[f]rom time immemorial the land has been continuously occupied by the Tejon Indians, who have resided thereon in permanent dwellings . . ." The Indians were in open, notorious, and adverse occupancy of such lands at the date of the grant.  The suit by the United States on behalf of the Tejon Mission Indians sought to have the original title of occupancy and possession of the land by the Indians confirmed.[3] The Indians argued that if the grant was made it was subject to a 'perpetual right' in the Indians and their descendants to occupy and use the lands.

The Supreme Court in *Title Ins.*, based its decision upon *Barker v. Harvey*.  Any claim that the Tejon Mission Indians may have had was lost by failing to present it to the land commission and that the patent issued to defendants "passed the full title, unencumbered by any right" of those Mission Indians. *Id.*  After summarizing and quoting from *Barker*, the Court held that the case was so much like *Barker* that the result must be the same. Id. at 485-86.  Accordingly, the Court affirmed the judgment against the Tejon Indians.  The Court said the United States would have been unable to grant the land patent it had by the Board of commissioners if the Indians had a claim of permanent occupancy. *Title Ins.*, 265 U.S. at 484 ("is an essential difference between the power of the United States over lands to which it had had full title, and of which it has given to an Indian tribe a temporary occupancy, and that over lands which were subjected by the action of some prior government to a right of permanent occupancy, for in the latter case the right, which is one of private property, antecedes and is superior to the title of this government, and limits necessarily its power of disposal.")

In *U.S. ex rel. Chunie v. Ringrose*, the Court held that an Indian tribe lost all rights to the their aboriginal land for failing to present claims in the land confirmation proceeding pursuant to the Treaty of Guadalupe Hidalgo and the 1851 Act.  The Indian Tribe claimed possession of islands off the Santa Barbara coast.  These same islands had been granted to individuals by the Mexican government, who submitted claims to the board of commissioners pursuant to the 1851 Act to determine the validity of

---

[3] Plaintiffs here do not claim that they are Tejon Mission Indians and are not related in any fashion to the Tejon Mission Indians.  (Doc. 155 , Opposition p.11 n.6.)

their claims.  Land patents were granted by the Commission.  A century later, the Indians disputed the land patents and claimed that, like the plaintiffs here, the 1851 Act did not apply to Indian claims based on aboriginal title.  Like the plaintiffs here, the Indians in *Ringrose* claimed they were excepted from the land confirmation proceedings. The Indians claimed they possessed the land "from time immemorial" and that their aboriginal title has never been extinguished.  *Id.* at 641. They argued that they had the right of occupancy notwithstanding the land patents.  The Indians argued, as plaintiffs do here, that they were not required to submit a land claim under the 1851 Act.  They argued that the 1851 Act only required persons claiming lands "by virtue of any right or title derived from the Spanish or Mexican government" to file claims, but because aboriginal title is not "derived from the Spanish or Mexican government," the Indians were not required to file a claim.  *Id.* at 645.

The Ninth Circuit acknowledged that a claim of aboriginal title provided the Indians with a "right of occupancy." *Id.* at 642. After reviewing Supreme Court precedent which recognized the "extensive reach" of the 1851 Act, the Ninth Circuit disagreed with the Indians.  The Court held that the Indians "claiming a right of occupancy based on aboriginal title, lost all rights in the land when they failed to present a claim to the commissioners." The Court stated that when the individuals' land claims derived from the Mexican government, were "confirmed and received federal patents to their lands, they were entitled to believe that adverse claims to their lands had been eliminated." *Ringrose*, 788 U.S. at 646. Thus, the Court held that aboriginal title had been extinguished by the failure of the Indians to present a claim for the disputed land with the board of commissioners pursuant to the 1851 Act. *See also Super v. Work*, 149, 3 F.2d 90 (1925), *affirmed by Super v. Work*, 271 U.S. 643, 46 S.Ct. 481, 70 L.Ed. 1128 (1926) (roving bands of Indians, who were not Mission Indians, did not make claim under the act of 1851, and they must therefore be treated as having lost, through abandonment, any claim which they may have had.)

Thus, case law holds that aboriginal title is lost when land patents are validly issued to predecessors in title.  Indian claims to occupancy is invalid as against such validly issued land patents by the board of commissioner pursuant to the 1851 Act.  Here, land patents were issued for the land claimed by plaintiffs.  Thus, the Tribe would lose any claim to aboriginal title for failing to submit a claim pursuant to the 1851 Act.

11

1    In their opposition, plaintiffs challenge the validity of the original land patents.  "Plaintiffs do

2   challenge their validity, as well as any other land grants or patents claimed by Tejon."  (Doc. 155,

3   Opposition p.12 n.7.)  In their opposition, plaintiffs state that the Kawaiisu dispute that Tejon actually

4   has good title to the property as the Kawaiisu allege that Tejon does not have any patents for the land

5   where the graves or cultural items were excavated or, in the alternative, that any patents for these lands

6   are forgeries or otherwise invalid."  (Doc. 155, Opposition p.21.)

7    Plaintiffs, however, have failed to allege any factual basis for claiming the invalidity of the land

8   patents.  Plaintiffs allege that land patents for their claimed land were issued and that ex-superintendent

9   Beale, TRC's predecessor, and others drew up patents under old Spanish land grants for the

10  approximately 270,000 acres that now comprises Tejon Ranch.  (Doc. 133 ¶28.)  Plaintiffs allege that

11  the land patents were "not approved by any action of either the United States or Congress and was

12  therefore unlawful."  (Doc. 133 ¶28.)  The factual basis is not alleged for the statement that the land

13  patents were invalid, were not approved and therefore unlawful.  If plaintiff claims that the predecessor

14  land patents are invalid, plaintiffs must allege a sufficient factual basis.  Leave to amend will be granted.

15  "[A] district court must retain the power to insist upon some specificity in pleading before allowing a

16  potentially massive factual controversy to proceed."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558,

17  127 S.Ct. 1955, 1967 (2007).  *Twombly* requires plaintiff to include sufficient facts supporting their

18  claim that the land patents issued to the predecessor in title are invalid.

19              **4.    *Cramer v. United States* which Permitted Right of Occupancy**

20   Plaintiffs distinguish the above cases and argue that the *Barker* court recognized that Section 8

21  of the 1851 Act only required persons claiming land in California by virtue of any right or title derived

22  from the Spanish or Mexican government to submit a claim to the commission.  (Doc. 155 Opposition

23  p.11.)  Plaintiffs argue that they do not claim right or title derived from the Mexican government.

24   Plaintiffs rely on *Cramer v. United States*, 261 U.S. 219, 43 S.Ct 342 (1923).  *Cramer* held that

25  the 1851 Act had no application to the Indian claims before the Court.  The Indians in *Cramer* were in

26  actual possession of land.  Three Indians had occupied 175 acres of public land for years prior to the

27  United States grant of a patent to a railroad, which excepted land "found to have been granted, sold,

28  reserved, occupied by homestead settlers, preempted, or otherwise disposed of."  261 U.S. 219, 43 S.Ct.

342. The Indians argued that the congressional act in question, which permitted issuance of the land patent, was invalid because they individually occupied and used the land continuously since before the federal government removed the land from settlement in 1859.  The Supreme Court upheld their title to the land actually enclosed and occupied by the individual Indians. *Id.* at 234–36.  The United States Supreme Court reasoned that aboriginal title creates an individual aboriginal right of occupancy. The Court concluded that the Indians' right of occupancy was superior to the title vested through a later federal land patent. *Id.* at 225, 43 S.Ct. at 343.  The Supreme Court grounded its opinion on the contemporary government policy which favored land settlement in general and Indian settlement in particular. The Court stated, "[i]n our opinion the possession of the property in question by these Indians was within the policy and with the implied consent of the Government." *Id.* at 230, 43 S.Ct. at 345.

In *Cramer*, the defendant railroad argued that the Indians were barred by the 1851 Act because the Indians failed to present their claims to the board of commissioner.  The Court rejected that argument on the grounds that the 1851 Act had no application.  *Id*. at 231.  The Indians did not claim their rights derived from the Spanish or Mexican government.  Indeed, the Court noted that prior to the cession to the United States, the Mexican authorities found that the Indians had abandoned the lands and thereupon made an absolute grant to the plaintiff's predecessors, and, this grant having been confirmed by the Commission, a patent for the lands had issued.  Significantly, the *Cramer* court noted that "it does not appear that these Indians were occupying the land in question when the act was passed."  *Id*. at 231.

Plaintiffs argue that the Kawaiisu's claim to Tejon Ranch likewise comes under *Cramer*, because like the Indians in *Cramer,* and unlike the Indians in *Barker* and *Title* Insurance, the Kawaiisu claim is not based on rights obtained from Spain or Mexico, and the Kawaiisu are not now nor have they ever been Mission Indians.

Plaintiffs' reliance on *Cramer* is not persuasive because *Cramer* is distinguishable.  *Cramer* involved a claim to land which the individual Indians had enclosed and occupied for years before the federal grant to the railroad.  The case did not involve tribal rights to vast areas not actually possessed. Further, the Court in *Cramer* found the 1851 Act inapplicable because the possession by the individual Indians occurred well after the Act.  *See Miller v. United States*, 159 F.2d 997, 1005 (9th Cir.1947) (erroneous claim of original Indian title does not defeat right of individual occupancy).  Here, plaintiffs

13

allege that their title preceded the 1851 Act. Further, there are no allegations as to the actual occupancy and possession of the disputed land such as was in *Cramer*.

At oral argument, plaintiffs argued that they could allege facts to fall within the *Cramer*. Plaintiffs will be granted leave to allege that their occupancy was in continued occupancy of the land they claim.

## C.      Treaty with the Utah (9 Stat. 984)

Plaintiffs allege they have express land rights through the Treaty with the Utah.  Plaintiffs claim that the 1851 Act cannot abrogate these express treaty rights.  Plaintiffs argue that their claim to the Tejon Reservation was created by Congress when it ratified the Treaty with the Utah on September 9, 1850, which occurred after the United States ratified the Treaty of Guadalupe Hidalgo (March 10, 1848). (Doc. 155, Opposition p.14.)  The Reservation was created **after** the 1851 Act was passed and thus falls with the *Cramer* exception.[4]  Plaintiffs argue that the 1851 Act cannot bar express land rights granted to the tribe and that their land claims arise from a ratified treaty.

### 1.      Legal Framework - Treaties

Supreme Court jurisprudence teaches that Indian Treaties must be interpreted as the Indians would have understood them.   A treaty between the United States and an Indian tribe "is essentially a contract between two sovereign nations." *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). Treaties constitute the "supreme law of the land."  *Skokomish Indian Tribe v. U.S.*,  410 F.3d 506, 512 (9th Cir. 2005) (*en banc*), *cert. denied,* 546 U.S. 1090, 126 S.Ct 1025 (2006).

"The Indian Nations did not seek out the United States and agree upon an exchange of lands in an arm's-length transaction. Rather, treaties were imposed upon them and they had no choice but to consent.  As a consequence, this Court has often held that treaties with the Indians must be interpreted as they would have understood them...." *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 630-31, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970) (citations omitted).  It is our responsibility to see that the terms of the treaty

---

[4] The Kawaiisu argue that they can allege that the land at issue in *Title Insurance*, as identified in the record both by legal description and a survey, is only a tiny fragment of the land (5,394 acres) that comprised the Reservation, and thus an even smaller portion of the approximately 270,000 acre Tejon Ranch.  (Doc. 155 Opposition p. 15.)

are carried out, so far as possible, in accordance with the meaning they were understood to have by the tribal representatives at the council, and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people. *Tulee v. Washington*, 315 U.S. 681, 684-85, 62 S.Ct. 862, 86 L.Ed. 1115 (1942) (citation omitted); see also *United States v. Winans*, 198 U.S. 371, 380-81, 25 S.Ct. 662, 49 L.Ed. 1089 (1905) ("we will construe a treaty with the Indians as 'that unlettered people' understood it, and 'as justice and reason demand ....' " (citation omitted)). Any doubtful expressions in the Treaty should be resolved in the Indian's favor. *See Choctaw Nation*, 397 U.S. at 631, 90 S.Ct. 1328.

## 2. Treaty with the Utah Did not Reserve Land or Apply in California

In the Treaty with the Utah, the Utah Indians submitted to the jurisdiction, power, and authority of the United States: "The Utah Tribe of Indians do hereby acknowledge and declare they are lawfully and exclusively under the jurisdiction of the Government of said States." (9 Stat. 984, art. I.)   The Court of Federal Claims in *Uintah Ute Indians of Utah v. U.S.*, 28 Fed.Cl. 768, 786 (Fed.Cl. 1993) provided a detailed opinion on the history of the Utah, aboriginal title and the Treaty with the Utah.   "Utah Indians" refers to "any and all Indians resident in Utah, in or around Salt Lake City," during the relevant time period.[5]  *Uintah Ute Indians of Utah v. U.S.*, 28 Fed.Cl. 773 n.5.   In pertinent part, the treaty provides that:

> the aforesaid Government shall, at its earliest convenience, designate, settle, and adjust their territorial boundaries.... And the said Utahs, further, bind themselves not to depart from their accustomed homes or localities unless specifically permitted by an agent of the aforesaid Government; and so soon as their boundaries are distinctly defined, the said Utahs are further bound to confine themselves to said limits ... and they now deliberately and considerately, pledge ... to confine themselves strictly to the limits which may be assigned them....

Treaty with the Utah, Dec. 30, 1849, art. VII, 9 Stat. 985.

As the Court recognized in *Uintah Ute Indians of Utah*, Article VII of the Treaty with the Utah does not recognize title because the boundaries of aboriginal lands were to be settled in the future. By its terms, the treaty does not designate, settle, adjust, define, or assign limits or boundaries to the Indians. It leaves such matters to the future. "The ratified treaty allowed the Indians permissive occupation and

---

[5]  Plaintiffs' allegations are inconsistent with the history of the Kawaiisu for purposes of the Treaty with the Utah. Plaintiffs allege that the tribe has resided in the State of California since time immemorial.  (Doc. 133 SAC 3.)

reserved a final settlement sometime in the future." *Uintah Ute Indians*, 28 Fed.Cl. at 789.  The treaty with the Utah does not establish any reservation for Indians, including plaintiffs in the instant case. Consequently, the treaty cannot be said to recognize Indian title. *Uintah Ute Indians of Utah*, 28 Fed.Cl. at 786.  The court held that treaty was made with the "Utah" Indians, which involved no cession of lands and did not set apart any reservation to the Indians. (9 Stats., 984.)  The Treaty with the Utah did not provide a reservation for Indians.  It did, however, recognize some rights of the Indians to the occupation of certain lands. For instance, Article V of that treaty is as follows:

> "V. The people of the United States, and all others in amity with the United States, shall have free passage through the territory of said Utahs, under such rules and regulations as may be adopted by authority of said States."

The Treaty, however, did not recognize Indian title.  Thus,  the treaty did not establish any title or reservation to land, and the treaty did not benefit tribes other than those in the Utah area.

### 3.      Pleading Deficiencies regarding the Treaty with the Utah

Here, plaintiffs' reliance upon the Treaty with the Utah as a basis of land claims suffers from two pleading deficiencies.[6]

First, plaintiffs have not alleged a factual basis for their association or descent from the tribes in the Treaty with the Utah.   Plaintiff's sole allegation of descent is, "The Tribe descends from signatories to the 1849 Treaty with the Utah and the 'Utah tribe of Indians.'" (Doc. 133 SAC 3.)

> "The KAWAIISU TRIBE OF TEJON is one of the ancient Great Basin Shoshone Paiute tribes whose pre-European territory extended from Utah to the Pacific Ocean. They have inhabited this area from time immemorial. At various times throughout history, the Kawaiisu People have been called any one or more the following names: Nochi, Cobaji, Cobajais, Covaji, Kahwissah, Kawiasuh, Kawishm, Kowasah, Kubakhye, Newooah, Noches Colteches, Tahichapahanna, Tahichp. (Doc. 133, SAC ¶16.)

If the tribe is located in Tejon in 1849, it is not plausible under the current allegations that it was part of the Utah.

Further, plaintiffs have not adequately alleged that this treaty had anything to do with the tribes

---

[6] The Court does not decide in this motion whether the treaty was intended to grant legal rights of occupancy.  The Court acknowledges that, if the Treaty did not recognize Indian title in land, this would be a fatal flaw in plaintiffs' allegations.  The Court does not reach this issue because the allegations are insufficient to address whether the Tribe may properly invoke protections of the Treaty of the Utah.

1    in the ceded land in California and that the treaty was intended to benefit the Kawaiisu.  For Indian title

2    to be recognized, "Congress, acting through a treaty or statute, ... must grant legal rights of permanent

3    occupancy within a sufficiently defined territory.... There must be an intention to accord or recognize

4    a legal interest in the land."  *U.S. ex rel. Chunie v. Ringrose*,  788 F.2d 638, 644 (9th Cir.1986).  As

5    currently alleged, it is not plausible that the Treaty with the Utah had anything to do with Indians in

6    California. Plaintiffs must allege a firmer connection between their land possession and with the Indians

7    in the Treaty with the Utah.  Therefore, plaintiffs have not adequately alleged they are descendants of

8    the Treaty of the Utahs or that the Treaty was entered into for their benefit, as a Tribe located in

9    California.

10           **3.      Treaty "D" has No Force**

11           Plaintiffs claim that Treaty D provides the Tribe its land claim.

12           Treaty D was a promise by the United States to set apart certain reservations for "various tribes

13   of Indians in the State of California" in 1852, and to provide the goods, chattels, school houses, teachers,

14   among other things.  Treaty D, Art. 4; see Hein Online, 4 Indian Aff. L & Treaties, 1101 (1913-1927).

15   Those promises were never carried out by the United States.  Both plaintiffs and the defendants agree

16   that Treaty D was not ratified by Congress. (Doc. 133 SC ¶25.)  An unratified treaty has no force until

17   ratified by a two-thirds vote of the Senate. U.S. Const., art. II, cl. 2; *S.E.C. v. International Swiss

18   Investments Corp.*, 895 F.2d 1272, 1275 (9th Cir. 1990).  Since Treaty D was never ratified, it cannot

19   provide any basis for plaintiffs' claim to land.

20           Defendants seek to further distinguish Treaty D, by noting that descendants of tribes in Treaty

21   D were compensated for the failure to ratify the treaties.  (See Doc. 170, Reply p.8.)  Treaty D was

22   among 18 treaties attached as "Exhibit A" to the complaint in *Indians of California by Webb v. United

23   States*, 98 Ct.Cl. 583 (1943), *cert. denied*, 319 U.S. 764, 63 S.Ct. 1324, 87 L.Ed. 1714, brought by the

24   California Attorney General under the "Indians of California Act" of May 18, 1928, 25 U.S.C. § 651.

25   The Indians of California Act authorized "the [A]ttorney [G]eneral of the State of California to bring

26   suit in the Court of Claims on behalf of the Indians of California," who were defined as "all Indians who

27   were residing in the State of California on June 1, 1852, and their descendants now living in said State."

28   *Id.*; *see also Indians of California by Webb v. United States*, 98 Ct.Cl. 583, 585 (Ct.Cl.1942)

("[P]laintiffs, herein designated as The Indians of California, comprise all those Indians of the various tribes, bands and rancherias who were living in the State of California on June 1, 1852, and their descendants living in the state on May 18, 1928—such definition and designation having been prescribed in the Jurisdictional Act [of 1928].").  The Act authorized the Attorney General to file on behalf of the Indians for compensation for land taken in the unratified treaties, such as Treaty D.  *Indians of California by Webb*, 98 Ct. Cal. 583 (these Indians "did not qualify before the Commission created by the Act of March 3, 1851, 9 Stat. 631, entitled 'An Act to ascertain and settle the private land claims in the State of California.'  Therefore whatever lands they may have claimed became a part of the public domain of the United States.")  The Attorney General filed suit on August 14, 1929 and in 1942, the Court of Claims held the Indians of California were entitled to recover damages from the United States.  As explained in *Round Valley Indian Tribes v. U.S.*, 97 Fed.Cl. 500, 504 (Fed.Cl. 2011), the government later stipulated to judgment on October 30, 1944 in the amount of $5,024,842.34.  *Round Valley Indian Tribes*, 97 Fed.Cl. at 504.

The court will note that Treaty D, negotiated two years after the Treaty with the Utah, specifically referred to "tribes in the state of California."  It did not reference the Treaty with the Utah or mention in any way the Treaty with the Utah or that the Indians in Treaty D were covered by the Treaty with the Utah.  Thus, based on the current allegations, the Tribe's land claims based on the Treaty with the Utahs are not plausible.

**4.**     **The Tejon/Sebastian Reservation**

Plaintiffs also argue that their land claims arise from the creation of the certain Reservations in California.  Plaintiffs allege that the Tejon/Sebastian Reservation was created for the Tribe's benefit.  Plaintiff argues the Reservation was authorized by Congress in 1853 and established by General Beale.  (Doc. 155, Opposition p.14.)

**a.**     **"Reservation" Statutory and Executive Authority**

The term "Indian reservation" originally meant any land reserved from an Indian cession to the federal government regardless of the form of tenure.  Cohen, *Handbook of Federal Indian Law*, §3.04[2][c][ii].  In the 1850s, the Federal government began frequently to reserve public lands from entry for Indian use.  Cohen, *id.*, citing Appropriations Act of Mar. 3, 1853, §1, 10 Stat. 226 ("President is .

. .authorized to make five military reservations from the public domain in the State of California . . . for Indian purposes . . . reservations shall not contain more than twenty-five thousand acres in each.")

Congress authorized the President in 1853 "to make five military reservations from the public domain in the State of California or the Territories of Utah and New Mexico bordering on said State, for Indian purposes.... Provided, That such reservations shall not contain more than twenty-five thousand acres." Act of March 3, 1853, ch. 104, 10 Stat. 226, 238. The 1853 Act permitted a reservation of at most 25,000 acres.[7] 10 Stat. 226, 238 (That "such reservations shall not contain more than twenty- five thousand acres each" and "shall not be made on any lands inhabited by Citizens of California.") It has long been held that Congress has the power to diminish reservations unilaterally. *Solem v. Bartlett*, 465 U.S. 463, 470 n. 11, 104 S.Ct. 1161, 1166 n. 11 (1984). "A congressional determination to terminate (an Indian reservation) must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." *Mattz v. Arnett*, 412 U.S. 481, 505, 93 S.Ct. at 2258.

The 1853 Act was subsequently amended to provide for two additional reservations. Act of March 3, 1855, ch. 204, 10 Stat. 686, 699; *see Shermoen v. U.S.*, 982 F.2d 1312, 1315 n.1 (9th Cir.1992), *cert. denied*, 509 U.S. 940 (1993). The Act of March 3, 1855, 10 Stat. 699, appropriated funds for "collecting, removing, and subsisting the Indians of California . . . on two additional military reservations, to be selected as heretofore . . . Provided, That the President may enlarge the quantity of reservations heretofore selected, equal to those hereby provided for."

Plaintiffs have not pointed to any executive order establishing the Tejon/Sebastian reservation as a result of the 1853 or 1855 Acts.

Later in 1864, Congress passed "An Act to provide for the Better Organization of Indian Affairs in California." Act of April 8, 1864, ch. 48, 13 Stat. 39. This measure empowered the President to reserve four tracts of land:

> set apart ... at his discretion, not exceeding four tracts of land, within the limits of [California], to be retained by the United States for the purposes of Indian reservations, which shall be of suitable extent for the accommodation of the Indians of said state, and shall be located as

---

[7] Plaintiffs claim that their land encompasses 270,000 plus an additional 75,000 acres. Given this express act of Congress to establish reservations in California for Indians of no more than 25,000, it is unclear how the plaintiffs may claim more acreage that granted by Congress.

remote from white settlements as may be found practicable....

The Act of April 8, 1864 designated California as one Indian superintendency. Congress authorized the President to designate the reservations. The 1864 Act further provided that the lands not retained were to be surveyed and offered for sale: "[T]he several Indian reservations in California which shall not be retained . . . under . . . this act, shall . . . be surveyed into lots or parcels . . . and . . . be offered for sale at public outcry, and thence afterward shall be held subject to sale at private entry." *Id.*, at 40; see *generally Mattz v. Arnett*, 412 U.S. 481, 490, 93 S.Ct 2245 (1973). The Supreme Court noted in *Mattz* that, "At the time of the passage of the 1864 Act there were, apparently, three reservations in California: the Klamath River, the Mendocino, and the Smith River. It appears, also, that the President did not take immediate action, upon the passage of the Act, to recognize reservations in California." *Mattz v. Arnett*, 412 U.S. at 489-490. The Act of 1864 superseded the Act of 1853 by allowing only four reservations in California. *Sermon v. U.S.,* 982 F.2d 1312, 1315 (9th Cir. 1992). See Executive Orders found in Hein Online, 1 Indian Aff. L & Treaties 815-831 (1902). Those reservations were established by Executive Order and were the Hoopa Reservation (established in 1876), Mission Indian Reserve (established in 1870, and revised from 1877-1889), Round Valley Reservation (established 1870), and Tule River Reservation (established 1873).

### b.    Tejon/Sebastian is not a Reservation

Plaintiff alleges that in 1853, the Tejon/Sebastian Reservation was created. Plaintiff alleges the Reservation was re-surveyed in 1858 at 49,927 acres.

As discussed above, the Act of 1864 required that the President establish the California Reservations. To the extent that there is no Executive Order creating the "Tejon/Sebastian Reservation", the absence of Executive Order nullifies the existence of such a reservation. The Act of 1864 superseded any prior act establishing a reservation and gave the authority to the President to create reservation.[8] Plaintiffs have not pointed to any executive order or executive action which establishes the Tejon/Sebastian Reservation, and the Court has not found any such Executive action.

Contrary to plaintiffs' arguments in opposition to this motion, no where in the Second Amended

---

[8]   For instance, the Mendocino Reservation, which was established in 1856 pursuant to 1855 Act, was restored to the public domain by Congress on July 27, 1868, 15 Stat. 223.

Complaint do they allege that the Tejon/Sebastian Reservation is in fact a current Reservation, as opposed to a historical, potential Reservation which was not established and now no longer exists. Relevant allegations are:

> 3.    In addition, the Tribe descends from those Indians for whom the 1853 Tejon/Sebastian Reservation was created. . . .
>
> 27.    The Tejon/Sebastian Reservation would be re-surveyed at 49,928 acres in 1858.
>
> 63. Plaintiffs are informed and believe and thereon allege that this damage or destruction occurred both on the Tejon/Sebastian Reservation property and within the Tejon Mountain Village Development footprint that is within land to which Plaintiffs hold aboriginal title.

Indeed, the SAC does not allege that the Tejon/Sebastian Reservation is an active reservation upon which the plaintiffs reside.

Plaintiffs argue that the SAC alleges that Congress has never disestablished the Reservation. (Doc. 155 Opposition p.22.) Plaintiffs, however, allege that the Indians were forcibly removed from the Tejon/Sebastian to the Tule River Reservation and all with the knowledge of Congress. (SAC ¶28.) The Tule River Reservation was a Reservation expressly established by Executive Order.  Documents relied upon by plaintiffs state that the reservation was "abandoned."  (See SAC ¶28; 56th Congress 1st Sess. House Doc. No. 736 at 788, 789.)  Accordingly, the Tejon/Sebastian Reservation was not an established reservation and therefore cannot provide land rights to plaintiffs.

### c.    *De Facto* Reservation

At oral argument on this motion related to the Reservation issue, plaintiffs argued that the Tejon/Sebastian reservation was a *de facto* reservation.

A *de facto* reservation is one where the federal government has treated the Indians as on a reservation. The actions of the federal government in its treatment of Indian land can create a *de facto* reservation, even though the reservation was not created by a specific treaty, statute or executive order. *U.S. v. Azure*, 801 F.2d 336, 338 (8th Cir. 1986) (tribal trust land could be considered de facto reservation or dependent Indian community).   A key factor in finding a *de facto* reservation is the actions of the BIA in expending funds and providing social services. *See e.g., Sac & Fox Tribe v. Licklider*, 576 F.2d 145, 149–50 (8th Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 353 (1978).  For instance, in *Mattz v. Arnett*, 412

U.S. at 490-491, the Court said that the Klamath River Reservation, "although not reestablished by Executive Order or specific congressional action, continued, certainly, in de facto existence."  The Court noted that the BIA regarded the Klamath River Reservation as "in a state of reservation," no attempts were made to sell the reservation, the military protected against trespass, and allotments were proposed. *See HRI, Inc. v. E.P.A.*, 198 F.3d 1224, 1231 (10th Cir. 2000) (declining to find a de facto reservation in the face of evidence of Congressional intent to disestablish that area); *See U.S. v. Roberts,* 185 F.3d 1125, 1131 (9th Cir.1999) (lands owned by the federal government in trust for Indian tribes are Indian Country pursuant to statute for crimes on Indian country); *State of Minnesota v. Hitchcock*, 185 U.S. 373, 388, 22 S.Ct 650 (1902) (government enacted legislation which assumed trustee relationship for Indians).

To the extent that plaintiffs may possess facts that could establish a *de facto* reservation, the Court will allow amendment.  However, plaintiffs are cautioned that they must allege factual content sufficient to raise a plausible claim that the land they allege was the Reservation, was treated by the federal government as a reservation.  Plaintiffs are further cautioned as to the factual pleading required by *Iqbal*  and *Twombly*, and the Court will not sustain conclusory allegations.  Finally, the plaintiffs are cautioned against making allegations inconsistent with Congressional enactments or Executive order.

**D.     Non-Intercourse Act**

Plaintiffs allege that TMV and TRC defendants have possessed plaintiffs' land unlawfully in violation of the Indian Non-Intercourse Act, 25 U.S.C. § 177 ("NIA").  Defendants argue that plaintiffs cannot bring a claim under the NIA because plaintiffs are not a "tribe" for purposes of the NIA, or in the alternative, tribal status should be determined by the Department of the Interior.

The Non-intercourse Act, 25 U.S.C. § 177, states, in relevant part, that, "No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177.  The purpose of NIA has been declared to be "to prevent unfair, improvident or improper disposition by Indians of land owned or possessed by them to other parties. . . ." *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 119, 80 S.Ct. 543, 555, 4 L.Ed.2d 584 (1960), *reh'g denied*, 362 U.S. 956 (1960).

To establish a prima facie case for violation of the Indian Nonintercourse Act, an Indian tribe is required to allege that (1) it is an Indian tribe, (2) the land in question is tribal land, (3) the sovereign has never consented to or approved the alienation of this tribal land, and (4) the trust relationship between the United States and the tribe has not been terminated or abandoned. *Delaware Nation v. Pennsylvania*, 446 F.3d 410 (3d Cir. 2006), as amended, (June 14, 2006) and *cert. denied*, 2006 WL 2646566 (U.S. 2006) (the Delaware Nation was a federally recognized Indian Tribe).

The NIA does not provide a definition of the term "tribe." The NIA does not state or include language that a tribe must be a "recognized" tribe.

**1.      Definition of Tribe**

In *Montoya v United States*, 180 U.S. 261, 21 S.Ct. 358, 359 (1901), the Supreme Court defined the term "tribe" for a statute with a similar purpose as the NIA. At issue in *Montoya* was a statute which protected citizens from property destruction by "any band, tribe, or nation." Like the NIA, the statute at issue did not define the term "tribe." The Court defined a tribe as follows:

> By a "tribe" we understand a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory; by a "band," a company of Indians not necessarily, though often of the same race or tribe, but united under the same leadership in a common design. While a "band" does not imply (a) separate racial origin . . . , it does imply a leadership and a concert of action.

*Montoya v. United States,* 180 U.S. 261, 266; *see Navajo Tribal Util. Auth. v. Ariz Dept of Revenue*, 608 F.2d 1228, 1231 (9th Cir. 1985) (a tribe does not include private Indian-owned entities or simi autonomous trial entities); *See Kahawaiolaa v. Norton*, 386 F.3d 1271, 1272–74 (9th Cir. 2004) (recognizing that members of a tribe are of a same or similar race). Other cases defer to the Department of the Interior's acknowledgment regulations and defer to the acknowledgment process. *Price v. Hawaii*, 764 F.2d 623, 627 (9th Cir. 1985), *cert. denied*, 474 U.S. 1055 (1986). In *United States v. Candelaria*, 271 U.S. 432, 442, 46 S.Ct. 561, 70 L.Ed. 1023 (1926), the Supreme Court interpreted "tribe" for purposes of the Non–Intercourse Act as being "a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular, though sometimes ill-defined, territory," (quoting *Montoya v. United States*, 180 U.S. 261, 266, 21 S.Ct. 358 (1901)).

Here, the SAC does not contain allegations that the Tribe is "the same race united in a

community under a single government."  Importantly, "[t]he *Montoya/Candelaria* definition and the BIA criteria both have anthropological, political, geographical and cultural bases and require, at a minimum, a community with a political structure."  *Narragansett Tribe of Indians v. Southern R.I. Land Dev. Corp.*, 418 F.Supp. 798, 807 n.8 (D.R.I.1976).  The SAC fails to contain non-conclusory facts explaining how the Tribe itself is the authentic lineal descendants entitled to assert NIA claims pertaining to the land.  Nonspecific allegation that they are a "tribe" - where the allegations do not meet the requirements of *Montoya/Candelaria*, and in light of the evidence that plaintiffs have submitted of a competing group.  The facts are insufficient to allege that these plaintiffs are the present day embodiment of an ancient tribe.  The SAC is devoid of any specific allegations that would permit the Court to draw a plausible inference that the plaintiffs are who they say they are.  At a minimum, the complaint does not allege facts to satisfy the *Montoya/Candelaria* definition of a tribe.

## 2.    Deferral to the BIA for Determination of Tribal Status

An additional issue the parties dispute is whether plaintiffs must go through the BIA acknowledgment process to be considered a "tribe."  TMV, TRC and Ken Salazar argue that plaintiffs cannot bring suit in this action because the Court should defer to the BIA acknowledgment process.

### a.    Federal Acknowledgment of Tribal Existence

The parties do not dispute that, generally, acknowledgment of tribal existence by the Department of the Interior is a prerequisite to the protection, services, and benefits from the federal government that are available to Indian tribes.  25 C.F.R. §83.2.  In 1975, Congress established the American Indian Policy Review Commission to survey the current status of Native Americans. The Commission highlighted a number of inconsistencies in the Department of Interior tribal recognition process and special problems that existed with non-recognized tribes.  Congress delegated to the Department of the Interior the authority to adopt regulations to administer Indian affairs and to clarify departmental authority by regulation under 25 U.S.C. §§ 2, 9; *see James v. United States Dep't of Health and Human Services*, 824 F.2d 1132, 1137-38 (D.C.Cir.1987). As a result, in 1978, the Department of Interior exercised its delegated authority and promulgated regulations establishing a uniform procedure for "acknowledging" American Indian Tribes.  25 C.F.R. § 83.1 et seq. The Department of Interior adopted comprehensive regulations that govern its decisions concerning tribal status as set out in 25 C.F.R. Part

83 (the "acknowledgment regulations"). This part established procedures by which the DOI acknowledges that certain Indian groups exist as "tribes." *Id.* § 83.2; *See generally*, *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1273-74 (9th Cir. 2004). Recognition "is intended to apply to groups that can establish a substantially continuous tribal existence and which have functioned as autonomous entities throughout history until the present." 25 C.F.R. §83.3(a). The Department of Interior, the federal Bureau of Indian Affairs ("BIA"), applies its expertise to this determination and has established the Branch of Acknowledgment and Research ("BAR") which staffs historians and anthropologists to determine whether groups seeking recognition "actually constitute Indian tribes and presumably to determine which tribes have previously obtained federal recognition."[9] *Kahawaiolaa v. Norton*, 386 F.3d at 1274.

### b.   Plaintiffs' Position on Deferral to the BIA

Plaintiffs argue that the Court should not defer to the BIA the decision regarding whether the Kawaiisu is a "tribe" under the NIA. Plaintiff cites the Second Circuit's decision of *Golden Hill Paugussett of Indians v. Weicker*, 39 F.3d 51 (2nd Cir. 1994) for the proposition that this Court should not defer to the BIA. Plaintiffs note that *Golden Hill Paugussett Tribe* did not resolve "whether deference to the BIA would be appropriate if no recognition application were pending." (Doc. 155, Opposition p. 15.) Plaintiffs argue that they do not have a recognition application pending before the BIA, and therefore deferral would be inappropriate.

In *Golden Hill Paugussett Tribe*, plaintiff Golden Hill Paugussett Tribe of Indians sued under the Indian Nonintercourse Act, and the Proclamation of 1763 by King George III of Great Britain, against holders of record title to land in Bridgeport, Connecticut. Defendants contended that the Tribe was not a federally recognized tribe and therefore lacked standing to sue under the NIA absent federal

---

[9]A tribal group seeking federal recognition must satisfy seven mandatory criteria: (a) the group has been identified as an American Indian entity on a substantially continuous basis since 1900; (b) a "predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present"; (c) the petitioning group "has maintained political influence or authority over its members as an autonomous entity from historical times until the present"; (d) a copy of the group's present governing document must be submitted, including its membership criteria; (e) the petitioning group's "membership consists of individuals who descend from a historical Indian tribe or from historical Indian tribes which combined and functioned as a single autonomous political entity"; (f) the group's membership is composed principally of persons who are not members of any already-acknowledged North American Indian tribe; and (g) neither the petitioning group nor its members are the subject of congressional legislation that has expressly precluded their relationship with the federal government. 25 C.F.R. § 83.7.

acknowledgment recognition.   The Tribe had applied to the BIA for federal recognition and their application was then pending.

The Court held that it should defer to the primary jurisdiction of the BIA for the administrative process of acknowledging Indian tribes is appropriate.[10]  *Golden Hill Paugussett Tribe*, 39 F.3d at 60.  "[T]he BIA's experience and expertise in implementing these regulations, and the flexibility of the procedures weigh heavily in favor of a court's giving deference to the BIA."  *Id.*  The court stated that "the BIA is better qualified by virtue of its knowledge and experience to determine at the outset whether Golden Hill meets the criteria for tribal status. This is a question at the heart of the task assigned by Congress to the BIA and should be answered in the first instance by that agency."  Thus, although a group of Indians may constitute a "tribe" for the purposes of the Non–Intercourse Act without being a tribe formally recognized by the federal government, *Golden Hill*, 30 F.3d at 59, courts have deferred to the BIA regulations governing federal recognition for further guidance.  The Second Circuit concluded that "[w]here a statute confers jurisdiction over a general subject matter to an agency and that matter is a significant component of a dispute properly before the court, it is desirable that the agency and the court go down the same track-although at different times-to attain the statute's ends by their coordinated action."   The Court remanded the case to the district court, holding that because the plaintiff tribe had simultaneously petitioned the BIA for recognition and asserted claims in federal court under the Nonintercourse Act, the district court should stay the litigation pending the BIA's decision on tribal status under the doctrine of primary jurisdiction. *Id.* at 60.

Plaintiff relies upon the following language stated by the court in *Golden Hill Paugussett Tribe*: "We need not decide whether deference would be appropriate if *no recognition application were pending*, but deferral is fully warranted here where the plaintiff has already invoked the BIA's authority."  30 F.3d at 60 (emphasis added).  Plaintiff argues that since no application by the Kawaiisu is pending

---

[10] The primary jurisdiction doctrine applies when "an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch." *Lyon v. Gila River Indian Community*, 626 F.3d 1059, 1075 (9th Cir. 2010).  The primary jurisdiction doctrine should be used "if a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency, and if protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *Id.*

1    before the BIA, the Court should not defer.[11]

2        Here, the evidence of party admissions and judicial noticeable documents show that plaintiffs

3    had an application pending before the BIA since 1979.  (Doc. 153, p. 33.)   That application was

4    withdrawn in 2006.  Plaintiffs acknowledge that no application is now pending.  The Tribe's voluntary

5    withdrawal of the application cannot serve as a basis for avoiding the BIA recognition.

6        Deference to the BIA determination is preferred course of action. While courts may make the

7    determination whether an unrecognized group is "an Indian Tribe," they are not required to so. Instead,

8    under the doctrine of primary jurisdiction, courts may defer resolution of the issue to the BIA.  *See e.g.,*

9    *New Jersey Sand Hill Band of Lenape & Cherokee Indians v. Corzine*, 2010 WL 2674565 (D.N.J. 2010)

10   (court dismissed claims under the NIA based on deference to the BIA for a "hotly disputed" tribal

11   authenticity, and where plaintiff had not yet begun the federal recognition process). *BGA, LLC v. Ulster*

12   *County, N.Y.*, 2010 WL 3338958 (N.D.N.Y. 2010) (given the complexity of the tribal inquiry and the

13   potential for inconsistent and under-informed rulings, deference to the BIA is generally preferred); *see*

14   *also U.S. v. 43.47 Acres of Land*, 45 F.Supp.2d 187 (D.Conn 1999) (determination of band's tribal status

15   would be referred to BIA).

16       Here, as discussed below, the complexity of the Tribal status, the Tribe's claims and the Tribe's

17   composition would warrant deferral to the BIA.  Nonetheless, in light of the Tribe's request for leave

18   to amend, as to the Declaratory Relief Claim, which goes hand-in-hand with the acknowledgment

19   process and claims of treaty rights, the Court will not rule on deferment until after the amendment.

20               **c.      Plaintiffs' Other Cases that the Court should not Defer to the BIA**

21       Plaintiffs also rely upon two cases from the Eastern District of New York for the proposition that

22   courts may decline to defer to the BIA and may decide the "tribal" issue. *New York v. Shinnecock Indian*

23   _____

24       [11] Plaintiffs filed a request of judicial notice of various documents.  Plaintiff Tribe purportedly filed a petition with
     the BIA on February 3, 1979.  The group which filed the petition was called the "Kern Valley Indian Community" (Doc. 153,
25   p.33.)  The BIA responded to the petition on March 28, 1979 indicating the detailed petition would have to be filed.  (Doc.
     153 p. 39.)  An attorney corresponded with the BIA in September 1988 regarding the petition.  (Doc. 153 p. 41.)  In April
26   1995, the BIA responded to a partially documented petition for federal acknowledgment. (Doc. 153 p.44.)  On September
     29, 2006, the "Kern Valley Indian Community" informed the BIA that they were withdrawing the Petition for Federal
27   Acknowledgment.  (Doc. 153 p. 52.)  Sometime in late 2010 to early 2011, the Tribe, here, notified the BIA of its intent to
     reinstate the Petition for Acknowledgment filed in March 1979.  (Doc. 153, p. 55.)  The Court does not take judicial notice
28   of the facts contained in these documents but will take judicial notice that correspondence occurred.

*Nation*, 400 F. Supp. 2d 486, 487 (E.D.N.Y. 2005) and *Gristede's Foods, Inc. v. Unkechauge Nation*, 660 F. Supp. 2d 442, 466-477 (E.D.N.Y. 2009).  In *New York v. Shinnecock Indian Nation*, New York sued to enjoin the construction and operation of a gaming casino by the Shinnecock. The Shinnecock invoked the defense of sovereign immunity against the suit, which implicated its tribal status. The court held that despite the lack of federal tribal recognition, the Shinnecock Nation was an Indian Tribe.  The Tribe had presented evidence that the Legislature of New York recognized the Tribe in 1792, the Tribe had been treated as a tribe before that and there was evidence of many acts of recognition of tribal status from 1792 to the present. 400 F.Supp.2d at 488.  Further, the BIA did not object to the court recognizing the Shinnecock for purposes of state gaming laws.  *See also Narragansett Tribe of Indians v. Southern Rhode Island Land*, 418 F.Supp. 798 (D.C.R.I. 1976) ( the court decided the issue of tribal status. This case predates the adoption of the acknowledgment regulations and is unpersuasive for that reason.)

The other New York case cited by plaintiffs is *Gristede's Foods, Inc. v. Unkechuage Nation*, 660 F.Supp.2d 442 (E.D.N.Y. 2009).  Like in *Shinnecock*, the defendant Indian tribe was sued on state and federal claims involving cigarette sales.  The defendant Indian tribe raised the defense of sovereign immunity, which like in defense in *Shinnecock*, implicated the "tribal status."  It was undisputed that the tribe was not a federally recognized tribe, but the tribe argued that it met the common law definition of a tribe under *Montoya*/*Candelaria* and therefore could assert the defense of sovereign immunity.  The Court conducted a five day evidentiary hearing on whether the tribe met the common law definition of a "tribe" as defined in *Montoya/Candelaria*.  Based upon the extensive evidentiary hearing, the court found that the tribe was a common law tribe and therefore enjoyed sovereign immunity.  The argument was then made that the Court lacked subject matter jurisdiction to resolve the tribal status.  The court held that it had jurisdiction to determine tribal status for the purpose of tribal immunity:

> "The Unkechuage has never been rejected from BIA recognition and has no pending BIA application. Additionally, the Unkechuage is not affirmatively seeking federal recognition from this court in an attempt to circumvent the administrative process prescribed by Congress. Instead, the Unkechuage defendants seek this court's determination of the Unkechuage Nation's tribal status because it is necessary to resolve a critical issue arising from their status as defendants in this case: whether the Unkechuage enjoys sovereign immunity from suit."  660 F.Supp.2d at 469.

Thus, the court determined that for purposes of sovereign immunity, the court had jurisdiction to

determine whether a tribe meets the federal common law definition of "tribe" as defined by *Montoya/Candelaria*. Suits against Indian tribes are barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation. *See Kiowa Tribe of Okla. v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 754, 118 S.Ct. 1700, 1702, 140 L.Ed.2d 981 (1998)

Plaintiffs here note, like the language in *Shinnecock*, that the court has jurisdiction to determine tribal status when "the tribe has no pending federal recognition application with the BIA." Plaintiff Tribe here does not have a pending recognition application with the BIA.

Plaintiffs' claims, however, are fundamentally different from those of the *Shinnecock* and in *Gristede's Foods*. Plaintiffs allege land rights based upon aboriginal title and based upon treaties from long ago. They claim they are descendants from those to whom promises were made, Reservations created and treaty and statutory rights infringed. They claim land rights under a complex array of historical federal statutes and federal treatises. The Tribes genealogy appears to be disperse, residing in vast locations from Utah to California. Deciding whether an Indian group is a tribe involves decisions of anthropological, political, geographical, and cultural considerations. These are not claims based upon state law for which the state has recognized the tribe as a tribe, as the State of New York did in *Shinnecock*. Here, plaintiffs are seeking to enforce federal rights.

### 3. Plaintiffs' Cases dealing with Treaty Rights and Tribal Status

Plaintiff cites two cases for the proposition that the Court should not defer the issue of current and historical tribal existence when treaty rights are at issue in the case. *United States v. Washington*, 520 F.2d 676 (9th Cir. 1975) ("Washington I"), *cert. denied*, 424 U.S. 978 (1976), and *Greene v. Babbitt*, 64 F.3d 1266, 1270-1271 (9th Cir. 1995).

In *United States v. Washington*, the government brought action against the State of Washington on behalf of numerous tribes to protect their fishing rights under treaties. Two of the tribes were descendants of treaty signatories, but were not tribes recognized as organized tribes by the federal government. *United States v. Washington*, 520 F.2d at 692-93. The State of Washington argued that the non-recognized tribes were not entitled to preserve the treaty rights. The court held otherwise:

> "Rights under the treaties vested with the tribes at the time of the signing of the treaties. Nonrecognition of the tribe by the federal government and

1
2
3
4

the failure of the Secretary of the Interior to approve a tribe's enrollment may result in loss of statutory benefits, but can have no impact on vested treaty rights. Whether a group of citizens of Indian ancestry is descended from a treaty signatory and has maintained an organized tribal structure is a factual question which a district court is competent to determine. 520 F.2d at 692-93.

5   Rights under a treaty vest with the tribe at the time of the signing of the treaty, *Washington*, 520 F.2d
6   at 692, but Indians later asserting treaty rights must establish that their group has preserved its tribal
7   status: "[t]reaty-tribe status is established when a group of citizens of Indian ancestry is descended from
8   a treaty signatory and has maintained an organized tribal structure." *United States v. Washington*, 641
9   F.2d 1368, 1372-73 (9th Cir.1981) ("*Washington II* "), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1001
10  (1982). The group seeking to exercise treaty rights must show that it has maintained an "organized tribal
11  structure," which in turn can be shown by establishing that "some defining characteristic of the original
12  tribe persists in an evolving tribal community." *Id.* at 1372-73 (finding no tribal status for lack of
13  "continuous separate, distinct and cohesive Indian cultural or political communities").

14      In *Greene v. Babbit*, the court held that vested rights could not be lost for failure of
15  nonrecognition of the tribe by the federal government and the failure of the Secretary of the Interior to
16  approve a tribe's enrollment. *Greene*, 64 F.3d at 1270 ("Nonrecognition of the tribe by the federal
17  government and the failure of the Secretary of the Interior to approve a tribe's enrollment may result in
18  loss of statutory benefits, but can have no impact on vested treaty rights.") In *Greene*, an Indian Tribe
19  sought recognition in 1972 before the DOI promulgated the acknowledgment regulations.  After the
20  regulations were adopted in 1978, the DOI undertook its research and investigation and denied
21  recognition in 1982. *Id.* at 1270.   The tribe later filed action in district court to be recognized.  The
22  court held that treaty rights are not affected by the recognition or nonrecognition by the federal
23  government.   The tribe need only be descendants of the parties to the treaty. The court said that,
24  "Whether a group of citizens of Indian ancestry is descended from a treaty signatory and has maintained
25  an organized tribal structure is a factual question which a district court is competent to determine." *Id*
26  at 1270.

27      The Court agrees that the Kawaiisu do not have to be federally recognized to exercise any treaty
28  rights, assuming treaty rights in fact exist. However, as discussed above, plaintiffs have not adequately

30

1    alleged they are descendants of those for whom the treaty was entered, the Tribe has maintained an

2    organized tribal community or that the treaty was designed to benefit the Tribe located in California.

3           **4.      Claims by David Laughing Horse under the NIA**

4           Individuals do not have standing to bring a claim under the NIA.  The NIA protects only the

5    rights of an Indian tribe. *See San Xavier Dev. Auth. v. Charles*, 237 F.3d 1149, 1152 (9th Cir.2001)

6    ("Only Indian tribes may bring § 177 actions, and 'individual Indians do not even have standing to

7    contest a transfer of tribal lands on the ground that the transfer violated that statute.' ")  In *San Xavier*,

8    a nonprofit develop corporation chartered by an Indian Nation, and which was the lessee of allotted

9    Indian land, sued to terminate a sublease.  The court held that the nonprofit corporation was not an

10   Indian Tribe and did not have standing to contest the transfer of tribal land.

11          To the extent that David Laughing Horse Robinson alleges claims under the NIA, these claims

12   are dismissed without leave to amend.

13          **5.      Futility of Deferral to the BIA**

14          Plaintiffs argue that the Kawaiisu have sought out the help from the BIA to protect their lands

15   and those efforts have all failed.  (Doc. 161 Reply p. 17.)  Plaintiffs argue that Salazar has terminated

16   its efforts to support recognition "by omitting Kawaiisu from the official list of Acknowledged tribes

17   and refusing to provide assistance to the tribe."  (Doc. 161 Reply p.17.)  Plaintiff alleges pursuing

18   acknowledgment would be futile.  Plaintiffs' allegations regarding futility are as follows:

19                  115.  Plaintiffs are excused from exhausting administrative remedies, if
                    such is otherwise required, because they are inadequate and futile in that
20                  there is no administrative procedure whereby Plaintiffs can obtain a
                    declaration of their rights under the Treaty or to obtain and enforce the
21                  rights afforded to Plaintiffs under the Treaty. Moreover, Plaintiffs are
                    informed and believe and thereon allege that any attempt to obtain said
22                  rights will be futile as the Department of the Interior has unequivocally
                    made clear that it will not provide Plaintiffs with the rights afforded
23                  under the Treaty because Plaintiffs are not listed on the list of federally
                    acknowledged Indian Tribes maintained by the BIA.
24

25          On April 1, 2011, pursuant to Plaintiffs' request (see Doc. 94), the Court dismissed Plaintiffs'

26   First Amended Complaint as to Defendant Salazar without prejudice specifically to allow Plaintiffs to

27   exhaust their administrative remedies.  (Doc. 175 p. 16-17.)  The factual allegations of futility are

28   insufficient to be plausibly suggestive of a claim entitling the plaintiffs to relief.

1    In light of the Tribe's request for leave to amend, as to the Declaratory Relief Claim, which goes

2    hand-in-hand with the acknowledgment process and claims of treaty rights, the Court will not rule on

3    deferment until after the amendment.

4    **E.    NAGPRA Claim Against TRC and TMV**

5        In their second claim for relief, plaintiffs allege that Defendants TRC and TMV damaged or

6    destroyed, seven or more Native American cemeteries, graves, sacred sites and/or artifacts in connection

7    with development on the project.  (SAC ¶62.)  Plaintiffs allege:

8        63.    Plaintiffs are informed and believe and thereon allege that this damage or
            destruction occurred both on the Tejon/Sebastian Reservation property and within
9            the Tejon Mountain Village Development footprint that is within land to which
            Plaintiffs hold aboriginal title.

10

11   Plaintiffs claim violation of the Native American Graves Protection and Repatriation Act.

12       The Native American Graves Protection and Repatriation Act ("NAGPRA"), 25 U.S.C. § 3001

13   et seq., provides for repatriation of "Native American human remains and associated funerary objects,"

14   "sacred objects," and "objects of cultural patrimony" found on federal or tribal lands after November

15   16, 1990. 25 U.S.C. § 3002(a)(1).  "Tribal lands" means all lands within the exterior boundaries of any

16   Indian reservation or all dependent Indian communities.  25 U.S.C. §3001(15)(A).

17       Defendants TRC and TMV argue that plaintiffs cannot allege an NAGPRA claim.  Plaintiffs

18   cannot allege the lands are tribal lands because the lands are private lands.  "Plaintiffs have not alleged

19   a valid aboriginal land claim and cannot, whether they are barred by the 1851 Act or by the doctrine of

20   primary jurisdiction. Because the land at issue is neither tribal nor federal land, their claim under

21   NAGPRA fails. NAGPRA has no application to TRC's land and the Defendants have no obligations."

22   (Doc. 140, Moving paper p.14.)

23       Plaintiffs argue that the lands are currently "tribal lands" within the meaning of NAGPRA.  The

24   statutory definition of "tribal lands" includes a reservation.  Plaintiffs argue that TRC and TMV

25   excavated graves within the Tejon/Sebastian Indian Reservation in violation of NAGPRA.  (Doc. 155,

26   Opposition p.21 citing SAC ¶62-80.)  The SAC alleges that the land on which the graves and cultural

27   items were excavated occurred on land that is currently an Indian reservation (the Tejon/Sebastian

28   Reservation), and at all times since its establishment in 1853 has been an Indian reservation.  (Doc. 155

Opposition p.21.)

Defendants question whether an individual who is not a member of a recognized Indian tribe has standing to bring suit under NAGPRA. NAGPRA, 25 U.S.C. § 3013, provides district courts with jurisdiction over "any action brought by any person alleging a violation of this chapter ...."[12] The Ninth Circuit has held that the "any person" language in § 3013 "may not be interpreted restrictively to mean only 'any American Indian person' or 'any Indian Tribe.' " *Bonnichsen v. United States*, 367 F.3d 864, 874 (9th Cir.2004).

This claims suffers from the same factual deficiency as plaintiffs' other land claims.  As discussed above, plaintiffs have not adequately alleged its claims to the Reservation or treaty rights. "The NAGPRA establishes rights of tribes and lineal descendants to obtain repatriation of human remains and cultural items from federal agencies and museums, and protects human remains and cultural items found in federal public lands and tribal lands." *Castro Romero v. Becken*, 256 F.3d 349, 354 (5th Cir. 2001).  Accordingly, this claim is dismissed with leave to amend along the same terms and the land-based claim.

**F.      Plaintiffs' Civil Right Claim against Kern**

Plaintiffs' third claim for relief is for violation of Civil Rights, 42 U.S.C. § 1983 against the County of Kern.  Kern moves to dismiss this claim on the ground that the tribe is not a "person" for purposes of Section 1983 liability.  Kern argues that "plaintiffs cannot plausibly assert a civil rights cause of action that is premised on the alleged 'deprivation' of property that admittedly is not the property of the unrecognized "Kawaiisu Tribe of Tejon." (Doc. 137, Moving papers p.6.)

Plaintiffs argue that their claims is not based on sovereign right, but upon distinct rights: (1) to occupy the Reservation and treaty lands, (2) to utilize the natural resources from the lands, and (3) their

---

[12] § 3013, NAGPRA explicitly vests jurisdiction in federal courts:

> The United States district courts shall have jurisdiction over any action brought by any person alleging a violation of this chapter [NAGPRA] and shall have the authority to issue such orders as maybe necessary to enforce the provisions of this chapter.

25 U.S.C. § 3013 (1990).

statutory rights under NAGPRA with regarding graves and remains of their ancestors and related cultural items.  (Doc. 163, Opposition p.4.)  Plaintiffs argue that these rights are not sovereign rights in this case's context because they seek to protect their "private right" to live on the land, which is a right Section 1983 was designed to protect from government encroachment.  The Tribe argues that for its claim under NAGPRA, the Tribe is a person which can protect NAGPRA rights.[13]  As to Plaintiff Robinson's claim for violation of Section 1983, plaintiffs concede that Plaintiff Robinson, as an individual member of the Tribe, cannot assert communal tribal rights.

> **1.      Section 1983**

The relevant portion of 42 U.S.C. § 1983 reads: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Indian tribes are not "persons" capable of bringing claims under 42 U.S.C. § 1983 for claims as a sovereign. *See Inyo County v. Paiute-Shoshone Indians*, 538 U.S. 701, 711, 123 S.Ct. 1887 (2003) (holding that the tribe could not sue under § 1983 to vindicate the sovereign right against search and seizure); *Skokomish Indian Tribe,* 410 F.3d at 515-516 (finding that the tribe was not a "person" under § 1983 when attempting to assert communal rights granted under a treaty between the tribe and the federal government). In *Skodomish*, a federally recognized tribe challenged damage to tribal lands and fisheries caused by flooding from dams, reservoirs and other water related project.  The Tribe sued, among others, a city and public utility for violation of a treaty and Section 1983.  The *Skokomish* court, citing *Inyo County*, held the that tribe was not a "person" qualified to sue under section 1983.  The court noted that the "tribe is attempting to assert communal fishing rights reserved to it, as a sovereign, by a treaty it entered into with the United States."  As a sovereign, the Tribe was asserting its treaty based rights with the federal government.  Thus, *Skokomish* squarely held that Indian tribes may not sue as "persons" under section 1983 for violation of treaty-based rights.

---

[13]   The NAGPRA claim in the second amended complaint is not alleged against County of Kern. (Doc. 133, p.13.)

Here, as in *Skokomish*, the Kawaiisu tribe is asserting its alleged treaty-based rights with the federal government for possession of the Tejon land. Kawaiisu alleges land claims based upon the "Treaty with the Utah" and "Treaty D." The Kawaiisu seek to occupy, use, protect and exclude others from the land based upon their claimed treaty rights which granted them the right to occupy. These treaty rights can be asserted solely because the Kawaiisu claims to be a sovereign which entered into contractual obligations, the treaties, with the United States. These treaty-based claims do not give rise to actions cognizable under section 1983. As a sovereign, the Kawaiisu is not a "person." Accordingly, the section 1983 claims against the County of Kern must be dismissed with prejudice. Further, David Laughing Horse concedes that his section 1983 claim against the County of Kern cannot be maintained because his claim is communal to the tribe. Therefore, David Laughing Horse's claim against Kern will be dismissed with prejudice.

### 2.     Policy or Custom

Even if Kawaiisu were making claims as a sovereign, the §1983 claim would be dismissed.

To bring a § 1983 claim against a local government entity, a plaintiff must plead that a municipality's policy or custom caused a violation of the plaintiff's constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality may only be sued under section 1983 if "the action that is alleged to be unconstitutional implement [ed] or execute[d] a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690, 98 S.Ct. 2018. To maintain a section 1983 claim against a local government, a plaintiff must establish the requisite culpability (a "policy or custom" attributable to municipal policymakers) and the requisite causation (the policy or custom as the "moving force" behind the constitutional deprivation). *Monell*, 436 U.S. at 691-694, 98 S.Ct. 2018; *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002).

Plaintiffs have not alleged in the SAC any custom, policy or practice of Kern which allegedly violated their rights. Plaintiffs do not argue in the opposition that they are able to allege a custom, policy or practice. Accordingly, plaintiff's complaint is factually devoid of this necessary element for the cause of action.

## G.     CEQA Claim

Plaintiff's fourth claim for relief alleges that Kern approved the development project without complying with California Environmental Quality Act ("CEQA").  Plaintiffs allege they have significant interest in the environmental effects of the project and to the land on which the project is developed. (SAC ¶¶91-92.)  Plaintiffs allege that the project has "significant effect" requiring the preparation of an Environmental Impact Report ("EIR").  Plaintiffs allege the previously prepared EIR is deficient in many respects, and that Kern's approval of the EIR was arbitrary and capricious.  (SAC ¶¶101, 113.)

Kern argues that the County's compliance with CEQA has been fully litigated and decided in a state court mandamus proceeding.  (Doc. 1138, Judicial Notice Exh A.)[14]  Judgment was entered and an appeal is pending before the Fifth Circuit Court of Appeal (Doc. 137, Moving papers p.13.)  Kern argues that the result plaintiffs seek is otherwise the same as that condemned under the *Rooker-Feldman* doctrine. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *Feldman v. Hickey*, 460 U.S. 462 (1983). Kern recognizes that the Supreme Court has narrowed this doctrine (*see, e.g.*, *Lance v. Dennis,* 546 U.S. 459 (2006)), but the fact remains that the relief sought by plaintiffs  would be indistinguishable in its effect from a de novo review by this Court of the Kern County Superior Court's CEQA judgment.

In their opposition, plaintiffs argue that their federal land claims are intertwined with their CEQA claims.  They argue that if the CEQA claims were tried in a state forum while the land claims and/or the NAGPRA claim were tried in the federal forum, inconsistent results would occur.  (Doc. 163, Opposition p.6.)   Whether or not Kern adequately evaluated the environmental effects of TRC and TMV Defendants' proposed development, especially the effect on cultural resources, such as the remains and other cultural items of Plaintiffs' ancestors, is dependent on the Court's resolution of the land claims and the NAGPRA claims.  Plaintiffs argue that "there is nothing overly complex about a CEQA claim" as they parallel the comparable federal act, NEPA.[15]

---

[14]   To the extent plaintiffs object to this Court taking judicial notice of a state court judgment, their objection is overruled.

[15]   The Court will not engage in any attempt to trivialize the scope, breath or complexity of CEQA.   The California Environmental Quality Act (Pub. Res. Code §§ 21000, et seq.) was enacted in 1972 to require governmental agencies to take account of the environmental issues that their actions implicated by mandating preparation of an environmental impact report ("EIR") as a predicate to such actions.   The text of CEQA itself now runs to roughly one hundred pages, with almost two hundred pages of explanatory and implementing "guidelines." (Title 14 Chapter 3, Cal. Code of Regs §§ 15000 et seq.); H.

Pursuant to the *Rooker-Feldman* doctrine Federal courts lack jurisdiction to review or modify state court judgments. *See Rooker v. Fidelity Trust Company*, 263 U.S. 413, 44 S.Ct. 149 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482, 103 S.Ct. 1303 (1983). The *Rooker-Feldman* doctrine is based on 28 U.S.C. § 1257 which grants the United States Supreme Court jurisdiction to review decisions of the highest state courts for compliance with the federal Constitution. *See Rooker*, 263 U.S. 413, 44 S.Ct. 149; *Feldman*, 460 U.S. at 482, 103 S.Ct. 1303. The doctrine provides that "lower federal courts do not have jurisdiction to review a case litigated and decided in state court; only the United States Supreme Court has jurisdiction to correct state court judgments." *Gottfried v. Medical Planning Services*, 142 F.3d 326, 330 (6th Cir.), *cert. denied,* 525 U.S. 1041 (1998). The *Rooker-Feldman* doctrine recognizes that federal district courts generally lack subject matter jurisdiction to review state court judgments. *See also Branson v. Nott*, 62 F.3d 287, 291 (9th Cir.1995) ("As courts of original jurisdiction, federal district courts have no authority to review the final determinations of a state court in judicial proceedings."), *cert. denied*, 561 U.S. 1009 (1995); *see also Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005) (*Rooker-Feldman* bars "state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced" from asking district courts to review and reject those judgments); *Doe & Assocs. Law Offices v. Napolitano*, 252 F.3d 1026, 1029 (9th Cir.2001) (applying *Rooker-Feldman* doctrine to interlocutory state court decisions).

Recently, the Supreme Court has noted the narrowness of the *Rooker-Feldman* doctrine. *Lance v. Dennis*, 546 U.S. 459, 126 S.Ct. 1198 (2006). As explained by the Court in *Lance*, the doctrine is "confined to cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." The *Rooker–Feldman* doctrine does not bar actions by nonparties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity

---

Ellman, Practicing Law Institute, *An Overview of the Entitlement Process: a Burgeoning Thicket of Complexity in the Storm of Declining Markets* 571 PLI/Real 741 , 747 (2009 ). "CEQA cases have become such a specialty that the Superior Courts of counties with a population greater than 200,000 are required to designate specific judges to hear them -- members of their panels with special expertise in the subject -- in deference to both the volume and complexity of such cases as well as the statutory mandate that they be given calendar priority and handled expeditiously. *Id.*; See Pub.Res.Code §21167.1(b).

with a party to the judgment.  *Id.* at 466.  The Court left open the issue of whether there are any circumstances in which Rooker–Feldman may be applied against a party not named in an earlier state proceeding.  *Id.* at 466 n.2.

In ruling on defendants' prior motions to dismiss the CEQA claim, the Court ruled that "Plaintiffs' CEQA claim does not substantially overlap with the 1983/equal protection claim against NAHC." (Doc. 123, Order February 7, 2011 p. 21.)  Here, the only other claims against Kern is the section 1983 claim which will be dismissed.  Again, as before, the allegations in the SAC do not overlap with any claim against Kern and the CEQA claims.

A federal court lacks subject matter jurisdiction to review claims "inextricably intertwined" with final state court decisions, even if such "inextricably intertwined" claims were not raised in state court.  *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 483-487 and n. 16 (1983); *Olson Farms, Inc. v. Barbosa*, 134 F.3d 933, 937 (9th Cir. 1998); *See Bianchi v. Rylaarsdam*, 334 F.3d 895, 900 (9th Cir. 2003) ("Stated plainly, *Rooker-Feldman* bars any suit that seeks to disrupt or 'undo' a prior state-court judgment, of whether the state-court proceeding afforded the federal-court plaintiff a full and fair opportunity to litigate her claims.").

The Court finds that, in these circumstances, preclusion is warrant.  As long as the complaint sets forth a claim "arising under" federal law, the district court may (discretionary) adjudicate state law claims that are related transactionally to the federal claim. This includes claims both against original parties and any properly-joined new parties.  See 28 U.S.C. § 1367(a).  A district court may decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction over a state law claim if "the district court has dismissed all claims over which it has original jurisdiction.").

Here, the CEQA claim is not related transactionally to the Indians' claim to ownership or possession of the property.  This case is about title and/or right of possession.  It does not decide environmental impacts of a proposed development project and assessing the impacts of such a project. It does not involve the project's environmental impacts: preservation of water; water quality; traffic and traffic patterns; air quality, and so forth.  In short, the only commonality between the federal claims in this case and the CEQA claim is that the lands are generally located in the same area.  This Court will

not undertake a vast and complex environmental analysis where the state court has undertaken the exact task and the environment has nothing to do with the main claims in this case.  Accordingly, the CEQA claim will be dismissed without leave to amend.

**H.        Fifth Claim for Relief Against Defendant Salazar**

**1.        Declaratory Relief**

The declaratory relief claim is subject to evaluation under the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201.  The DJA and its 28 U.S.C. § 2201(a) provides in pertinent part:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

The DJA's operation "is procedural only." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 463 (1937).  A DJA action requires a district court to "inquire whether there is a case of actual controversy within its jurisdiction." *American States Ins. Co. v. Kearns*, 15 F.3d 142, 143-144 (9th Cir. 1994).  The Administrative Procedure Act, like the Declaratory Judgment Act, merely provides remedies otherwise within the jurisdiction of the court. *Commonwealth v. Connor*, 248 F.Supp. 656 (D.C.Mass.1966), *aff'd*, 366 F.2d 778 (1st Cir. 1966).  It is also well settled that, although the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, enlarges the range of available remedies, it is not an independent source of district court jurisdiction and presupposes the existence of some judicially remedial right. *Schilling v. Rogers*, 363 U.S. 666, 677, 80 S.Ct. 1288, 4 L.Ed.2d 1478 (1960).

**2.        Declaratory Relief Statute does not Waive the Immunity of the United States**

It is a fundamental principle that the United States and its agencies may not be sued in federal court unless Congress has waived sovereign immunity.  If Congress has not waived the federal government's immunity for a particular claim, courts lack jurisdiction over that claim and must dismiss it. *United States v. Dalm*, 494 U.S. 596, 608, 110 S.Ct. 1361 (1990).  "A mere assertion that jurisdictional statutes apply does not suffice to confer jurisdiction when, as in this case, the government did not waive its immunity." *Hughes v. United States*, 953 F.2d 531, 539 n. 5 (9th Cir.1992). Sections 1331, 1353, 1361, and 1362 of Title 28 do not contain waivers of sovereign immunity. See 28 U. S. C. § 1353. Sections  28 U.S.C. §§ 1331 and 1337 are statutes of general jurisdiction, but they do not waive

39

1   the United States' sovereign immunity.  Whether a court may grant declaratory relief against any type

2   of defendant in a case otherwise within the court's jurisdiction does not imply, let alone expressly state,

3   that the United States has waived its immunity for all declaratory relief claims.  Indeed, §2201 provides

4   that the statute is "procedural only" and does not confer jurisdiction.  *Cal. Shock Trauma Air Rescue v.*

5   *State Compensation Ins. Fund*, 636 F.3d 538, 543 (9th Cir. 2011).

6       Even if § 2201 did grant jurisdiction, it would not necessarily waive sovereign immunity.

7   Sovereign immunity and subject matter jurisdiction are "distinct" concepts. *United States v. Park Place*

8   *Assocs., Ltd.*, 563 F.3d 907, 923 (9th Cir.2009) (A waiver of sovereign immunity means the United

9   States is amenable to suit in a court properly possessing jurisdiction; it does not guarantee a forum.

10  Conversely, the mere existence of a forum does not waive sovereign immunity.)  The Court lacks subject

11  matter jurisdiction over a suit against the United States without a waiver of sovereign immunity.  *Dunn*

12  *& Black P.S. v. United States,* 492 F.3d 1084, 1088 (9th Cir. 2007) (the United States must expressly

13  waive its immunity).  Section 2201, alone, does not waive immunity.

14      **3.      Administrative Procedures Act - as Waiver of Immunity**

15      Plaintiff contends that the immunity of the United States has been waived in the Administrative

16  Procedures Act ("APA").  Plaintiffs contend that the second sentence of section 702 is a waiver of

17  immunity for injunctive or declaratory relief.  (Doc. 161, Opposition p. 5-6.)  Plaintiffs argue that this

18  sentence is in express waiver of sovereign immunity. 5 U.S.C. § 702.

19      Right to review of agency action:

20      "A person suffering legal wrong because of agency action, or adversely affected or
        aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial
21      review thereof. **An action in a court of the United States seeking relief other than
        money damages and stating a claim that an agency or an officer or employee thereof
22      acted or failed to act in an official capacity** or under color of legal authority **shall not
        be dismissed** nor relief therein be denied on the ground that it is against the United States
23      or that the United States is an indispensable party." 5 U.S.C. § 702 (emphasis added).

24      There is some authority for plaintiffs' position.  In *The Presbyterian Church (U.S.A.) v. United*

25  *States*, 870 F.2d 518, 525–26 (9th Cir.1989), the court held that constitutional challenges to unlawful

26  agency action fell within the section 702 waiver of immunity. The plaintiffs in that case alleged that their

27  First and Fourth Amendment rights were violated when employees of various federal agencies

28  surreptitiously recorded church services. The court rejected the government's argument that section 702

                                                40

waives immunity only for challenges involving "agency action" as that term is used in section 704. The court found that sovereign immunity was waived for the constitutional challenges raised in the case. The court pointed to the legislative history, which refers to waiving sovereign immunity in all equitable actions against the government, and it noted that the second sentence in section 702 is not, by its terms, limited to cases involving "agency action." Accordingly, the court concluded that the waiver of sovereign immunity in section 702 is not limited to claims challenging conduct that constitutes "agency action." Id. at 525.

In *Veterans for Common Sense v. Shinseki*, 644 F.3d 845 (9th Cir.2011), the Ninth Circuit reaffirmed that the waiver of sovereign immunity in section 702 is not limited to actions in which the APA creates the right to judicial review. Recently, however, the Ninth Circuit granted rehearing en banc in this case on November 16, 2011.[16]  *See Veterans for Common Sense v. Shinseki*, 663 F.3d 1033 (9th Cir. Nov 16, 2011).  In *Veterans for Common Sense*, an advocacy group alleged that the slow pace at which the Department of Veterans Affairs processes requests for mental health benefits violates veterans' constitutionally protected rights to those benefits. The district court concluded that the limitations on the APA cause of action found in section 704, including the requirement for "agency action," also restrict the scope of the waiver of sovereign immunity in section 702. Because the delay in benefits adjudication constituted neither "agency action" nor "final agency action" within the meaning of section 704, the district court ruled that section 702 did not waive sovereign immunity for the veterans' action. The Ninth Circuit reversed; it held that the question whether section 702 waives sovereign immunity for the plaintiffs' constitutional, non-APA cause of action does not turn on whether the challenged delays constituted "agency action" or "final agency action."  *Veterans*, 644 F.3d at 865. Instead, the court held, the waiver of sovereign immunity applies to the plaintiffs' request for an

---

[16] Granting of an en banc hearing is unusual and is ordered only when (1) en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or (2) the proceeding involves a question of exceptional importance." Fed.R.App. Proc 35(a).  If the court grants a petition for rehearing en banc, the three-judge panel opinion is withdrawn unless the en banc panel orders otherwise. Adv. Comm. Note to Circuit Rules 35–1 to 35–3.  The three-judge panel opinion shall not be regarded as precedent and cannot be cited in briefs or oral argument to the Ninth Circuit or any district court in the Ninth Circuit except to the extent adopted by the en banc court. General Order 5.5(d); *Socop Gonzalez v. I.N.S.*, 272 F.3d 1176, 1187, fn. 8 (9th Cir. 2001) (en banc) (court's decision to rehear case en banc effectively means that original three-judge panel never existed, and en banc court acts as if it were hearing case on appeal for first time). Here, the grant of the en banc hearing states that "The three-judge panel opinion shall not be cited as precedent by or to any court of the Ninth Circuit." Therefore, the *Veterans* case does not provide any authority.

injunction to correct a constitutional violation even though the request for judicial review was not based on the authority granted by section 704 and did not involve "agency action," as defined by the APA.

Even if *Veterans* is citable authority, which it is not, Salazar distinguishes it in two ways. Salazar on the basis in *Veterans for Common Sense*, the Ninth Circuit did not reach the issue of whether the waiver of sovereign immunity for non-APA claims against federal agencies extends beyond constitutional claims and non-statutory ultra vires claims.[17]   (Doc. 175 Reply p. 6.)   Salazar also distinguishes *Veterans* on the basis that the second sentence of section 702 has two requirements which plaintiffs cannot satisfy.   The second sentence waives immunity provided that the case "seek[s] relief other than money damages **and** stat[es] a claim that an agency or [its] officer[s] or employee[s] acted or failed to act" unlawfully.  (Doc. 175 Reply p. 3.)

This latter argument is more compelling.  Here, the Tribe's declaratory relief action does not allege any wrongs "acted or failed to act" by Salazar.  Plaintiffs do not allege a wrong committed by Salazar so as to fit within two requirements of section 702.

Plaintiffs argue that the Kawaiisu's claims against Salazar are created by, inter alia, the Non Intercourse Act, Congressional actions, statutes, as well as the fiduciary obligation that Salazar owes to the Kawaiisu under Federal common law.  (Doc. 161, Opposition p. 3-4.)  The Declaratory relief claim alleges that plaintiffs are seeking to enforce their rights under the Treaty, as descendants of the signatories from the Treaty of the Utah.  (Doc. 133, SAC ¶115-117.)  They seek a declaration as to:

"b.    The respective rights and obligations of the Kawaiisu and the United States under the Treaty of the Utah.

c.    That the Kawaiisu have a trust relationship with the United States by virtue of the Treaty of the Utah, the act of Congress and the Executive Order creating the Tejon/Sebastian Reservation and the Non-Intercourse Act.

d.    That by virtue of the trust relationship, the United States has a duty to bring an action on behalf of the tribe against Defendants TRC and TMV to protect Plaintiffs' aboriginal

---

[17] Plaintiffs do not assert in the SAC constitutional claims against Salazar.  Plaintiffs do not assert non-statutory ultra vires actions by Salazar.  Both *The Presbyterian Church* and *Veterans for Common Sense* found waiver for these types of claims, which are not present in the instant action.

42

1   title.

2   e.      That by virtue of the trust relationship, the United States has a duty to ensure Plaintiffs

3           access and possession to the Tejon/Sebastian Reservation and to prevent others from

4           trespassing thereon.  (SAC ¶117)

5   Plaintiffs have not alleged that "that an agency or an officer or employee thereof acted or failed to act

6   in an official capacity."  Indeed, defendant Salazar is not mentioned in the SAC until this last claim for

7   Declaratory Relief. Without this allegation of wrongdoing, the declaratory relief claims fails to fit within

8   the waiver of immunity.[18]

9               **4.      Request for Leave to Amend the Declaratory Relief Claim**

10          At oral argument, plaintiffs argued that leave to amend should be granted.  They argued that they

11  should not be required to go through the acknowledgment process at all because their Treaty rights

12  provide that they are a "tribe."  They argue that the BIA had an obligation to place the Kawaiisu on the

13  list of recognized tribes by virtue of these rights.  They argue that they are not seeking initial recognition

14  but are challenging BIA's failure to duly include the Tribe on recognition by virtue of the treaty.

15  Plaintiffs cite *Mishewal Wappo Tribe of Alexander Valley v. Salazar*, 2011 WL 5038356 (N.D.Cal.

16  2011) in support of their proposition.

17          In *Mishewal Wappo*, Sonoma County sought to intervene in action against the U.S. Government

18  _____

19  [18]  Indeed, to the extent the plaintiffs are seeking to enforce treaty rights against the United States, their claim may
    be barred by the Tucker Act. If the tribe's claims arise out of treaty, the Tribe's claims may best be characterized as arising
20  under the Tucker Act, 28 U.S.C. § 1491, or its counterpart for Indian claims, the Indian Tucker Act, 28 U.S.C. § 1505. The
    Tucker Act gives the Court of Federal Claims exclusive jurisdiction over claims **for damages** exceeding $10,000 that are
21  "founded ... upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The Indian Tucker Act
    extends the Court of Federal Claims' jurisdiction to

22          The United States Court of Federal Claims shall have jurisdiction of any claim against the United States
            accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians
23          residing within the territorial limits of the United States or Alaska whenever such claim is one arising under
            the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which
24          otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band
            or group.

25  28 U.S.C. § 1505. It is under the Tucker and Indian Tucker Acts that the federal courts have considered claims most similar
    to those of the Tribe. For example, in United States v. Mitchell ( Mitchell II), 463 U.S. 206, 208, 103 S.Ct. 2961, 77 L.Ed.2d
26  580 (1983), an Indian tribe brought a Tucker Act cause of action in the Court of Claims (the Court of Federal Claims'
    predecessor) against the United States for breach of trust responsibilities that originated with a treaty, which was later codified
27  in federal law. This is very much like our case, in which the Tribe's claims against the United States can be characterized as
    breach of its fiduciary obligations under the Treaty.  In addition, as plaintiffs argue that the claim against Salazar is also
28  inextricably intertwined the claim against TMV and TRC, which claims asks for monetary damages, it is arguable that the
    claims are barred by the Tucker Act.

                                                43

1   by an Indian tribe which sought to compel lands, within Sonoma County, to be taken into trust. The tribe

2   alleged that it had been wrongfully terminated from recognition.  Sonoma County argued that whether

3   the tribe was in fact a "tribe" for recognition was a non-judicable political question.  The court disagreed.

4   The court noted the distinction that the Tribe was not seeking federal recognition in the first instance

5   pursuant 25 C.F.R. § 83. To the contrary, the Tribe contended it never ceased to exist due to a failure

6   to observe termination procedures and sought relief under the APA. The court held that "[t]hat distinct

7   issue may be properly raised before the court."  *Mishewal Wappo*, 2011 WL 5038356, 7.

8       Plaintiffs argue that they are not seeking recognition "in the first stance" but are challenging the

9   wrongful action of "being left of the acknowledgment list."

10      Salazar argues that the Kawaiisu should have appealed being left off the Indian list no later than

11  1994 when the regulations were modified.  Salazar argues that there is no presumption of continued

12  Indian existence.

13      In 1994, Congress enacted the Federally Recognized Indian Tribe List Act ("List Act"), Pub.L.

14  No. 103-454, 108 Stat. 4791 (1994), which requires the Secretary of the Interior to keep a list of all

15  federally recognized tribes, which "should reflect all of the federally recognized Indian tribes in the

16  United States which are eligible for the special programs and services provided by the United States to

17  Indians because of their status as Indians." Pub.L. No. 103-454, § 103. That statute, codified as 25

18  U.S.C. § 479a, defines the term "tribe" as "any Indian or Alaska Native tribe, band, nation, pueblo,

19  village or community that the Secretary of the Interior acknowledges to exist as an Indian tribe." 25

20  U.S.C. § 479a(2).

21      In this instance, leave to amend should be granted. Rule 15(a) is very liberal and leave to amend

22  'shall be freely given when justice so requires.'  *Amerisource Bergen Corp. v. Dialysis West, Inc.*, 465

23  F.3d 946, 951 (9th Cir. 2006) (quoting Fed. R. Civ. P. 15(a)). Here, plaintiffs have raised new potential

24  allegations which may state a claim.  Without the benefit of the factual allegations the parties and the

25  Court are unable to determine whether plaintiff may state a factually sufficient claim which plausibly

26

27

28

permits relief.  Accordingly, leave to amend shall be granted.[19]

### CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part the three motions to dismiss as follows:

(1)    The Court GRANTS the motions to dismiss with leave to amend as to the First Claim for Relief for Unlawful possession under common law, Violation of Non-Intercourse Act, trespass and accounting.

(2)    The Court GRANTS the motions to dismiss with leave to amend as to the Second Claim for Relief for Violation of NAGPRA.

(3)    The Court GRANTS the motion to dismiss without leave to amend as to the Third Claim for Relief for Violation of Civil Rights, 42 U.S.C. §1983 against the County of Kern

(4)    The Court GRANTS the motions to dismiss without leave to amend as to the Fourth Claim for Relief for Violation of the California Environmental Quality Act (CEQA) and Govt. Code 65352.3 against Kern, TRC and TMV.

(5)    The Court GRANTS the motion to dismiss with leave to amend as to the Fifth Claim for Relief for Declaratory Relief against defendant Salazar.

Plaintiff shall amend the complaint, in strict conformance with this order, and file the amended complaint within thirty days of the service of this order.

IT IS SO ORDERED.

**Dated:    January 17, 2012**            _____ **/s/ Barbara A. McAuliffe** _____

UNITED STATES MAGISTRATE JUDGE

---

[19] The Court acknowledges that permitting plaintiff to amend an additional time will result in the another round of motions to dismiss.  The important issues at stake here, however, warrant granting plaintiff an additional attempt to allege a claim, even in light of the high probability that deferral to the BIA is warranted.