1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT

7                  FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9   DAVID LAUGHING HORSE                    CASE NO. 09-cv-01977-BAM
    ROBINSON, ET AL.
10                      Plaintiffs,         **ORDER ON ALL DEFENDANTS' MOTIONS
                                            TO DISMISS** (Doc. 219, 221, 223)
11        vs.

12  KEN SALAZAR, ET AL.,

13                      Defendants.
    _____/
14

15        Three motions to dismiss pursuant to Fed.R.Civ.Proc. 12(b)(1) and 12(b)(6) are pending before

16  this Court: (1) motion by Tejon Mountain Village, LLC and Tejon Ranchcorp (doc. 221), (2) motion by

17  County of Kern (doc. 219), and (3) motion by defendant Ken Salazar, in his capacity as the Secretary,

18  U.S. Department of the Interior (doc. 223).  Plaintiffs David Laughing Horse Robinson and Kawaiisu

19  Tribe of Tejon filed oppositions, objections, and evidentiary support to their oppositions (see Doc. 233-

20  235.) Moving parties filed reply briefs and supporting evidence. (See Doc. 236-238.)  The parties have

21  consented to the conduct of all proceedings before the assigned Magistrate Judge.  The Court conducted

22  a hearing on the motions on July 20, 2012.  Plaintiffs appeared by telephone by counsel Michele

23  Jackson, telephonically, and by Robert Wyrick, in person. Defendant Ken Salazar appeared by telephone

24  by counsel Barbara Marvin and Barbara Coen.  Defendants Tejon Mountain Village, LLC, Tejon

25  Ranchcorp, and Tejon Ranch Corporation appeared by telephone by counsel Jena MacLean and

26  Benjamin Sharp.  Kern County appeared by telephone by counsel Charles Collins.  Having considered

27  the moving, opposition, and reply papers, including supporting evidence and objections, as well as the

28  argument of counsel and the Court's file, the Court issues the following order.

1

1

## FACTUAL OVERVIEW

The following factual overview is taken from the Third Amended Complaint ("TAC"). The well pled factual allegations are taken as true. In the interest of completeness, the Court repeats the allegations well-known to the parties even though this is the fourth time the complaint has been amended, and many of the allegations are the same as addressed in this Court's prior orders.

The overview of the case is that plaintiffs seek title, to occupy and use land, that they contend the United States guaranteed them pursuant to the 1849 Treaty with the Utah and by establishing the Tejon Indian Reservation in 1853.  (TAC ¶1.)

**A.      The Plaintiffs**

Plaintiff, the Kawaiisu Tribe of the Tejon ("Tribe"), is an Indian tribe which "resided in the State of California since time immemorial."[1]  Plaintiffs allege that the Tribe "descends from signatories to the 1849 Treaty with the Utah and the 'Utah tribe of Indians' that was recognized by the government of the United States in that treaty" and are descendants from the Indians for whom the 1853 Tejon/Sebastian Reservation was created. (Doc. 211, TAC ¶2.)  The Tribe acknowledges that it is not on the list of federally recognized tribes by the Bureau of Indian Affairs, but allege that it is "a federally recognized tribe by virtue of, inter alia, descending from signatories to of the 1849 Treaty with the Utahs and the Utah Tribes of Indians."  (Doc. 211 TAC ¶2)

Plaintiff David Laughing Horse Robinson is the Chairman of the Kawaiisu Tribe of Tejon.

**B.      The Defendants**

Defendant Tejon Mountain Village, LLC, Defendant Tejon Ranch Corporation and Defendant Tejon Ranchcorp ("Tejon Defendants")[2] are private entities which hold title or interest in 270,000 acres

---

[1] As the Court did in the previous motions to dismiss, the Court will refer to the Kawaiisu as the "Tribe" or Kawaiisu.  The Court acknowledges that a major dispute between the parties is whether, indeed, the Kawaiisu is a "Tribe."

[2] The Tejon Defendants state in their opposition that Tejon Ranchcorp, a California corporation, owns the 270,000 acres which comprise "Tejon Ranch." Defendants note that Plaintiffs named as a defendant Tejon Ranch Corporation, but no such entity exists. (See Doc. 221, Opposition p.1 n..)  The Tejon Defendants filed a corporate disclosure which states that Defendant Tejon Ranchcorp is 100% owned by Tejon Ranch Co. (Doc. 143). Tejon Ranch Co. is a Delaware corporation, and is not named in this action.  As noted by the Tejon Defendants, they had previously informed plaintiffs that plaintiffs incorrectly named Tejon Ranch Corporation as a defendant. Tejon Ranchcorp owns the property. (See Doc. 221, Opposition p.1 n..) The Third Amended Complaint continues to incorrectly name Tejon Ranch Corporation, and entity which does not exist.

of land which the Tribe claims is a portion of the reservation and lands of the Tribe.  (Doc. 211 TAC ¶¶6-9.)  These entities intend to develop "Tejon Mountain Village" with 3,450 residences, additional commercial development, including a hotel and resort facilities, a golf course and other recreational and educational facilities.  (Doc. 211, TAC ¶36.)

Defendant County of Kern ("Kern") was the lead agency for the Tejon Mountain Village development project and ultimately approved the project after hearing and Environmental Impact Report.  (Doc. 211, TAC ¶7.)

Defendant Ken Salazar is sued in his official capacity as Secretary of the United States Department of Interior ("DOI").[3]

**C.      The Kawaiisu Tribe**

Plaintiffs allege that the Kawaiisu is one of the ancient Great Basin Shoshone Paiute tribes whose pre-European territory extended from Utah to the Pacific Ocean. They have inhabited the Tejon area of California from time immemorial. At various times throughout history, the Kawaiisu People have been called any one or more the following names: Nochi, Cobaji, Cobajais, Covaji, Kahwissah, Kawiasuh, Kawishm, Kowasah, Kubakhye, Newooah, Noches Colteches, Tahichapahanna, Tahichp.  (TAC ¶32.) Currently, five hundred individuals are alleged to be enrolled in the Tribe and are all related either by blood or adopted and all blood related are "descendants of the leaders of the Kawaiisu Tribe that signed the Treaty with the Utahs in 1849."  (TAC ¶15.)  The citizens of the Kawaiisu are also descendants of the tribe of Native American encountered by Father Garces in or about 1776 and discussed in his diary and noted in his diseno maps as: Cobaji, Cobajaef, Cobajais, Covaji, Quabajai, Nochi, Nochis and Noches Colteches.  In allegations found at paragraphs 32 to 63, plaintiffs outline the history, customs, community and beliefs of the Kawaiisu.  The Tribe currently operates under an adopted Constitution which was adopted in 2002.  (TAC ¶16.)

**D.      Treaty with the Utahs**

Plaintiffs allege that before California was admitted to the Union, the Tribe's ancestors were

---

[3] Executive authority over Indian Affairs generally flows from the President to the Secretary of the Interior and then further delegated to the Bureau of Indian Affairs ("BIA"), an agency within the DOI. *See* 25 U.S.C. 1, 1a, 2; 43 U.S.C. 1457. For purposes of this order, the Court refers to the DOI and the BIA interchangeably.

signatories to the Treaty Between the United States of America and the Utah Indians, known as the Treaty with the Utah signed December 30, 1849, and ratified by the Senate on September 9, 1850. (TAC ¶ 89.) Plaintiff alleges that representatives of the Kawaiisu met to sign the Treaty with the Utah along with other tribe leaders. (TAC ¶101.) Plaintiffs allege on information and belief that around 1847, the tribe was headed by Acaguate Nochi, who signed the Treaty with the Utahs in 1849. (TAC 18.) Plaintiffs allege that in entering into the Treaty with the Utah, the tribal leaders were told that "they were not giving up their ancestral territories." (TAC ¶101.) The group of chiefs who signed the Treaty did not represent a single "tribe" of Indians, but actually each represented a tribe or band of Indians, which together made up the Confederated Tribes of Utahs, which included the Kawaiisu. (TAC ¶105.) Plaintiff alleges that the "Utah tribe" was considered a "large umbrella that contained numerous groups of Indians, including the Paiutes," which plaintiffs allege is the Kawaiisu. (TAC ¶108.) Plaintiffs allege that "the United States understood the designation of the

territory of the 'Utah tribe' as stretching all the way from Utah to California and that all of the groups of Indians within the area had some sort of affiliation." (TAC ¶109.)

**E.     Treaty D**

Plaintiff alleges that on June 10, 1851, the headmen of the Tribe entered into a treaty, known as Treaty D, in which the Tribe agreed to cede large portions of its land in return for a defined reservation along with other goods and supplies for subsistence. (TAC ¶112.) The treaty was rejected by the Senate, but plaintiff alleges that the Tribe relied upon the treaty as if it were in force. (TAC ¶¶112-13.)

In 1852, Superintendent of Indian Affairs in California Beale was appointed. Beale established military posts and some provision for subsistence of the Indians. (TAC ¶¶119-123.) Plaintiffs allege that in 1853, Tejon was chosen as a site for a reservation. (TAC ¶135.) The majority of the allegations are based on information and belief as to the history and operations, citing some correspondence, regarding what Plaintiffs call the Tejon Reservation from 1852 through 1854. (TAC ¶¶136-168.) In 1857, the commissioner of Indian Affairs reported that five reservations including Sebastian or Tejon were formed. (TAC 198.) Between 1863 and 1866, Beale took possession of the approximately 270,000 acres that now comprises Tejon Ranch, and includes the land covered by the original Tejon/Sebastian Reservation. (TAC ¶ 217) Approximately 380 Indians were left at the Tejon Reservation, primarily citizens of the

1  Kawaiisu Tribe.

2      Plaintiffs allege that the Act of 1864 established "An Act To Provide For The Better

3  Organization Of Indian Affairs In California." (TAC ¶219.)  The Act of 1864 authorized the president

4  to set aside four tracts for reservations and the rest to be sold at public auction.  (TAC ¶219.)  Plaintiff

5  alleges that the Tejon Reservation was acknowledged by Congress and was not terminated.  (TAC ¶ 221-

6  ¶222.)  Plaintiffs allege that no public sale of the Tejon Reservation was held and the defendants did not

7  acquire land by the 1864 Act.  (TAC ¶ 224.)  The Tejon Defendants are currently in possession of the

8  approximately 270,000 acres that now comprises Tejon Ranch and that they claim to have acquired the

9  rights to the land from Beale. Plaintiffs are informed and believe and thereon allege, to the extent that

10  any rights descending from Beale has deprived the Tribe of lands which the Tribe historically occupied

11  or lands reserved pursuant to 1849 Treaty with the Utah and the 1853 Tejon Reservation, such

12  deprivation is unlawful.  (TAC ¶228.)  Plaintiffs allege that in 1994, the Department of the Interior

13  confirmed that the Kawaiisu had not been terminated. (TAC ¶229.)  Plaintiff alleges approximately 70

14  allotments were taken out by Kawaiisu, beginning in or about 1893 and continuing until in or about

15  1964.  (TAC ¶232.)

16      Plaintiff alleges that Department of the Interior, during the 1920s to 1940, built or established

17  schools for Kawaiisu children on the Reservation.  (TAC ¶¶136-140.)  Plaintiffs also allege various other

18  federal agencies recognize the Kawaiisu, such as the U.S. Forest Service (which consults with the Tribe

19  regarding forestry).  (TAC ¶¶247-249.)

20  **F.      Land Patents Under the 1851 Act (TAC ¶257 e seq.)**

21      Land patents were issued and confirmed by the Land Commission pursuant to the Act of 1851.

22  Plaintiffs allege that ultimately Beale acquired all of the land patents.  (TAC ¶¶258-261.) Plaintiffs allege

23  that the Tejon Defendants claim title to approximately 270,000 acres of land located in and around Kern

24  County, California, commonly known as Tejon Ranch, based on four alleged Mexican land grants,

25  acquired by Beale and ultimately acquired from Beale by defendants' predecessor.  Plaintiff alleges that

26  their title in interest in the land is superior to any land grants because plaintiff rights to the land "came

27  into existence upon the United States Senate's ratification of the [Treaty with the Utah] on September

28  9, 1850."  (TAC ¶ 262(a).)  Plaintiffs allege they substantially complied with the 1851 Act because they

negotiated and entered into Treaty D within the 2-year time period to present claims to the Land Commission.   (TAC ¶ 262(b)-(c).)  Plaintiff alleges each of the four identified alleged Mexican land grants and the patents issued thereon are and were invalid because the land comprised land to which the United States had granted Plaintiffs the permanent right of occupancy pursuant to the 1849 Treaty and the establishment of the Tejon Reservation in 1853.  (TAC ¶263.)

**G.      Claims against Defendants**

Plaintiffs allege the following claims for relief:

(1)      Unlawful possession under common law, Violation of Non-Intercourse Act, trespass and accounting, against Tejon Defendants;

(2)      Equitable Enforcement of Treaty against Kern;

(3)      Violation of the Native American Graves Protection and Repatriation Act, against Tejon Defendants;

(4)      Deprivation of Property in Violation of the Fifth Amendment against Salazar;

(5)      Breach of Fiduciary Duty against Salazar;

(6)      Denial of Equal Protection in Violation of the Fifth Amendment against Salazar; and

(7)      Non-Statutory Review against Salazar.

## ANALYSIS AND DISCUSSION

**A.      Standard for Motion to Dismiss**

### 1.      Motion to Dismiss for Failure to State a Claim

A motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6) is a challenge to the sufficiency of the pleadings set forth in the complaint.  A Fed. R. Civ. P. 12(b)(6) dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990).  In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the factual allegations of the complaint in question, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens,* 546 F.3d 580, 588 (9th Cir. 2008); *Jenkins v. McKeithen*, 395 U.S. 411, 421, *reh'g denied*, 396 U.S. 869 (1969).

Plaintiff's complaint must contain "a short and plain statement of the claim showing that

6

1   [Plaintiff] is entitled to relief." Federal Rule of Civil Procedure 8(a)(2). Plaintiff's complaint is neither

2   short nor plain. Plaintiff's complaint is 436 paragraphs and 125 pages long.

3           To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief

4   that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007).

5   A claim has facial plausibility,"when the plaintiff pleads factual content that allows the court to draw

6   the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556

7   U.S. 662, 129 S.Ct. 1937 (2009). "[F]or a complaint to survive a motion to dismiss, the non-conclusory

8   'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim

9   entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).

10          A court is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences

11  and sweeping legal conclusions cast in the form of factual allegations." *Farm Credit Services v.*

12  *American State Bank*, 339 F.3d 765, 767 (8th Cir. 2003) (citation omitted). "While a complaint attacked

13  by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation

14  to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a

15  formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. 554,127 S. Ct.

16  1955, 1964-65 (internal citations omitted). Although accepted as true, the "[f]actual allegations must

17  be [sufficient] to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555

18  (citations omitted). Moreover, a court "will dismiss any claim that, even when construed in the light

19  most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student*

20  *Loan Marketing Ass'n v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998). In practice, "a complaint . . .

21  must contain either direct or inferential allegations respecting all the material elements necessary to

22  sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562, 127 S.Ct. at 1969. While

23  accepting factual allegations in the complaint as true, the court is not required to accept legal conclusions

24  as true, and the factual allegations must state a plausible claim for relief. *Maya v. Centex Corp*., 658

25  F.3d 1060, 1067 (9th Cir. 2011).

26          **2.      Motion to Dismiss for Lack of Subject Matter Jurisdiction**

27          The defendants seek Fed.R.Civ.Proc. 12(b)(1) dismissal of plaintiffs' claims.  F.R.Civ.P.

28  12(b)(1) authorizes a motion to dismiss for lack of subject matter jurisdiction.  Fundamentally, federal

courts are of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377, 114 S.Ct. 341 (1994).  "A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." *Stock West, Inc. v. Confederated Tribes*, 873 F. 2d 1221, 1225 (9th Cir. 1989). Limits on federal jurisdiction must neither be disregarded nor evaded. *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 374, 98 S.Ct. 2396 (1978).  A plaintiff bears the burden to establish that subject matter jurisdiction is proper.  *Kokkonen*, 511 U.S. at 377, 98 S.Ct. 2396; *see Tosco Corp. v. Communities for Better Environment*, 236 F.3d 495, 499 (9th Cir. 2001) ("plaintiff has burden of proving jurisdiction" to survive a F.R.Civ.P. 12(b)(1) motion to dismiss).

When addressing an attack on the existence of subject matter jurisdiction, a court "is not restricted to the face of the pleadings." *McCarthy v. U.S.*, 850 F.2d 558, 560 (9th Cir. 1988), *cert. denied*, 489 U.S. 1052 (1989).  In such a case, a court may rely on evidence extrinsic to the pleadings and resolve factual disputes relating to jurisdiction. *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir.), *cert. denied*, 493 U.S. 993, 110 S.Ct. 541 (1989); *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987); *Smith v. Rossotte*, 250 F.Supp.2d 1266, 1268 (D. Or. 2003) (a court "may consider evidence outside the pleadings to resolve factual disputes apart from the pleadings").

"The plaintiff always bears the burden of establishing subject matter jurisdiction. In effect, the court presumes lack of jurisdiction until the plaintiff proves otherwise." *Valdez v. U.S.*, 837 F.Supp. 1065, 1067 (E.D. Cal. 1993), *aff'd*, 56 F.3d 1177 (9th Cir. 1995).  "[T]he burden of proof is on the plaintiff to support allegations of jurisdiction with competent proof when the allegations are challenged by the defendant." *O'Toole v. Arlington Trust Co.*, 681 F.2d 94, 98 (1st Cir. 1982).

**B.    Plaintiffs' Land Claims**

In an expanded version of their claim to the Tejon Ranch 270,000 acres, plaintiffs claim they have "title."[4]  Plaintiffs allege that two parcels of real property in Kern County are in dispute.  The Kawaiisu claim title to approximately 270,000 acres of land that comprise the Tejon Ranch, and which Tejon Defendants also claims ownership. (See Doc. 233, Opposition p.7; and TAC ¶¶ 217, 224-228, 257, 262, 283-284.)  The Kawaiisu also claim superior title to the Tejon/Sebastian Indian Reservation

---

[4] In the Second Amended Complaint, plaintiffs claimed the right of occupancy based upon aboriginal title to the land.  In the TAC, plaintiffs claim they have "title" to the land.

("Tejon Reservation"), approximately 49,000 acres as shown on the 1858 Survey of the Reservation, which constitutes a portion of Tejon Ranch, and which the Tejon Defendants also claim to own. (Doc.233, Opposition p.7; TAC ¶¶ 294-304.)  The Kawaiisu claim title to Tejon Ranch pursuant to the Treaty with the Utah, signed on December 30, 1849, and ratified by the Senate on September 9, 1850 (9 Stat. 984), as "elucidated" by Treaty D. (TAC¶ 89, 25; Ex. 16).  In addition, the Kawaiisu claim title to the Tejon Reservation pursuant to Congress' Act of March 3, 1853 (10 Stat 226, 238), and the establishment of the Tejon Reservation thereafter. (TAC ¶¶ 128-133.)

>        **1.       Treaty with the Utah**

As plaintiffs have alleged in the prior complaint, Plaintiffs again allege that the Treaty with the Utah granted them vast land rights as "elucidated" by Treaty D.[5]

In the Treaty with the Utah, the Utah Indians submitted to the jurisdiction, power, and authority of the United States.  The Treaty states: "The Utah Tribe of Indians do hereby acknowledge and declare they are lawfully and exclusively under the jurisdiction of the Government of said States."  (9 Stat. 984, art. I.)  In pertinent part, the Treaty provides that:

> the aforesaid Government shall, at its earliest convenience, designate, settle, and adjust their territorial boundaries.... And the said Utahs, further, bind themselves not to depart from their accustomed homes or localities unless specifically permitted by an agent of the aforesaid Government; and so soon as their boundaries are distinctly defined, the said Utahs are further bound to confine themselves to said limits ... and they now deliberately and considerately, pledge ... to confine themselves strictly to the limits which may be assigned them....

Treaty with the Utah, Dec. 30, 1849, art. VII, 9 Stat. 985.

---

[5] In the Court's order dismissing the Second Amended Complaint, the Court found that plaintiffs allegations did not state a plausible claim that the Treaty of Utah involved any Indian Tribe in California.  The Court stated: "As currently alleged, it is not plausible that the Treaty with the Utah had anything to do with Indians in California.  Plaintiffs must allege a firmer connection between their land possession and with the Indians in the Treaty with the Utah.  Therefore, plaintiffs have not adequately alleged they are descendants of the Treaty of the Utahs or that the Treaty was entered into for their benefit, as a Tribe located in California." (Doc. 205, January 18, 2012 Order at 17.)  In the TAC, Plaintiffs have broken down the components of the "Utahs" to explain that they did not just encompass tribes in the region which is now known as the **state** of Utah, but, in fact, the "Utah tribe" stretched all the way from Utah to California. (TAC ¶109.)  Paragraphs 96-109 of the TAC detail how the Utah Tribe of Indians was actually the Confederated Tribes of Utahs, which is not just one tribe, but many tribes which joined efforts to protect themselves and their territory from other invading tribe. ( TAC ¶ 96.) The TAC also attaches correspondence from Indian Agent, James S. Calhoun, in which he describes the varied tribes which form the Utah Tribe of Indians, see TAC exhibits 13-15. The new factual allegations in Plaintiffs' pleading, taken as true, show that the Treaty with the Utah encompassed Indians living in California. The TAC allegations, accepted as true, show a connection between their purported land possession in California and with the Indians in the Treaty of the Utahs.

1    The Court of Federal Claims in *Uintah Ute Indians of Utah v. U.S.*, 28 Fed.Cl. 768, 786 (Fed.Cl.

2    1993) provided a detailed opinion on the history of the Utah, aboriginal title and the Treaty with the

3    Utah. As the Court in *Uintah Ute Indians of Utah* recognized, Article VII of the Treaty with the Utah

4    does not recognize title because the boundaries of aboriginal lands were to be settled in the future. By

5    its terms, the treaty does not designate, settle, adjust, define, or assign limits or boundaries to the Indians.

6    It leaves such matters to the future. "The ratified treaty allowed the Indians permissive occupation and

7    reserved a final settlement sometime in the future." *Uintah Ute Indians*, 28 Fed.Cl. at 789. The express

8    terms of the Treaty state that "Government **shall, at its earliest convenience**, designate, settle, and

9    adjust their territorial boundaries." The Treaty with the Utah does not establish any reservation for

10   Indians, including plaintiffs in the instant case. It left such matters to future decision. Consequently,

11   the treaty cannot be said to recognize Indian title. *Uintah Ute Indians of Utah*, 28 Fed.Cl. at 786. The

12   court held that treaty was made with the "Utah" Indians involved no cession of lands, and did not set

13   apart any reservation to the Indians. (9 Stats., 984.) The Treaty with the Utah did not provide a

14   reservation for Indians. The Treaty did not recognize Indian title. Thus, the treaty did not establish any

15   title or reservation to land, and the treaty did not grant title to land.

16   Review of the plain terms of the Treaty show that the Treaty was not self-executing. As the

17   Supreme Court has noted, other courts of appeals have recognized this presumption that treaties

18   generally "do not create privately enforceable rights in the absence of express language to the contrary."

19   *Medelln v. Texas,* 552 U.S. at 491, 505 n.3, 128 S.Ct. at 1357 n.3 (2008). Whether a treaty is

20   self-executing depends on whether "the treaty contains stipulations which ... require no legislation to

21   make them operative;" if so, "they have the force and effect of a legislative enactment." *Id.* at 505-06,

22   128 S.Ct. 1346. In order to decide a dispute over whether a particular treaty is self-executing, courts

23   "may look beyond the written words [of the treaty] to the history of the treaty, the negotiations, and the

24   practical construction adopted by the parties." *Choctaw Nation of Indians v. United States*, 318 U.S.

25   423, 432 (1943) (citations omitted). But even Indian treaties cannot be re-written or expanded beyond

26   their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties.

27   *Choctaw Nation of Indians v. U.S.*, 318 U.S. at 432, 63 S.Ct. at 678.

28   In the specific context of determining whether a treaty provision is self-executing, several factors

10

1  may be referred to:

2  > the purposes of the treaty and the objectives of its creators, the existence of domestic
3  > procedures and institutions appropriate for direct implementation, the availability and
> feasibility of alternative enforcement methods, and the immediate and long-range
> consequences of self- or non-self-execution.

4

5  *People of Saipan v. United States Department of Interior*, 502 F.2d 90, 97 (9th Cir. 1974), *cert. denied*,

6  420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975).

7  As shown from the language of the Treaty with the Utah, the government was to establish

8  reservations in the future.  "Government shall, at its earliest convenience, designate, settle, and adjust

9  their territorial boundaries."  The Treaty with the Utah was a future commitment to set aside land for

10  the signatory tribes.  As this Court has held in ruling on the prior motions to dismiss, the Treaty with the

11  Utah did not grant land title or possession.

12  **2.      The Act of 1851**

13  In these motions, as in the prior motions, the parties argue the applicability of the Act of 1851.

14  The Act of 1851 followed the cessation of hostilities with Mexico and which culminated in the

15  Treaty of Guadalupe Hidalgo.  The Treaty, signed on February 2, 1848 and entered into force on May

16  30, 1848, signaled the formal end of the Mexican-American War.  9 Stat. 922 (1848); *U.S. ex rel. Chunie*

17  *v. Ringrose,* 788 F.2d 638, 641 (9th Cir. 1986).  The United States and Mexico signed the treaty of

18  Guadalupe Hidalgo, in which Mexico ceded land that includes parts of the present-day state of California

19  to the United States.  9 Stat. 922 (1848).  To settle land claims in the newly acquired territory, Congress

20  passed the Act of March 3, 1851, ch. 41, 9 Stat. 631 (1851) ("Act of 1851").  The Act of 1851 created

21  a board of commissioners to determine the validity of claims, and required every person "claiming lands

22  in California by virtue of any right or title derived from the Spanish or Mexican government" to present

23  the claim within two years.  Act of 1851, ch. 41, § 8; *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d at 641.

24  Any land not claimed within two years, and any land for which a claim was finally rejected, was deemed

25  "part of the public domain of the United States."  Act of 1851, ch. 41, § 13.  The determination by the

26  commission as to land patents issued "shall be conclusive between the United States and the said

27  claimants only, and shall not affect the interests of third persons."  Act of 1851, ch. 41, § 13.  Courts in

28  the United States have uniformly found that title to the land first passed to the United States through the

11

Treaty of Guadalupe Hidalgo.  See, e.g., *United States v. California*, 436 U.S. 32, 34 n. 3, 98 S.Ct. 1662, 1663 n. 3, 56 L.Ed.2d 94 (1978) (stating that, under the Treaty, "all nongranted lands previously held by the Government of Mexico passed into the federal public domain").

This Court, in ruling on the previous motions to dismiss and after an exhaustive review of the cases dealing with the Act of 1851 and whether "Indians" were required to file claims, held:

> "case law holds that aboriginal title is lost when land patents are validly issued to predecessors in title.  Indian claims to occupancy is invalid as against such validly issued land patents by the board of commissioner pursuant to the 1851 Act.  Here, land patents were issued for the land claimed by plaintiffs.  Thus, the Tribe would lose any claim to aboriginal title for failing to submit a claim pursuant to the 1851 Act."

(Doc. 205, January 18, 2012 Order p. 11.)  The Court will not repeat that analysis again, even though it is reargued by plaintiffs.

In the TAC, Plaintiffs acknowledge that land patents were issued to Tejon Defendants' predecessor by the United States for the land at issue (as discussed more fully below).  As stated in *Title Insurance*, the United States would have been unable to grant the land patents by the Board of Commissioners if the Indians had a claim of permanent occupancy.  *Title Ins.*, 265 U.S. at 484.[6]  As the Supreme Court noted, there would be "little reason for presenting to the land commission his claim to land, and securing a confirmation of that claim, if the only result was to transfer the naked fee to him, burdened by an Indian right of permanent occupancy." *Title Ins.*, 265 U.S. at 484.  Thus, the purpose of the Board of Commissioners was to grant <u>clear</u> title.

This Court agrees with the argument made by the Tejon Defendants.  (Doc. 221, Motion p.9.) The Board of Commissioners granted clear title to land presented to it for resolution.  If, to the contrary, the Court were to accept plaintiffs' argument, that the Treaty of the Utah granted land rights, that Treaty would be in direct conflict with the Treaty of Guadalupe Hidalgo.  In the Treaty of Guadalupe Hidalgo executed in 1948, the United States promised to honor Mexican land grants. If, however, the Treaty with the Utah, ratified in 1949, granted rights in land in California which had Mexican land grants, the United

---

[6] *U.S. v. Title Insurance & Trust Co.*, 288 F. 821 (9th Cir. 1923), *affirmed*, *U.S. v. Title Insurance & Trust Co.*, 265 U.S. 472, 44 S.Ct. 621, 68 L.Ed. 1110 (1924) dealt with the "Tejon Indians," claiming an aboriginal right of occupancy occupied a portion of the land in Kern County which is in dispute in this case. The court affirmed the land patent at issue there.

States would be unable to grant land under the Treaty of Guadalupe Hidalgo or any other authority.  To accept plaintiff's argument would mean that the United States granted land to plaintiffs in executing the Treaty with the Utah in violation of the Treaty of Guadalupe Hidalgo by failing to honor Mexican land grants.  To the contrary, the Board of Commissioners held that the Mexican land grants were valid and issued patents thereon.

### 3.      Plaintiffs Argue that the Land Patents are Invalid

Plaintiffs argue that the Tejon Defendants, as successors in title, do not possess valid title because the original land patents were invalid.

As plaintiffs allege, the Tejon Defendants trace title to the Tejon Ranch from Mexican land grants.  Plaintiffs acknowledge that land patents were issued to Tejon Defendant's predecessor in interest.  Plaintiffs allege, on information and belief, that the Tejon Defendants claim title to Tejon Ranch, based on four alleged Mexican land grants, for Rancho La Liebre, Rancho los Alamos y Agua Caliente, Rancho El Tejon and Rancho Castac.  (TAC ¶257.)  Plaintiffs acknowledge in the TAC, on information and belief, that the land claimed by Tejon Defendants was confirmed as patents issued to Tejon Defendant's predecessor in interest.[7]

The land grants were confirmed by patent and upheld in court decisions.  These land patents are the predecessors in interest to the Tejon defendants. For instance, in *U.S. v. Title Ins. & Trust Co*, 288 F. 821 (9th Cir. 1923), *affirmed*, *U.S. v. Title Ins. &Trust Co.*, 265 U.S. 472, 44 S.C. 621 (1924), the "Tejon Indians" claimed an aboriginal right of occupancy, in land occupied in Kern County. Mexican grantees had claimed the land under the Act of 1851 and the Board of Commissioners approved the grant and it was affirmed on appeal.  *Title Insurance*, 288 F.821 at 823 ("On successive appeals to the United States District Court and to the Supreme Court of the United States, the board's decision was affirmed. On May 9, 1863, a patent from the United States was issued conveying to Mexican grantees the land,

---

[7]"Plaintiffs are informed and believe and thereon allege, the claim for Rancho El Tejon was ultimately confirmed and a patent was issued on May 9, 1863 to Aguirre and Del Valle for 97,616.78 acres." (Doc. 211,TAC ¶ 258). "Plaintiffs are informed and believe and thereon allege, the claim for Rancho La Liebre was ultimately confirmed and a patent was issued on June 21, 1875 to J.M Flores for 48,799.59 acres." (TAC ¶ 259). "Plaintiffs are informed and believe and thereon allege, the claim for Rancho los Alamos y Agua Caliente was ultimately confirmed and a patent was issued on November 9, 1866 to A. Olevara and others for 26,626.23 acres." (TAC ¶ 260). "Plaintiffs are informed and believe and thereon allege, the claim for Rancho Castac was ultimately confirmed and a patent was issued on November 27, 1866 to J.M. Covarrubias for 22,178.28 acres." (TAC ¶ 261).

which includes the Indian tract.); *see Super*s v. *Work,* 3 F.2d 90, 91 (C.E.D. 1925) (*Non-mission* Indians who are "merely roving bands" were required to present their claims to the claims commission), *aff'd*, 271 U.S. 643 (1926).

The purpose of the Board of Commissioners, pursuant to the Act of 1851, was to provide clear title to land. As the court in *Title Ins.* noted, "a claim of a right to permanent occupancy of land is one of far reaching effect . . ." *Title Ins.*, 265 U.S. at 484. The land patents were issued by the United States and pursuant to the Court's holding *Title Ins.*, provide clear title. Plaintiffs cannot now challenge the validity of United States issued land patents after over a century of time has elapsed. *Title Ins.*, 265 U.S. at 486 ("Where questions arise which affect titles to land, it is of great importance to the public that, when they are once decided, they should no longer be considered open.")

### 4.    Treaty D, an Unratified Treaty, Does Not Grants Title

Plaintiffs again rely upon a grant of title in Treaty D. This Court has previously considered Treaty D and rejected, as a matter of law, that Treaty D granted land rights. In 1848, the United States executed the Treaty of Guadalupe Hidalgo, pursuant to which the United States promised to honor Mexican land grants. Congress established a land commission through the Act of 1851 to effectuate the Treaty of Guadalupe Hidalgo.

Treaty D was a promise by the United States to set apart "for the sole use and occupancy" certain reservations for "various tribes of Indians in the State of California" in 1852, and to provide the goods, chattels, school houses, teachers, among other things. Treaty D, Art. 3, 4; see Hein Online, 4 Indian Aff. L & Treaties, 1101 (1913-1927). Those promises were never carried out by the United States. Both plaintiffs and the defendants agree that Treaty D was not ratified by Congress. An unratified treaty has no force until ratified by a two-thirds vote of the Senate. U.S. Const., Art. II, cl. 2; *S.E.C. v. International Swiss Investments Corp.*, 895 F.2d 1272, 1275 (9th Cir. 1990). The particular terms of Treaty D stated: "This treaty to be binding on the contracting parties when ratified and confirmed by the President and Senate of the United States of America." Since Treaty D was never ratified, it cannot provide any basis for plaintiffs' claim to land. Further, its express terms provided it had not force until it was ratified.

As noted in this Court's prior order, the descendants of tribes in Treaty D were compensated for the failure to ratify the treaties. (See Doc. 205, January 18, 2012 Order p. 17-18.) Treaty D was among

18 treaties attached as "Exhibit A" to the complaint in *Indians of California by Webb v. United States*, 98 Ct.Cl. 583 (1942), *cert. denied*, 319 U.S. 764, 63 S.Ct. 1324, 87 L.Ed. 1714, brought by the California Attorney General under the "Indians of California Act" of May 18, 1928, 25 U.S.C. § 651. The Indians of California Act authorized "the [A]ttorney [G]eneral of the State of California to bring suit in the Court of Claims on behalf of the Indians of California," who were defined as "all Indians who were residing in the State of California on June 1, 1852, and their descendants now living in said State." *Indians of California by Webb,* 98 Ct.Cl. 583, 585 (Ct.Cl.1942) ("[P]laintiffs, herein designated as The Indians of California, comprise all those Indians of the various tribes, bands and rancherias who were living in the State of California on June 1, 1852, and their descendants living in the state on May 18, 1928—such definition and designation having been prescribed in the Jurisdictional Act [of 1928]."). The Indians of California Act authorized the Attorney General to file on behalf of the Indians for compensation for land taken in the unratified treaties, such as Treaty D. *Indians of California by Webb*, 98 Ct. Cl. 583 (these Indians "did not qualify before the Commission created by the Act of March 3, 1851, 9 Stat. 631, entitled 'An Act to ascertain and settle the private land claims in the State of California.' Therefore whatever lands they may have claimed became a part of the public domain of the United States.")  The Attorney General filed suit on August 14, 1929 and in 1942, the Court of Claims held the Indians of California were entitled to recover damages from the United States. As explained in *Round Valley Indian Tribes v. U.S.*, 97 Fed.Cl. 500, 504 (Fed.Cl. 2011), the government later stipulated to judgment on October 30, 1944 in the amount of $5,024,842.34. *Indians of California by Webb v. United States,* 102 Ct.Cl. 837 (1944); *Round Valley Indian Tribes*, 97 Fed.Cl. at 504. Therefore, Treaty D has no force and effect and its signatories were compensated by Court judgment.

**5.      The Tejon/Sebastian Reservation**

Plaintiffs also argue that their land claims arise from the creation of the certain Reservations in California.  Plaintiffs allege that the Tejon/Sebastian Reservation was created for the Tribe's benefit. In conjunction with Treaty D and the Treaty with the Utah, Plaintiffs have alleged facts showing how the Tejon land came to be reserved for the Kawaiisu.  (TAC ¶¶132-135, Exhibits 19-20; See allegations of Tejon Sebastian reservation at TAC ¶¶114-249.)  Plaintiffs allege that General Edward Fitzgerald Beale established the Tejon/Sebastian Reservation for the Kawaiisu in 1853 at the direction of Congress.

1    Plaintiffs cite to the Congressional Globe which refers to the Tejon/Sebastian reservation.[8]

2    In their oppositions to the motions, plaintiffs did not address the lack of Presidential

3    establishment of the Tejon/Sebastian reservation.  Rather, plaintiffs state that the Tejon/Sebastian

4    reservation "was established by Edward F. Beale, the Superintendent of Indian Affairs in California, on

5    behalf of the United States in or about September 1853." (Doc. 211 TAC 15, 114.)  Plaintiff refers to

6    letters between various officials regarding protection of Indians and establishing a plan for doing so and

7    that an 1858 survey of Tejon/Sebastian was made.  (TAC ¶133-134, 294.)

8    In this Court's prior order, the Court noted the deficiency in alleging the existence of the

9    Tejon/Sebastian Reservation.  The Tejon/Sebastian Reservation was not a reservation established by the

10   President and therefore cannot provide land rights to plaintiffs.  The Court also noted that plaintiffs did

11   not point to any executive order establishing the Tejon/Sebastian reservation as a result of the 1853 or

12   1855 Acts.  (See Doc. 205, January 18, 2012 Order p. 19-20.)

13   Congress authorized the President in 1853 "to make five military reservations from the public

14   domain in the State of California or the Territories of Utah and New Mexico bordering on said State,

15   for Indian purposes.... Provided, That such reservations shall not contain more than twenty-five thousand

16   acres." Act of March 3, 1853, ch. 104, 10 Stat. 226, 238; See TAC ¶130-131.  The 1853 Act permitted

17   a reservation of at most 25,000 acres.[9]  10 Stat. 226, 238 (That "such reservations shall not contain more

18   than twenty-five thousand acres each" and "shall not be made on any lands inhabited by Citizens of

19   California.")  It has long been held that Congress has the power to diminish reservations unilaterally.

20   *Solem v. Bartlett*, 465 U.S. 463, 470 n. 11, 104 S.Ct. 1161, 1166 n. 11 (1984).  "A congressional

21   determination to terminate (an Indian reservation) must be expressed on the face of the Act or be clear

22   from the surrounding circumstances and legislative history." *Mattz v. Arnett*, 412 U.S. 481, 505, 93

---

23

24       [8]  Plaintiffs allege that Exh. 18-20 attached to the TAC show the "establishment of the Reservation."  (Doc. 233, Opposition p.7) Exh 18 is the 1853 Act, 10 Stat 226, 238 ("That the president of the United States, if upon examination he shall approve of the plan hereinafter provided for the protection of the Indians, be and he is hereby authorized to make five

25       military reservations from the public domain the state of California. . .")  Exh. 19 is a letter to the Secretary of Interior with the proposed language included in the 1853 Act from Franklin Pierce.

26

27       [9]  Plaintiffs claim that their land encompasses 270,000 plus an additional 75,000 acres.  Given this express Act of Congress to establish reservations in California for Indians of no more than 25,000, plaintiffs claim in the TAC that they have

28       "at least" 25,000 acres, although they seek title to the full 270,000.  At oral argument, plaintiffs claimed that there are three different reservations of 25,000 acres for a total of 75,000 acres.

S.Ct. at 2258.

The 1853 Act was subsequently amended to provide for two additional reservations. Act of March 3, 1855, ch. 204, 10 Stat. 686, 699; *see Shermoen v. U.S.*, 982 F.2d 1312, 1315 n.1 (9th Cir.1992), *cert. denied*, 509 U.S. 940 (1993). The Act of March 3, 1855, 10 Stat. 699, appropriated funds for "collecting, removing, and subsisting the Indians of California . . . on two additional military reservations, to be selected as heretofore . . . Provided, That the President may enlarge the quantity of reservations heretofore selected, equal to those hereby provided for."   Plaintiffs allege, consistent with this Act, that the Tejon/Sebastian Reservation was established in 1953.

In 1864, Congress passed "An Act to provide for the Better Organization of Indian Affairs in California." Act of April 8, 1864, ch. 48, 13 Stat. 39. This measure empowered the President to reserve four tracts of land:

> set apart ... at his discretion, not exceeding four tracts of land, within the limits of [California], to be retained by the United States for the purposes of Indian reservations, which shall be of suitable extent for the accommodation of the Indians of said state, and shall be located as remote from white settlements as may be found practicable....

The Act of April 8, 1864 designated California as one Indian superintendency. Congress authorized the President to designate the reservations.  The 1864 Act further provided that the lands not retained as reservations were to be surveyed and offered for sale: "[T]he several Indian reservations in California which shall not be retained . . . under . . . this act, shall . . . be surveyed into lots or parcels . . . and . . . be offered for sale at public outcry, and thence afterward shall be held subject to sale at private entry." *Id.*, at 40; see *generally Mattz v. Arnett*, 412 U.S. 481, 490, 93 S.Ct 2245 (1973).  The Supreme Court noted in *Mattz* that, "At the time of the passage of the 1864 Act there were, apparently, three reservations in California: the Klamath River, the Mendocino, and the Smith River.  It appears, also, that the President did not take immediate action, upon the passage of the Act, to recognize reservations in California." *Mattz v. Arnett*, 412 U.S. at 489-490.   The Act of 1864 superseded the Act of 1853 by allowing only four reservations in California. *Sermon v. U.S.,* 982 F.2d 1312, 1315 (9th Cir. 1992).  See Executive Orders found in Hein Online, 1 Indian Aff. L & Treaties 815-831 (1902). Those reservations were established by Executive Order and were the Hoopa Reservation (established in 1876), Mission Indian Reserve (established in 1870, and revised from 1877-1889), Round Valley Reservation

(established 1870), and Tule River Reservation (established 1873).  See *Mattz*, 412 U.S. at 494 (The 1864 Act had authorized the President to 'set apart' no more than four tracts for Indian reservations in California); *Donnelly v. U.S.*, 228 U.S. 243, 258-259, 33 S.Ct. 449, 453 (1913) ("Presidents Grant, Hayes, Garfield, Arthur, Cleveland, and Harrison, successively, acted with respect to one or more of these reservations upon the theory that the Act of 1864 conferred a continuing discretion upon the Executive; orders were made for altering and enlarging the bounds of the reservations, restoring portions of their territory to the public domain, and abolishing reservations once made, and establishing others in their stead; and in numerous instances Congress in effect ratified such action.")

In the TAC, plaintiffs allege that the "Tejon Reservation" was not abolished by the Act of 1864: "Plaintiffs are informed and believe and thereon allege, the 1864 Act did not terminate the Tejon Reservation because the Act lacked the "unequivocal language of termination" with respect to the Tejon Reservation that is required for an Indian reservation to be properly terminated."  (TAC 221-222.)

The Court does not accept as true this allegation because the allegation is not factual, and is a legal conclusion.  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation.  *Bell Atlantic Corp. v. Twombly*,  550 U.S. 544, 555, 127 S.Ct. 1955, 1965 (2007). The Act of 1864 states that "all acts or parts of acts in conflict with the provisions of the act, be, and the same are hereby, repealed . . ." Congress also provided that "the several Indian reservations in California which shall not be retained for the purposes of Indian reservations" shall be sold.  13 Stat. 39, Sec.3. It is difficult to determine more precise legislative language to abolish prior reservations, even assuming the reservation existed. See *Mattz*, 412 U.S. at 505 n. 22, 93 S.Ct. 2245 (noting that "Congress has used clear language of express termination when that result is desired," and quoting instances where acts declared a reservation "abolished," "discontinued," or "vacated and restored to the public domain"). Any prior act creating a reservation was "repealed" and any existing reservations not acknowledged by the President, were to be sold.  Thus, even if a Sebastian/Tejon reservation had been established in 1853, any such legislation was "repealed."

## C.     Federal Recognition

Plaintiffs allege that Salazar's failure to place the Kawaiisu on the List of Federally Recognized Tribes is wrongful.  "Contrary to its historical obligations, ratified by Treaty, Defendant Salazar failed

1  to correct the Plaintiffs' omission from the list of acknowledged tribal entities, failed to respond to

2  provide Plaintiffs' with assistance in this claim against the Tejon defendants' [sic] or to intervene to stop

3  the Tejon Defendants' wrongful conduct and failed to protect the tribe from the unlawful taking of their

4  reservation."[10] (Doc. 235, Opposition p. 6.) Plaintiffs allege that the Tribe is a federally recognized tribe

5  by virtue of the Act of Congress of 1855.[11]

6  Salazar argues that not being placed on the List is an issue which must be pursued through the

7  administrative process and is an otherwise non-judicable political question.

## 1.   Federal Acknowledgment of Tribal Existence

9  The parties do not dispute that, generally, acknowledgment of tribal existence by the Department

10  of the Interior is a prerequisite to the protection, services, and benefits from the federal government that

11  are available to Indian tribes.[12] 25 C.F.R. §83.2.  In 1975, Congress established the American Indian

---

13  [10] A tribe may also have treaty rights which are independent of formal government recognition, as the Kawaiisu claim in the TAC.  In *United States v. Washington*, 520 F.2d 676 (9th Cir.1975), *cert. denied*, 423 U.S. 1086, 96 S.Ct. 877,

14  47 L.Ed.2d 97 (1976), the Ninth Circuit held that a tribe's recognition or lack of recognition by the Secretary of the Interior does not determine whether the tribe has vested treaty rights:

> Nonrecognition of the tribe by the federal government and the failure of the Secretary
> of the Interior to approve a tribe's enrollment may result in loss of statutory benefits, but
> can have no impact on vested treaty rights. Whether a group of citizens of Indian
> ancestry is descended from a treaty signatory and has maintained an organized tribal
> structure is a factual question which a district court is competent to determine.

18  *Id.* at 692–93. Once a tribe is determined to be a party to a treaty, its rights under such a treaty may be lost only by

19  unequivocal action of Congress. *Id.* at 693; *See Greene v. Babbitt*, 64 F.3d 1266 (9ᵗʰ Cir. 1995).  The Court accepts the well plead factual TAC allegation as true that the Kawaiisu were parties to the Treaty with the Utah.  The Court does not accept as true, as stated above, the legal conclusion that the Treaty granted the land rights claimed by the Kawaiisu.

21  [11] The Court does not accept as true the allegation that the Kawaiisu is a federally recognized Tribe. On a motion to dismiss, the court generally accepts as true the allegations of the complaint in question. *Lazy Y. Ranch LTD v. Behrens*,

22  546 F.3d 580, 588 (9th Cir. 2008).  Courts, however, "are not bound to accept as true a legal conclusion couched as a factual allegation. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1965 (2007).  Whether the Kawaiisu has attained the status of "recognized" by the United States is a legal conclusion based upon the application of facts to law.

24  [12] The Court notes that prior complaints filed by plaintiffs alleged that plaintiffs had engaged in the administrative prerequisite with the Department of Interior.  In the original complaint, filed by individual Robinson in pro per, the complaint

25  alleged: "The Kawaiisu Tribe of Tejon is a Tribe that has been recognized by the United States since before 1934 and has been omitted from the Federal Register list of entities recognized...." (Doc. 1, Complaint ¶2.) The complaint sought to "Order

26  Department of the Interior (DOI) to reaffirm formal recognition of the Kawaiisu Tribe of Tejon...." (Doc. 1 Complaint, p.

27  56.) In the First Amended Complaint, plaintiffs, then represented by counsel, alleged that, "On February 27, 1979, the Tribe engaged the administrative process by filing a petition with the BIA as the 'Kern Valley Indian Community under the leadership of Mr. Clyde Robinson, father of Plaintiff David Laughing Horse Robinson.'" (Doc. 71, FAC, ¶ 25, p. 9).  As relief

28  in that complaint, plaintiffs sought to hold a hearing on the merits that the Kawaiisu Tribe be listed or an order to DOI to

Policy Review Commission to survey the current status of Native Americans. The Commission highlighted a number of inconsistencies in the Department of Interior tribal recognition process and special problems that existed with non-recognized tribes. Congress delegated to the Department of the Interior the authority to adopt regulations to administer Indian affairs and to clarify departmental authority by regulation under 25 U.S.C. §§ 2, 9; *see James v. United States Dep't of Health and Human Services*, 824 F.2d 1132, 1137-38 (D.C.Cir.1987). As a result, in 1978, the Department of Interior exercised its delegated authority and promulgated regulations establishing a uniform procedure for "acknowledging" American Indian Tribes. 25 C.F.R. § 83.1 et seq. The Department of Interior adopted comprehensive regulations that govern its decisions concerning tribal status as set out in 25 C.F.R. Part 83 (the "acknowledgment regulations"). This part established procedures by which the DOI acknowledges that certain Indian groups exist as "tribes." *Id.* § 83.2; *See generally*, *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1273-74 (9th Cir. 2004), *cert. denied*, 545 U.S. 1114 (2005). Recognition "is intended to apply to groups that can establish a substantially continuous tribal existence and which have functioned as autonomous entities throughout history until the present." 25 C.F.R. §83.3(a). The Department of Interior, the federal Bureau of Indian Affairs ("BIA"), applies its expertise to this determination and has established the Branch of Acknowledgment and Research ("BAR") which staffs historians and anthropologists to determine whether groups seeking recognition "actually constitute

---

"make a final determination on the Tribe's federal acknowledgment petition within 12 months." When challenged by motions to dismiss for failure to exhaust DOI administrative remedies, Plaintiffs then dismissed their claims against Salazar to pursue the administrative remedies with DOI. (Doc 94.) The administrative remedies were not pursued, and the Second Amended Complaint again asserted claims against Salazar. Plaintiffs asserted a declaratory relief claim on the basis that "Plaintiffs are excused from exhausting administrative remedies, if such is otherwise required, because they are inadequate and futile" and because DOI "has unequivocally made clear that it will not provide Plaintiffs with the rights afforded under the Treaty because Plaintiffs are not listed on the list of federally acknowledged Indian Tribes maintained by the BIA." (Doc. 133, SAC ¶225.) In the TAC, the current, operative complaint, plaintiffs allege that they are not seeking recognition because they have recognition under the Treaty with the Utah and state they have no petition pending with the BIA. (TAC ¶275.) In their oppositions to the three current motions to dismiss, plaintiffs argue that their prior complaints are irrelevant. The prior pleadings, however, are not irrelevant. A prior pleading may be superseded as a pleading, but the prior pleading may be admissible in evidence against the pleader; e.g., as an admission or prior inconsistent statement by the pleader: "The amendment of a pleading does not make it any the less an admission of the party." *Andrews v. Metro North Commuter R.R. Co.*, 882 F.2d 705, 707 (2nd Cir. 1989)*; see also White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396, fn. 5 (5th Cir. 1983). In evaluating the allegations of tribal status, the Court does not ignore plaintiffs' prior, inconsistent allegation. The prior allegations state that the tribe, under the name of the "Kern Valley Indian Community," filed a petition with the BIA. These allegations are considered in determining whether deferral to the BIA is appropriate, among other things.

Indian tribes and presumably to determine which tribes have previously obtained federal recognition."[13]

*Kahawaiolaa v. Norton*, 386 F.3d at 1274.

## 2.     The List of Federally Recognized Indian Tribe

In 1994, Congress enacted the Federally Recognized Indian Tribe List Act , Pub.L. No. 103-454, 108 Stat. 4791 (1994), which requires the Secretary of the Interior to keep a list of all federally recognized tribes, which "should reflect all of the federally recognized Indian tribes in the United States which are eligible for the special programs and services provided by the United States to Indians because of their status as Indians." Pub.L. No. 103-454, § 103. That statute, codified as 25 U.S.C. § 479a, defines the term "tribe" as "any Indian or Alaska Native tribe, band, nation, pueblo, village or community that the Secretary of the Interior acknowledges to exist as an Indian tribe." 25 U.S.C. § 479a(2).

The Federally Recognized Indian Tribe List Act of 1994 provides Indian tribes may be recognized by alternative means: (1) an "Act of Congress;" (2) "the administrative procedures set forth in part 83 of the Code of Federal Regulations[;]" or (3) "a decision of a United States court." Pub.L. No. 103-454, § 103(3), 108 Stat. 4791; *see also United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 547-48 (10th Cir.2001) (citing 25 U.S.C. 479a). A recognized tribe is placed on the DOI's "list of recognized tribes" ("The List"). 25 U.S.C. §§ 479a(3), 479a-1; 25 C.F.R. § 83.5(a).

The 1994 revised regulations, establish modified criteria for petitioning tribes that can provide substantial evidence of "[u]nambiguous previous [f]ederal acknowledgment." 25 C.F.R. § 83.8(a). Under the modified criteria, a previously acknowledged tribe needs only demonstrate, inter alia, (1) that it has been identified as an American Indian entity on a substantially continuous basis "since the point of [its] last [f]ederal acknowledgment," 25 C.F.R. § 83.8(d)(1); (2) that "it comprises a distinct community at present," 25 C.F.R. § 83.8(d)(2); and (3) that "political influence or authority is exercised within the

---

[13] A tribal group seeking federal recognition must satisfy seven mandatory criteria: (a) the group has been identified as an American Indian entity on a substantially continuous basis since 1900; (b) a "predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present"; (c) the petitioning group "has maintained political influence or authority over its members as an autonomous entity from historical times until the present"; (d) a copy of the group's present governing document must be submitted, including its membership criteria; (e) the petitioning group's "membership consists of individuals who descend from a historical Indian tribe or from historical Indian tribes which combined and functioned as a single autonomous political entity"; (f) the group's membership is composed principally of persons who are not members of any already-acknowledged North American Indian tribe; and (g) neither the petitioning group nor its members are the subject of congressional legislation that has expressly precluded their relationship with the federal government. 25 C.F.R. § 83.7.

group ... from the point of [its] last [f]ederal acknowledgment to the present," 25 C.F.R. § 83.8(d)(3).

###    3.    Plaintiffs' Claims Against Salazar

Plaintiffs seek relief against Salazar in the Fourth through Seventh Claims for Relief.  The allegations and relief are summarized as follows.  Each of plaintiffs' claims against Salazar are predicated upon the failure of the DOI to recognize and/or "list" the Kawaiisu as a recognized Indian tribe.

In the Fourth Claim for Relief, Plaintiffs allege that Salazar is on notice that the Kawaiisu have been wrongly omitted from the list of tribal entities.  (Doc. 211, TAC ¶ 341, 356.)  Plaintiffs allege that they are not required to exhaust administrative remedies because of the ineffectual administrative process.

In the Fifth Claim for Relief, Plaintiffs allege that defendant Salazar breached his fiduciary duty to plaintiffs.  The breach occurred because pursuant to the Treaty with the Utah, plaintiffs' lands, graves, and way of life were to be protected against any "cases of aggression."  Plaintiffs allege their lands and way of life has been endangered by the Tejon Defendants development and digging of the lands.

> "By failing to take any action to address the situation and ensure that Plaintiffs are treated humanely, including protecting the graves of their ancestors and other cultural items, the Department of the Interior has breached its fiduciary duty owed to Plaintiffs."  (Doc. 211, TAC ¶379.)

In the Sixth Claim for Relief, Plaintiffs allege Denial of Equal Protection.  Plaintiff allege that in 2009, Salazar added a different Tribe's name, the "Tejon Indian Tribe" to the list of Federally recognized tribes, but failed to add the Kawaiisu to the List.  Plaintiff allege that in 2012, they sent a letter to requesting being added to the List, just as the Tejon Indian Tribe had been added.  (See Doc. 211, TAC ¶¶391-397.)

In the Seventh Claim for Relief, for "non-statutory- review," plaintiffs allege that the Kawaiisu are a federally recognized tribe which has been omitted from the List.  (Doc. 211, TAC ¶¶404, 405.)  Plaintiffs allege that the DOI/BIA has failed to respond to the Tribe's requests to protect their land and grave sites and  refuses to provide assistance.  Plaintiffs allege that by being left off the List of Federally Recognized Tribes, their rights under the 1994 List Act and 25 U.S.C. § 479a-1 (Publication of list of recognized tribes) have been violated.

**4.     Sovereign Immunity of the United States**

Salazar claims this Court lacks subject matter jurisdiction because Salazar has not waived sovereign immunity.

Generally, the United States and its agencies may not be sued in federal court unless Congress has waived sovereign immunity.  If Congress has not waived the federal government's immunity for a particular claim, courts lack jurisdiction over that claim and must dismiss it. *United States v. Dalm*, 494 U.S. 596, 608, 110 S.Ct. 1361 (1990).  "A mere assertion that jurisdictional statutes apply does not suffice to confer jurisdiction when, as in this case, the government did not waive its immunity." *Hughes v. United States*, 953 F.2d 531, 539 n. 5 (9th Cir.1992). Sections 1331, 1353, 1361, and 1362 of Title 28 do not contain waivers of sovereign immunity. See 28 U. S. C. § 1353.  Sections  28 U.S.C. §§ 1331 and 1337 are statutes of general jurisdiction, but they do not waive the United States' sovereign immunity.  Any waiver "must be construed strictly in favor of the sovereign" and "not enlarged beyond what the language requires."  *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992).

       **a.**     *The APA and Waiver of Sovereign Immunity for Constitutional Challenges*

The Administrative Procedures Act ("APA") generally waives the Federal Government's immunity from a suit "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." 5 U.S.C. § 702.

Right to review of agency action:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party." 5 U.S.C. § 702.

"Agency action" under the APA is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

The government concedes that the APA provides a waiver of sovereign immunity in suits seeking judicial review of a federal agency action. *Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198

(9th Cir.1998). Salazar argues that the APA does not provide a waiver of sovereign immunity for plaintiffs' claims because the claims are not constitutional claims, and are within the administrative process, where no final agency action has occurred and the Kawaiisu have abandoned the administrative process.

Plaintiffs argue that they allege constitutional challenges to Salazar's non-action and failure to place the Kawaiisu on the List. They argue that their constitutional challenges permit suit against the United States, relying on *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525–26 (9th Cir.1989).

In *The Presbyterian Church v. United States*, the court held that constitutional challenges to unlawful agency action fell within the section 702 waiver of immunity. The plaintiffs in Presbyterian Church alleged that their First and Fourth Amendment rights were violated when employees of various federal agencies surreptitiously recorded church services. The court rejected the government's argument that section 702 waives immunity only for challenges involving "agency action" as that term is used in section 704. The court found that sovereign immunity was waived for the constitutional challenges raised in the case. The court pointed to the legislative history, which refers to waiving sovereign immunity in all equitable actions against the government, and it noted that the second sentence in section 702 is not, by its terms, limited to cases involving "agency action." Accordingly, the court concluded that the waiver of sovereign immunity in section 702 encompasses constitutional challenges, and is not limited to claims challenging conduct that constitutes "agency action." *Id.* at 525.

Here, however, plaintiffs' claims are not constitutional challenges. While the claims for relief are denominated "Fifth Amendment," "Equal Protection" and "non-statutory review," the gravamen of the claims challenge Salazar's non-action or failure to act in accordances with his administrative duties. Plaintiffs allege that the wrongful act was failure to place the Kawaiisu on the List of Federally Recognized tribes or to otherwise protect the Tribe's rights in land. Plaintiffs have not cited to any authority that they have a constitutional right to be placed on the List. Their claims are not constitutional claims, but are issues within the realm of the DOI administrative duties of defendant Salazar.

**b.**   *Ex Parte Young does not Waive Immunity*

Indeed, plaintiffs specifically argue they have not sought relief under the Administrative

Procedures Act and proceed against DOI officials for injunctive relieve under *Ex Parte Young*, 209 U.S. 123, 158 (1908). (Doc. 235, Opposition p.4.)

The *Ex Parte Young* doctrine provides that suits against state officials to enjoin them from continuing to enforce allegedly unconstitutional state laws are not deemed against the state, and hence are not barred by the 11th Amendment. It is immaterial that the state is the real party in interest in such cases. *Ex Parte Young*, 209 U.S. 123, 166, 28 S.Ct. 441, 456 (1908) (state's attorney general enjoined from enforcing unconstitutional state rate-setting scheme for railroad companies). "The *Ex parte Young* fiction remains the basis for prospective relief against state officers." *See E.E.O.C. v. Peabody Western Coal Co.*, 610 F.3d 1070 (9th Cir. 2010), *cert. denied*, 132 S.Ct 91 (2011). The Ninth Circuit noted that, "For a number of years, prospective relief against federal officials was available under the fiction of Ex parte Young." *E.E.O.C. v. Peabody*, 610 F.3d at 1084. "However, since 1976 federal courts have looked to § 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, to serve the purposes of the *Ex parte Young* fiction in suits against federal officers." *E.E.O.C. v. Peabody*, 610 F.3d at 1084; *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525-26 (9th Cir.1989) (after § 702 was amended in 1976, it replaced the *Ex parte Young* fiction). Thus, the APA is the remedy for suits against federal officers for actions arising from their administrative duties. *Ex Parte Young* does not provide a basis for jurisdiction.

        **c.**    <u>*Ultra Vires* Doctrine is Inapplicable</u>

Plaintiffs contend that the DOI/BIA's actions in refusing to accord the Kawaiisu status as a recognized tribe and enter it on the List of Recognized Tribes is outside the limit of the DOI/BIA's authority imposed by the Federally Recognized Indian Tribe List Act of 1994, and is therefore *ultra vires*. Plaintiffs allege that Salazar, by doing so, was acting unconstitutionally by not putting the Kawaiisu on the List.

The mere allegation that the official acted wrongfully "does not establish that the officer, in committing that wrong, is not exercising the powers delegated to him by the sovereign." *United Tribe of Shawnee Indians v. U.S.*, 253 F.3d 543, 548 -549 (10th Cir 2001). The *ultra vires* doctrine is grounded on "the officer's lack of delegated power." An officer acts *ultra vires* when the officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign

has forbidden.  "A claim of error in the exercise of that power is therefore not sufficient." *Larson v. Domestic &Foreign Commerce Corp.*, 337 U.S. 682, 690, 69 S.Ct. 1457 (1949) (The claim may be made only against the official and not against the United States, as the official was acting individually and not in his capacity as a government agent).

The claims at issue here - not placing Kawaiisu on the List and placing the "Tejon Indians" on the List - are not claims that Salazar, an official of the United States, has acted or failed to act in excess of his statutory authority. *Dalton v. Specter*, 511 U.S. 462, 472, 114 S.Ct. 1719 (1994) (Executive actions in excess of statutory authority are not *ispo facto* unconstitutional).  Salazar is empowered by the United States to administer and resolve tribal status.  A typical power would encompass "putting on" and "leaving off" tribes from the List, and resolving conflicts between similar groups, pursuant to delegation of power and regulatory authority.  Salazar's act within the realm of delegated authority is not a "constitutional" claim subject to the *ultra vires* doctrine.

### 5.    The Political Question Doctrine

Salazar argues that federal recognition of an Indian tribe is committed to the Executive and presents a non-judiciable political question.  Salazar argues there must "first be determination as to whether the Kawaiisu, as Plaintiffs claim, [are]the present-day continuation of a historical treaty tribe." (Doc. 238, Reply p.5.)  "The relief Plaintiffs seek first request a declaration concerning the nature of their relationship between the Kawaiisu and the Federal Government and of any obligations the government has to the Kawaiisu." *Id.*

Plaintiffs argue that the Political Question doctrine does not bar plaintiffs' suit because: "(1) the Plaintiffs have arguably not been acknowledged as an Indian tribe by any political branch (executive or congressional) and (2) in the absence of such political acknowledgment, Courts can recognize tribes. Plaintiffs allege that they were recognized as an Indian Tribe by the 59th Congress." (Doc. 235, Opposition p. 10.)

The Ninth Circuit has observed that the political question inquiry "proceeds from the age-old observation of Chief Justice Marshall that "questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Alperin v. Vatican Bank*, 410 F.3d 532, 544 (9th Cir.2005) (quoting *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 170,

2 L.Ed. 60 (1803)), *cert. denied*, 546 U.S. 1137 (2006).  The nonjusticiability of a political question is primarily a function of the separation of powers."  *Baker v. Carr*, 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).[14]  The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986).

Article I, Section 8, Clause 3 of the U.S. Constitution commits to Congress issues involving Indian affairs: "The Congress shall have Power ... To regulate Commerce ... with the Indian Tribes." "Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights." *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998). Pursuant to its plenary power rooted in the Indian Commerce Clause, among other sources, "Congress has the power, both directly and by delegation to the President, to establish the criteria for recognizing a tribe." *Miami Nation v. United States Dep't of Interior*, 255 F.3d 342, 345 (7th Cir.2001); accord *Samish Indian Nation v. U.S.,* 419 F.3d 1355, 1374 (Fed. Cir. 2005) (federal acknowledgment has been committed to the coordinate branches).  Governmental actions that exceed Congress's authority over the Indians—as opposed to discretionary actions executed within that authority—may present justiciable questions: "[The courts] will not stand impotent before an obvious instance of a manifestly unauthorized exercise of power." *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. at 710.  The *Baker* Court also noted that "there is no blanket rule" of nonjusticiability in cases involving the status of Indian tribes.

---

[14] Courts considering the political question doctrine begin with the Supreme Court's elaboration of the appropriate analysis in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), where the Court described the doctrine as a function of the separation of powers, and set forth six factors that require the dismissal of a suit under the political question doctrine if any one of them is "inextricable from the case at bar." 369 U.S. at 217, 82 S.Ct. 691. An issue is a nonjusticiable political question when one of the following circumstances is present:

> "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

*Baker*, 369 U.S. at 217, 82 S.Ct. at 710.

*Baker*, 369 U.S. at 215, 82 S.Ct. at 709.

Nonetheless, judicial deference to the Legislative and Executive branches concerning the recognition of Indian tribes is a policy of long standing:

> In reference to all matters of this kind, it is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty it is to determine such affairs. If by them those Indians are recognized as a tribe, this court must do the same.

*United States v. Holliday*, 70 U.S. 407, 419, 18 L.Ed. 182 (1866); *see also United States v. Sandoval*, 231 U.S. 28, 46, 34 S.Ct. 1, 5, 58 L.Ed. 107 (1913) ("in respect of distinctly Indian communities the questions whether, to what extent, and for what time they shall be recognized and dealt with as dependent tribes requiring the guardianship and protection of the United States are to be determined by Congress, and not by the courts.")

Certain circumstances do not present political questions regarding Indian rights. For instance, in *Arakaki v. Lingle*, 477 F.3d 1048, 1067-68 (2007), the Ninth Circuit held that the political question doctrine did not bar the court from determining the equal protection rights of a tribe not recognized by Congress. In *Arakaki*, Citizens of Hawa'i sued the United States, and state officials, alleging that various state programs gave preferential treatment to persons of Hawaiian ancestry in violation of equal protection principles and the terms of public lands trust. The court held the claim judicable because tribal status was not at issue.

> "Nothing in the claims Plaintiffs have asserted or the remedy they seek invites the district court to exercise powers reserved to Congress or to the President. The district court has not been asked to declare tribal status where Congress has declined. Instead, it is asked to interpret the implications of past congressional action or inaction for equal protection analysis.

*Arakaki v. Lingle,* 477 F.3d at 1068. The significant language to the case at hand is that "[t]he district court has not been asked to declare tribal status where Congress has declined." *Id.* at 1068. As it pertained to tribal status, the Court stated that "no party seeks to compel Congress to recognize the tribal status of Hawaiians." *Id.*

Here, contrary to *Arakaki*, the plaintiffs ask this Court to determine their tribal status, if not explicitly, certainly implicitly. Plaintiffs ask the Court to determine that they are the present day embodiment of an ancient tribe and to compel Salazar to place the Kawaiisu on the List of Federally

Recognized Tribes, as a recognized tribe.  This determination of tribal status is within the authority vested in Congress, as delegated to the Executive.

Plaintiffs cite *Mishewal Wappo Tribe of Alexander Valley v. Salazar*, 2011 WL 5038356 (N.D.Cal. 2011) in support of their proposition that no nonjudicial political question exists.  In *Mishewal Wappo*, Sonoma County sought to intervene in an action against the U.S. Government by an Indian tribe which sought to compel lands, within Sonoma County, to be taken into trust.  The tribe alleged that it had been wrongfully terminated from recognition.  Plaintiffs alleged that it was a group the federal government began to officially recognize as an Indian tribe in 1851 and for whose benefit the government held acres of land.  Sonoma County argued that whether the tribe was in fact a "tribe" for recognition was a non-judicable political question.  The court disagreed.  The court noted the distinction that the Tribe was not seeking federal recognition in the first instance pursuant 25 C.F.R. § 83.  To the contrary, the Tribe contended it never ceased to exist due to a failure to observe termination procedures and sought relief under the APA. The court held that "[t]hat distinct issue may be properly raised before the court."  *Mishewal Wappo*, 2011 WL 5038356, 7.

In the current case, the gravamen of plaintiffs' due process and equal protection claims is that Salazar's failed to include the Kawaiisu on the List, and thus grant them federal acknowledgment, as a previously recognized tribe.[15]  However, whether the Kawaiisu are entitled to such acknowledgment is a non-justiciable political question and thus beyond the purview of the court. While plaintiffs argue that they do not seek federal recognition through this litigation, their claims necessarily require the court place the Kawaiisu on the List and thus to inject the Court in processes expressly left to the province of the Executive, as delegated by Congress.  This Court's determination of whether the Kawaiisu are the present day embodiment of the alleged historical tribe, would infringe upon the role committed to the other two branches and violate separation of powers.[16]

---

[15] Plaintiffs' claim that the DOI recognized an additional tribe as "Tejon Indians" does not raise an equal protection claim.  The crux of this claim, like all others, is that the DOI has not recognized the Kawaiisu, yet recognized another tribe. "Recognition" is what is challenged.  Here, the proper resolution of the claim is to proceed first through the administrative process because recognition is the issue.  Recognition requires the DOI's special expertise to determine tribal status.

[16] Even if plaintiffs' claims were limited to review of Salazar's actions of leaving Kawaiisu off the List, as was the APA claim in *Mishewal Wappo*, the plaintiffs' claim would be dismissed for failure to exhaust administrative remedies because those remedies have not been exhausted, as discussed *infra*.

1   The Court's research located a case, not cited by the parties, but which bears mentioning. In

2   *Oneida Indian Nation, Oneida Indian Nation of New York v. State of N.Y.*, 691 F.2d 1070, 1081 (2nd Cir.

3   1982), successors in interest of Oneida Indians who entered into two treaties with state of New York

4   ceding some 6,000,000 acres of land brought action to invalidate the treaties which conveyed land. The

5   court held that the land claim was judicable.

6   > Indian land claims have traditionally been asserted in the courts of this country for
> resolution. Suits against the United States for money damages, formerly brought before
7   > the Indian Claims Commission, 25 U.S.C. §§ 70 et seq., have been transferred to the
> Court of Claims, 25 U.S.C. §§ 70v et seq., and suits by the tribes or in their behalf by the
8   > United States may be brought in federal court pursuant to 28 U.S.C. § 1362. To our
> knowledge no Indian land claim has ever been dismissed on nonjusticiability grounds,
9   > even though many recent claims assert the possessory rights of Indian tribes to millions
> of acres of Eastern lands purportedly ceded nearly two hundred years ago. While
10  > legislative solutions are often more desirable and appropriate, it is equally well
> recognized that absent such alternative resolution a judicial forum is an appropriate
11  > avenue for obtaining relief.

12  *Oneida Indian Nation of New York v. State of N.Y.*, 691 F.2d 1070, 1081 (2nd Cir. 1982) (citations

13  omitted).

14  The Court finds that *Oneida* is distinguishable from the facts of the instant case. The key

15  distinction is that the land claims may be judiciable, but that the tribal status is not. Here, it is hotly

16  disputed whether the Kawaiisu is a "tribe."  It is also disputed that the Kawaiisu has any tribal status or

17  recognition.  Tribal status in *Oneida* was not at issue.

18  Kawaiisu argue that they are federally recognized by the Treaty with the Utah, and thus a

19  sovereign to sovereign relationship exists.  Nonetheless, it is undisputed that the Kawaiisu has never

20  been recognized under the DOI/BIA's acknowledgment regulations.  Under the acknowledgment

21  regulations, the executive-not the courts-must make the recognition determination.  *Samish Indian*

22  *Nation v. U.S.*, 419 F.3d 1355, 1373 (Fed Cir. 2005) ("The political determination may be circumscribed

23  by regulation, but it is still a political act."); *See Miami Nation*, 255 F.3d at 348 ("By promulgating such

24  regulations the executive brings the tribal recognition process within the scope of the Administrative

25  Procedure Act.").

26  **6.    Exhaustion of Administrative Remedies before the BIA**

27  Salazar argues that plaintiffs' failure to exhaust administrative remedies precludes the district

28  court from entertaining plaintiffs' action. See 5 U.S.C. §§702, 704, 706. Salazar argues that the political

question doctrine precludes jurisdiction to review a claim for Federal recognition and placement on the list of federally recognized tribes in the absence of exhaustion of administrative remedies. Salazar argues that "treaty and aboriginal rights are tribal rights, but there is no presumption of continuous tribal existence and ancestry alone is not enough to establish continuous existence as a tribe." (Doc. 223, p. 9.)

The exhaustion doctrine is grounded in deference to Congress' delegation of authority to coordinate branches of Government, that agencies, not the courts, have the primary responsibility for the programs that Congress has charged them to administer. Exhaustion applies with particular force when the action involves agency proceedings which require the agency to apply its special expertise. *United Tribe of Shawnee Indians v. U.S.*, 253 F.3d 543, 550 (10th Cir. 2001), citing *McCarthy v. Madigan*, 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992).

Where tribal status is at issue, the issue requires exhaustion of administrative remedies. In *Shinnecock Indian Nation v. Kempthorne*, 2008 WL 4455599 (E.D.N.Y. 2008), an Indian "Nation" sought to compel placement on the List for the BIA refusing to acknowledge that the Nation is an Indian tribe and refusal to fulfill its trust obligation regarding the Nation's land claim. The Nation had alleged that it had been acknowledged as an Indian tribe through historical reports and legislation. *Id.* at *1. The Court dismissed the claims as a matter of law as a nonjudiciable political question and required exhaustion:

> "The issue of federal recognition of an Indian tribe is a quintessential political question that, in the first instance, must be left to the political branches of government and not the courts. . . . Although the Nation asserts that Congress recognized it as a Tribe and established a government-to-government relationship in legislation over fifty years ago, that legislation did no such thing. Similarly, although the Nation points to evidence that it was recognized at some point in the past by the Department of the Interior as an Indian Tribe, it is undisputed that Interior does not currently recognize a government-to-government relationship with the Nation and that its petition is still pending with Interior. Therefore, it is not the role of the court to usurp the constitutionally-protected province of the politically-elected branches of government by attempting to address the merits of the recognition issue before the Secretary of the Interior has acted."

Exhaustion is required when, as here, a plaintiff attempts to bypass the regulatory framework for establishing that an Indian group exists as an Indian tribe. In *United Tribe of Shawnee Indians v. U.S.*,

253 F.3d 543 (10th Cir. 2001), an Indian tribe sought declaratory relief that it is a recognized tribe by virtue of being a signatory to a Treaty.  The court dismissed for lack of jurisdiction, holding that the only basis for a waiver of defendants' sovereign immunity was provided by the Administrative Procedure Act, and that plaintiffs' claims were not ripe for review under the APA because no final agency action had been taken.  The court affirmed the dismissal that the Indian tribe was not permitted to proceed on its theory that it was "previously recognized" in a Treaty.  "Determining whether a group of Indians exists as a tribe is a matter requiring the specialized agency expertise . . . Moreover, the judicial relief [plaintiff] requests would frustrate Congress' intent that recognized status be determined through the administrative process. Finally, exhaustion 'may produce a useful record for subsequent judicial consideration, especially in a complex or technically factual context.'"  *Tribe of Shawnee Indians*, 253 F.3d at 550. The court affirmed a dismissal for lack of subject matter jurisdiction for failure to exhaust administrative remedies where a purported tribe, claiming historical recognition, had not exhausted remedies with DOI.

Likewise, in *James v. United States Dep't of Health & Human Services*, 824 F.2d 1132 (D.C.Cir.1987), the court held federal recognition is subject to the administrative process. *James* involved an intra-tribal rivalry between two factions of the Gay Head Indians of Martha's Vineyard, Massachusetts, which had not been recognized as a tribe when the acknowledgment regulations were first promulgated. One faction, the Widdis group, followed the acknowledgment procedures, filed a petition with the Department of Interior, and was recognized. The other faction, the James group, contended that they had been recognized at least since the Nineteenth Century and therefore sought a court order placing the tribe on the Department of Interior's list of recognized tribes. The court declined to decide whether the evidence of historical recognition presented by the James group supported their claim, reasoning that Congress has specifically authorized the Executive Branch to decide issues of tribal recognition, and that the DOI has developed procedures for the determination of tribal status. "That purpose would be frustrated if the Judicial Branch made initial determinations of whether groups have been recognized previously or whether conditions for recognition currently exist." *Id.* at 1137.  The *James* court affirmed the dismissal of plaintiff's complaint for failure to exhaust administrative remedies and held that "the determination of whether ... [plaintiffs] were federally recognized in the middle of the

nineteenth century, or whether other factors support federal recognition, should be made in the first instance by the Department of Interior ...." *Id.*

Similarly, in *Burt Lake Band of Ottawa and Chippewa Indians v. Norton*, 217 F.Supp.2d 76, 79 (D.D.C. 2002), an Indian tribe sought an injunction to direct the Department of the Interior to place the tribe on the list of recognized tribes. Defendant DOI moved to dismiss for lack of subject matter jurisdiction for failure to exhaust administrative remedies. Plaintiff argued that it was not required to exhaust because it had "been recognized by the federal government in two treaties" entered into with the United States. The court dismissed the complaint for plaintiff's failure to complete the recognition process before bringing suit in District Court. *Id.* at 79. "As *James* and *Shawnee* demonstrate, historical recognition by the Executive Branch does not allow a defendant to bypass BIA, even if the recognition occurred in a treaty. The fact that BIA's regulations include separate fast tracking provisions for groups claiming prior federal recognition makes all the more evident that federal recognition does not allow an entity to completely bypass the BIA's recognition process." *Burt Lake Band*, 217 F.Supp.2d at 79. Thus, even though a tribe may claim it has been recognized in a Treaty, the tribe must exhaust remedies through the DOI.

Here, the Kawaiisu state that they are not seeking "recognition." Plaintiffs allege that they are not seeking recognition because they have recognition under the Treaty with the Utah and state they have no petition pending with the BIA. (TAC 275.

Like the tribes in *Shinnecock*, *Shawnees* and *Burt Lake Band of Ottawa,* the Kawaiisu claim historical recognition. Plaintiffs allege that the DOI/BIA does not recognize the Kawaiisu as the present day embodiment of the historical tribe. Historical recognition does not excuse exhaustion of administrative remedies through the DOI. The pleadings demonstrate that a petition, by some faction of the Kawaiisu, was filed and was pending with the DOI. Plaintiffs ask this Court, in substance, to compel Salazar, an official agent of the United States, to place the Kawaiisu on the List of Recognized Tribes and to protect the Kawaiisu's land rights. Plaintiffs first must obtain recognition through the administrative process.

Plaintiffs argue that if the Court finds they are obligated to exhaust administrative remedies, they are excused from exhausting administrative remedies before the DOI. Plaintiffs allege futility because

the Tejon defendants have already been destroying Plaintiffs' sacred burial sites and heritage since 2001, inadequacy of the administrative remedies due to length of time for exhaustion, and futility of exhaustion of administrative because DOI's refusal to act and recognition alone will not immediately stop that destruction.  (Doc. 235, Opposition p.15.)

Exhaustion of administrative remedies is not required if there is nothing in the administrative process that would provide for the relief sought. An administrative agency's failure to act, if "unreasonably prolonged," may give rise to federal court jurisdiction even in the absence of final agency action. *Rabkin v. Bowles*, 143 F.2d 600, 601 (9th Cir.1944); *see also United States v. Smith*, 254 F.2d 930, 933 n. 4 (9th Cir.1958); 5 U.S.C. § 706 (providing federal courts with authority to "compel agency action unlawfully withheld or unreasonably delayed").  Whether exhaustion of remedies would be "futile" means whether "nothing could be gained from permitting further administrative proceedings." *Anderson v. Babbitt*, 230 F.3d 1158, 1164 (9th Cir. 2000).  "The purpose of the exhaustion rule is to permit agencies to exercise discretion and apply their expertise, to allow the complete development of the record before judicial review, to prevent parties from circumventing the procedures established by Congress, and to avoid unnecessary judicial decisions by giving the agency an opportunity to correct errors." *Urban by Urban v. Jefferson County School Dist. R–1*, 89 F.3d 720, 724 (10th Cir.1996). Exhaustion is not required "when administrative remedies would be futile, when they would fail to provide relief, or when 'an agency has adopted a policy or pursued a practice of generally applicability that is contrary to law.' " Id.

A court's review of an agency's failure to act has been referred to as an exception to the final agency action requirement. *See Independence Mining Co., Inc. v. Babbitt*, 105 F.3d 502, 511 (9th Cir.1997); *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C.Cir.1987). "When agency recalcitrance is in the face of clear statutory duty or is of such a magnitude that it amounts to an abdication of statutory responsibility, the court has the power to order the agency to carry out its substantive statutory mandates." *ONRC Action v. Bureau of Land Management* , 150 F.3d 1132, 1137 (9th Cir. 1998); see also 5 U.S.C. § 551(13) (defining agency action as also including the failure to act); 5 U.S.C. § 706(1) (requiring the reviewing court to "compel agency action unlawfully withheld or unreasonably delayed"); *Marathon Oil Co. v. Lujan*, 937 F.2d 498, 500 (10th Cir.1991) (holding that "[a]dministrative agencies

do not possess the discretion to avoid discharging the duties that Congress intended them to perform");

Here, plaintiffs fail to allege that they have submitted any petition to BIA for recognition.[17]  In fact, plaintiffs allege that they have not submitted a petition. Absent any allegation that a petition has been submitted on plaintiffs' behalf, no plausible claim excusing exhaustion can be stated because the administrative process has not been attempted.   Indeed, the requirement to pursue administrative remedies would be a nullity if this court were to hold that **no petition at all** demonstrates futility.  See generally *Sapp v. Kimbrell*, 623 F.3d 813, 823–24 (9th Cir. 2010) (to fall within the futility exception to the administrative exhaustion requirement the inmate must, inter alia, "establish that he actually filed a grievance or grievances"); *Joint Bd. of Control of Flathead, Mission and Jocko Irr. Districts v. U.S.*, 862 F.2d 195, 200 (9th Cir. 1988) (the futility exception to the exhaustion requirement should not be applied where the agency has not had an opportunity to develop a record: The purposes underlying the exhaustion doctrine include the opportunity for the agency to exercise its discretion and expertise and the opportunity to make a record for the district court to review); *Anderson v. Babbitt*, 230 F.3d 1158, 1164 (9th Cir. 2000) (district court may not deem "[a]dministrative review ... futile if the plaintiff's allegations of bias are purely speculative.") Allegations of a generalized "breakdown" in the administrative process does not excuse exhaustion of administrative remedies.

### 7.   Non-Delegation of Congressional Authority

Plaintiffs allege that they are not required to exhaust administrative remedies with the DOI because Congress' delegation of authority to the Executive to acknowledges tribes violates the "non-delegation doctrine."  Plaintiff alleges that delegation of Congressional power to the Executive to determine tribal status and recognition is unconstitutional as violative of the non-delegation doctrine. Plaintiff alleges that the DOI has been given no such clear guidelines to follow and no schedule or deadline for making determinations of tribal status. (Doc. 235, Opposition p. 19.) Plaintiff argues that "the Secretary lacks carte blanche to issue regulations pursuant to a generalized grant of authority outside of preexisting statutorily defined rights." (Doc. 235, Opposition p.20.)

---

[17]  The Court notes that the prior versions of the complaint stated that a petition had been filed.  This complaint version states that a petition with the BIA has not been filed, but some faction of the Kawaiisu has submitted a petition for recognition.  See footnote, *supra*.

The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const., Art. I, § 1. From this language and principles of separation of powers, the Supreme Court has announced a nondelegation principle: "Congress may not constitutionally delegate its legislative power to another branch of Government." *Touby v. United States*, 500 U.S. 160, 165, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991). Accordingly, when "Congress confers authority upon agencies Congress must 'lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform.' " *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624 (1928)).

Pursuant to Congress' plenary power, Const., Art. I, § 8, cl. 3. "Congress has the power, both directly and by delegation to the President, to establish the criteria for recognizing a tribe." *Miami Nation v. United States Dep't of Interior*, 255 F.3d 342, 345 (7th Cir.2001), *cert. denied*, 534 U.S. 1129 (2002); *accord Kahawaiolaa v. Norton*, 386 F.3d at 1273 (noting Congress has plenary authority, and the executive has broad delegation, over Indian affairs). 25 U.S.C. § 2 provides:

> The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations.

25 U.S.C. § 9 provides:

> The President may prescribe such regulations as he may think fit for carrying into effect the various provisions of any act relating to Indian affairs, and for the settlement of the accounts of Indian affairs.

These statutes, enacted in 1832, provide the framework for comprehensive oversight of Indian affairs and have done so for nearly two centuries. The delegation of authority to the Executive and to the Department of Interior, specifically, have been interpreted by judicial opinion for centuries. Ever since these statutes were enacted in the 1830's, they have served as the source of DOI's plenary administrative authority in discharging the federal government's obligations to Indians. *U.S. v. Eberhardt*, 789 F.2d 1354, 1359-1360 (9th Cir. 1986) (We conclude that these statutory provisions give Interior sufficient authority to promulgate the Indian fishing regulations at issue here and consequently, we reject appellees' argument that the regulations are invalid in the absence of specific legislation giving Interior authority to regulate Indian fishing). In *Miami Nation of Indians of Indiana, Inc. v. U.S. Dept. of the Interior*, 255

F.3d 342, 347-48 (7th Cir. 2001), the Court upheld the DOI regulations against a challenge that the regulations are "invalid because not authorized by Congress." Other courts have upheld the DOI's authority to recognize tribes. *See*, *e.g.*, *W. Shoshone Bus. Council v. Babbitt*, 1 F.3d 1052, 1056–57 (10th Cir.1993) (relying on Department tribal recognition regulations to hold tribe's absence from Department's list was dispositive); *James v. U.S. Dep't of Health & Human Servs.*, 824 F.2d 1132, 1138 (D.C.Cir.1987) ("Congress has specifically authorized the Executive Branch to prescribe regulations concerning Indian affairs and relations. Regulations establishing procedures for federal recognition of Indian tribes certainly come within the area of Indian affairs and relations.").

In charging the DOI with broad responsibility for welfare of Indian tribes, Congress must be assumed to have given him reasonable powers to discharge it effectively. *Udall v. Littell*, 366 F.2d 668 (C.A.D.C.1966), *cert. denied*, 87 S.Ct. 713, 385 U.S. 1007, 17 L.Ed.2d 545, *rehearing denied*, 87 S.Ct. 952, 386 U.S. 939 (1967). The rules and regulations of the DOI, promulgated under the authority of law, have the force and effect of statutes, of which the court will take judicial notice. *Bridgeman v. U.S.*, 140 F. 577, 72 C.C.A. 145 (9th Cir. 1905).

Plaintiffs cites *Organized Village of Kake v. Eagan*, 369 U.S. 60, 63, 82 S.Ct. 562 (1962) for the unremarkable proposition that "25 U. S. C. sections 2 and 9 do not empower issuance of regulations without a statutory antecedent." (Doc. 235, Opposition p. 19-20.)

This Court does not find that delegation to the DOI to determine tribal recognition violates the non-delegation doctrine. Plaintiffs' citations to generalized legal authorities are inapplicable in light of the vast statutory authority before this Court and including centuries of history and judicial opinions adjudicating and upholding the DOI regulations. Plaintiffs generalities do not demonstrate that Congress' delegation to the Executive, and thereby, the promulgation of regulations by DOI, violate the non-delegation doctrine.

### 8.    Statute of Limitations

Defendant Salazar argues that plaintiffs' Fourth Claim (due process), Fifth Claim (breach of fiduciary duty), and Seventh claim (violation of the List Act), are each barred by the statute of limitations in 28 U.S.C. § 2401(a). Salazar argues the crux of Plaintiffs' claims is that they have not been included on the List of Federally Recognized Tribes, a fact of which they have had at least constructive notice

since 1979.  The List published in 1979 did not include the Kawaiisu, and none of the lists that have been published since then have included the tribe.

Plaintiffs argue that the continuing violations doctrine freezes that statute of limitations.  (Doc. 235, Opposition p.20-21.)  Plaintiff acknowledges that the "the exclusion from the list of recognized tribes occurred decades ago, but the harm and damage tying Plaintiffs' hands and preventing them from stopping the desecration of their rights only started recently and continues." (Doc. 235, Opposition p. 21.) Plaintiff argues that their claims are brought within six years of "substantive challenge to an agency decision alleging lack of agency authority may be brought within 6 years of the agency's application of that decision to the specific challenger," citing *Wind River Mining Corp. v. United States,* 946 F.2d 710, 712-716 (1991).

Title 28, section 2401(a) provides in pertinent part, that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues;" 28 U.S.C. § 2501 provides, in pertinent part, that "every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." A cause "first accrues" when all events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to file an action. The moment at which a cause of action first accrues within the meaning of Section 2401(a) is when "the person challenging the agency action can institute and maintain a suit in court." *Muwekma Ohlone Tribe v. Salazar*, 813 F.Supp.2d 170, 190 -191 (D.D.C.,2011).

The Court finds it unnecessary to reach the issue of whether the statute of limitations has run. The Court expresses no opinion on this issue.

**D.     Deferral to the DOI**

Even if the Court had subject matter jurisdiction, even if the plaintiffs alleged a plausibly valid claim for land, and even if the Court found recognition judiciable, deferral to the DOI/BIA would be appropriate.  Plaintiffs allege land rights based upon aboriginal title, possibly, and fee title and based upon treaties from long ago.  They claim they are descendants of Indians to whom the United States made promises, created Reservations and infringed and reneged on treaty and statutory rights.  They claim land rights under a complex array of historical federal statutes, federal treaties and official and

unofficial communications.  The Tribe's genealogy is disperse, residing in vast locations from Utah to California, encompassing numerous tribal names and location changes and with possibly differing factions.  Deciding whether an Indian group is a tribe involves decisions of anthropological, political, geographical, and cultural considerations. These considerations are well within the expertise of the DOI.

While courts may make this determination, they are not required to do so.  Instead, under the doctrine of primary jurisdiction, courts may defer resolution of the issue to the DOI/BIA.  The doctrine of primary jurisdiction "applies where a claim is originally cognizable in the courts, but enforcement of the claim requires, or is materially aided by, the resolution of threshold issues, usually of a factual nature, which are placed within the special competence of the administrative body."  *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 59 (2d Cir.1994) (citations omitted).  In fact, given the complexity of the inquiry in this case and the potential for inconsistent adjudications, deference to the DOI/BIA is preferred.  The DOI/BIA is better qualified by virtue of its knowledge and experience to determine at the outset whether the Kawaiisu is the historical tribe it claims to be and whether it meets the criteria for tribal status. *New Jersey Sand Hill Band of Lenape & Cherokee Indians v. Corzine*, 2010 WL 2674565, 14 (D.N.J. 2010) ("This Court is ill-equipped to assess the anthropological, political, geographical, genealogical, and cultural minutiae necessary to determine whether the plaintiff Sand Hill Band qualifies as a tribe."). Even if this Court had jurisdiction and the plaintiffs stated a claim, the Court would defer to the DOI.

**E.      NAGPRA Claim Against Tejon Defendants**

Plaintiffs claim violation of the Native American Graves Protection and Repatriation Act.

The Native American Graves Protection and Repatriation Act ("NAGPRA"), 25 U.S.C. § 3001 et seq.,  provides for repatriation of "Native American human remains and associated funerary objects," "sacred objects," and "objects of cultural patrimony" found on federal or tribal lands after November 16, 1990. 25 U.S.C. § 3002(a)(1).  "Tribal lands" means all lands within the exterior boundaries of any Indian reservation or all dependent Indian communities.  25 U.S.C. §3001(15)(A).

Plaintiffs argue that the lands are currently "tribal lands" within the meaning of NAGPRA.  The statutory definition of "tribal lands" includes a reservation.  (Doc.233, Opposition p. 14.)  The TAC alleges that the land on which the graves and cultural items were excavated occurred on land that is

currently an Indian reservation (the Tejon/Sebastian Reservation).

NAGPRA, 25 U.S.C. § 3013, provides district courts with jurisdiction over "any action brought by any person alleging a violation of this chapter ...." [18] The Ninth Circuit has held that the "any person" language in § 3013 "may not be interpreted restrictively to mean only 'any American Indian person' or 'any Indian Tribe.' " *Bonnichsen v. United States*, 367 F.3d 864, 874 (9th Cir.2004). "The NAGPRA establishes rights of tribes and lineal descendants to obtain repatriation of human remains and cultural items from federal agencies and museums, and protects human remains and cultural items found in federal public lands and tribal lands." *Castro Romero v. Becken*, 256 F.3d 349, 354 (5th Cir. 2001).

This claims suffers from the same fatal factual deficiency as plaintiffs' other land claims.  As discussed above, plaintiffs cannot allege a claim to the Reservation or land claims arising from the Treaty with the Utah.  As plaintiffs cannot allege a land claim, this claim fails to state a claim for relief.

## F.    Claim against Kern

The third claim for relief is against the County of Kern for "Equitable Enforcement of Treaty."  Plaintiffs allege that the Tejon Defendants submitted development proposes for a project with "falls within the land to which plaintiffs claim as tribal land" pursuant to the Treaty with the Utah.  (TAC ¶ 307.)  Plaintiffs allege that the Environmental Impact Report shows as a "wanton disregard for the existence of cultural resources and sites that are sacred to the Tribe." (TAC ¶311.)  Plaintiffs allege that because Kern has approved the Mountain Village Project, the project will interfere with the Kawaiisu's possession and use of the land granted to them under the Treaty with the Utah and the County has authorized the exclusion of the Tribe from their land.  The Tribe seeks an injunction requiring the County to void, vacate and set aside their approval of the project, the official action taken approving the project and to suspend all activities on the project including issuing permits.

---

[18] § 3013, NAGPRA explicitly vests jurisdiction in federal courts:

> The United States district courts shall have jurisdiction over any action brought by any person alleging a violation of this chapter [NAGPRA] and shall have the authority to issue such orders as maybe necessary to enforce the provisions of this chapter.

25 U.S.C. § 3013 (1990).

Kern argues that this claim is nothing more than the CEQA claim that the Court previously dismissed. Kern notes that in a preceding state court action under CEQA, a state court judgment was entered and an appeal to the Fifth Circuit Court of Appeal affirmed the state court's decision approving the project under CEQA. (See Doc.219-2, Request for Judicial Notice.) The state court issued a judgment in favor of Kern on a CEQA challenge, which was affirmed on appeal.

In plaintiffs' prior complaint, plaintiffs alleged that Kern approved the development project without complying with California Environmental Quality Act ("CEQA"). Plaintiffs alleged they have significant interest in the environmental effects of the project and to the land on which the project is developed. Plaintiffs alleged that the project has "significant effect" requiring the preparation of an Environmental Impact Report ("EIR"). Plaintiffs alleged the previously prepared EIR is deficient in many respects, and that Kern's approval of the EIR was arbitrary and capricious.

In this Court's prior order, the Court dismissed the CEQA action. This Court held that the CEQA action was barred in federal court:

> "     Pursuant to the *Rooker-Feldman* doctrine Federal courts lack jurisdiction to review or modify state court judgments. *See Rooker v. Fidelity Trust Company*, 263 U.S. 413, 44 S.Ct. 149 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482, 103 S.Ct. 1303 (1983). The *Rooker-Feldman* doctrine is based on 28 U.S.C. § 1257 which grants the United States Supreme Court jurisdiction to review decisions of the highest state courts for compliance with the federal Constitution. *See Rooker*, 263 U.S. 413, 44 S.Ct. 149; *Feldman*, 460 U.S. at 482, 103 S.Ct. 1303. The doctrine provides that "lower federal courts do not have jurisdiction to review a case litigated and decided in state court; only the United States Supreme Court has jurisdiction to correct state court judgments." *Gottfried v. Medical Planning Services*, 142 F.3d 326, 330 (6th Cir.), *cert. denied,* 525 U.S. 1041 (1998). The *Rooker-Feldman* doctrine recognizes that federal district courts generally lack subject matter jurisdiction to review state court judgments. *See also Branson v. Nott*, 62 F.3d 287, 291 (9th Cir.1995) ("As courts of original jurisdiction, federal district courts have no authority to review the final determinations of a state court in judicial proceedings."), *cert. denied*, 561 U.S. 1009 (1995); *see also Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005) (*Rooker-Feldman* bars "state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced" from asking district courts to review and reject those judgments); *Doe & Assocs. Law Offices v. Napolitano*, 252 F.3d 1026, 1029 (9th Cir.2001) (applying *Rooker-Feldman* doctrine to interlocutory state court decisions). . . .
>
> "     A federal court lacks subject matter jurisdiction to review claims "inextricably intertwined" with final state court decisions, even if such

"inextricably intertwined" claims were not raised in state court. *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 483-487 and n. 16 (1983);*Olson Farms, Inc. v. Barbosa*, 134 F.3d 933, 937 (9th Cir. 1998); *See Bianchi v. Rylaarsdam*, 334 F.3d 895, 900 (9th Cir. 2003) ("Stated plainly, *Rooker-Feldman* bars any suit that seeks to disrupt or 'undo' a prior state-court judgment, of whether the state-court proceeding afforded the federal-court plaintiff a full and fair opportunity to litigate her claims.")." (Doc. 205, January 18, 2012 Order p. 37-38.)

In the TAC, plaintiffs seek "Equitable Enforcement of a Treaty." Plaintiffs argue that they are not seeking to invalidate the CEQA determination. They argue that the CEQA determination did not address to whom the land belonged or address the preservation of cultural heritage. Plaintiffs argue that their treaty claims are not inextricably intertwined with CEQA because the protection of tribal rights, human remains and ancestral artifacts would not conflict with environmental concerns. (Doc. 234, Opposition p.5.)

Regardless on the nomenclature used, Plaintiffs' claim is barred by the *Rooker Feldman* doctrine. The TAC seeks to undo the CEQA determinations and project approvals by Kern. Under *Rooker-Feldman*, the Court "must pay close attention to the relief sought by the federal-court plaintiff." *Bianchi v. Rylaarsdam*,  334 F.3d 895, 900 (9th Cir. 2003), *cert. denied*, 540 U.S. 1213 (2004).  If the redress that is sought by plaintiffs is to "undo" the prior state-court judgment, the relief is barred.

Here, plaintiffs seek to undo all Kern's approvals which were upheld by the trial and appellate courts.  The Tribe seeks relief in the form of an injunction requiring the County to void, vacate and set aside the approval of the project, and the official action taken approving the project and to suspend all activities on the project including issuing permits or other approvals, among other things. (TAC p. 123.) The Court cannot grant the relief plaintiffs seeks without "undoing" the decision of the state court and the appellate court.  The integrity of the judicial process depends on federal courts respecting final state court judgments and rebuffing de facto appeals of those judgments to federal court. *Bianchi*, 334 F.3d at 902; see *Reusser v. Wachovia Bank, N.A.*, 525 F.3d 855 (9th Cir. 2008) (the core inquiry is where the federal action is a de facto appeal from a final state court judgment).  The Tribe seeks injunctive relief that invalidates all aspects of the project as previously approved.  This relief is incompatible with the state court ruling.

**G.      Leave to Amend**

Generally, Rule 15(a) is very liberal and leave to amend "shall be freely given when justice so requires." *Amerisource Bergen Corp. v. Dialysis West, Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) (quoting Fed. R. Civ. P. 15(a)).  Here, however, plaintiffs have been granted four opportunities to amend the complaint to state a claim for relief for which this Court has jurisdiction.  Plaintiffs again have been unable to do so.

<u>**CONCLUSION**</u>

For all the foregoing reasons, the Court rules as follows:

1.      The motions by Defendants Tejon Mountain Village, LLC and Tejon Ranchcorp, County of Kern and Ken Salazar to dismiss the Third Amended Complaint for lack of subject matter jurisdiction are **GRANTED without leave to amend and with prejudice**.

2.      The motions by Defendants Tejon Mountain Village, LLC and Tejon Ranchcorp, County of Kern and Ken Salazar to dismiss the Third Amended Complaint for failure to state a claim are **GRANTED without leave to amend and with prejudice.**

3.      The Clerk of the Court is directed to close this action.

IT IS SO ORDERED.

Dated:   **August 6, 2012**              _____/s/ **Barbara A. McAuliffe**_____
                                                                   UNITED STATES MAGISTRATE JUDGE